1  MANATT, PHELPS & PHILLIPS, LLP
   MICHAEL M. BERGER, Bar No. 43228
2  EDWARD G. BURG, Bar No. 104258
   KISU LAM, Bar No. 181011
3  11355 West Olympic Boulevard
   Los Angeles, CA  90064-1614
4  Telephone:    (310) 312-4000
   Facsimile:    (310) 312-4224
5  Email:        mmberger@manatt.com
                 eburg@manatt.com
6                klam@manatt.com

7  COX, CASTLE & NICHOLSON LLP
   ANNE E. MUDGE, Bar No. 133940
8  555 Montgomery Street, Suite 1500
   San Francisco, CA  94111
9  Telephone:    (415) 392-4200
   Facsimile:    (415) 392-4250
10 Email:        amudge@coxcastle.com

11 Attorneys for Plaintiff

12

13                 UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15

16 JOYCE YAMAGIWA, Trustee of The Trust        Case No.  C05-04149 VRW
   Created Under Trust Agreement dated
17 January 30, 1980, by Charles J. Keenan III   (United States District Chief Judge
   and Anne Marie Keenan, for the benefit of      Vaughn R. Walker)
18 Charles J. Keenan IV, as to an undivided 50%
   interest, and Trustee of The Trust Created
19 Under Trust Agreement dated January 30,        **MOTION FOR SUMMARY
   1980, by Charles J. Keenan III and Anne        JUDGMENT ON LIABILITY FOR
20 Marie Keenan for the benefit of Ann Marie      INVERSE CONDEMNATION BY
   Keenan, as to an undivided 50% interest,       PLAINTIFF YAMAGIWA,
21                                                 TRUSTEE**
                     Plaintiff,
22                                                 Date:     March 15, 2007
             vs.                                   Time:     2:00 p.m.
23                                                 Dept.:    Courtroom 6, 17th Floor
   CITY OF HALF MOON BAY;
24 COASTSIDE COUNTY WATER DISTRICT;
   and DOES 1-50,
25
                     Defendants.                   Trial Date:  April 30, 2007
26

27

28

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................. ii

NOTICE OF MOTION ................................................................................................... iv

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

    The Beachwood Property .......................................................................................... 2

    Pre-Project Drainage in the Beachwood Area ............................................................ 2

    The City Planned and Constructed Improvements Pursuant to the
    Terrace Avenue Assessment District ("TAAD") ....................................................... 4

    A Dirt Shortage Led to the "Borrowing" of Dirt From Beachwood
    to Complete the TAAD Project .................................................................................. 8

    The Borrow Pits Filled Up With Water When the Winter
    Rains Came .............................................................................................................. 10

    The City Approved the Beachwood Vesting Tentative Map in 1990 ....................... 12

    The City's Sewer Moratorium Halted Construction of the
    Beachwood Subdivision for Over Seven Years ........................................................ 13

    The City Denied the Beachwood CDP Based on the Presence of
    New Wetlands on the Property in 2000 .................................................................... 16

    The Lengthy Litigation History Between The Parties ............................................... 19

THE CITY IS LIABLE IN INVERSE CONDEMNATION FOR THE PHYSICAL
DAMAGE TO THE BEACHWOOD PROPERTY ....................................................... 22

    A.    Background on the Law of Inverse Condemnation ...................................... 22

    B.    The Elements of Inverse Condemnation Liability
         Are Indisputably Established Here  ............................................................. 25

         1.    Yamagiwa's Ownership Interest in Beachwood ............................... 26

         2.    TAAD Is a Public Work of the City ................................................. 26

         3.    The Beachwood Property Was Damaged
             By The Development of Additional Wetlands
             on the Property ................................................................................ 29

         4.    The City's Public Works Are a Substantial
             Cause of the Damage to Beachwood ................................................ 30

CONCLUSION .............................................................................................................. 34

# TABLE OF AUTHORITIES

**Page**

## CASES

*Albers v. County of Los Angeles,*
62 Cal. 2d 250 (1965)..................................................................23, 24, 25, 30, 34

*Belair v. Riverside County Flood Control Dist.,*
47 Cal. 3d 550 (1988)......................................................................................30, 31

*Blau v. City of Los Angeles,*
32 Cal. App. 3d 77 (1973)......................................................................................30

*Bunch v. Coachella Valley Water Dist.,*
15 Cal. 4th 432 (1997) ..........................................................................................25

*California State Automobile Assoc. Inter-Insurance Bureau v. City of Palo Alto,*
138 Cal. App. 4th 474 (2006) ................................................................................26

*City of Half Moon Bay v. Superior Court (Yamagiwa),* 106 Cal. App. 4th 795
(2003) ......................................................................................................13, 15, 20

*Customer Co. v. City of Sacramento,*
10 Cal. 4th 368 (1995) ....................................................................................24, 25

*Federal Construction Co. v. Ensign,*
59 Cal. App. 200 (1922) ........................................................................................28

*Frustuck v. City of Fairfax,*
212 Cal. App. 2d 345 (1963)............................................................................26, 27

*Healing v. California Coastal Com.,*
22 Cal. App. 4th 1158 (1994) ................................................................................20

*Holtz v. Superior Court,*
3 Cal. 3d 296 (1970)........................................................................................24, 30

*Imperial Cattle Co. v. Imperial Irrigation Dist.,*
167 Cal. App. 3d 263 (1985)..................................................................................25

*Ingram v. City of Redondo Beach,*
45 Cal. App. 3d 628 (1975)....................................................................................31

*Jorgensen v. Beach 'N' Bay Realty, Inc.,*
125 Cal. App. 3d 155 (1981)..................................................................................33

*Los Osos Valley Associates v. City of San Luis Obispo,*
30 Cal. App. 4th 1670 (1994) ................................................................................25

*Marin v. City of San Rafael,*
111 Cal. App. 3d 591 (1980)............................................................................25, 26

1

**TABLE OF AUTHORITIES (cont'd)**

**Page**

2

### CASES

3

4

*Marshall v. Department of Water & Power,*
    219 Cal. App. 3d 1124 (1990)..................................................................25

5

*McMahan's of Santa Monica v. City of Santa Monica,*
    146 Cal. App. 3d 683 (1983)..................................................................33

6

7

*Pacific Bell v. City of San Diego,*
    81 Cal. App. 4th 596 (2000) ..................................................................33

8

*Reardon v. City and County of San Francisco,*
    66 Cal. 492 (1885)........................................................................22, 23

9

10

*Souza v. Silver Development Co.,*
    164 Cal. App. 3d 165 (1985)...............................................................27, 31

11

*Varjabedian v. City of Madera,*
    20 Cal. 3d 285 (1977)..........................................................................30

12

*Wildensten v. East Bay Regional Park Dist.,*
    231 Cal. App. 3d 976 (1991).................................................................25

13

14

### STATUTES

15

Civ. Code § 3100 ...............................................................................28

16

Civ. Code § 832 .................................................................................24

Pub. Res. Code § 30511(b) ..................................................................13

17

Pub. Res. Code § 30519(a) ..................................................................13

18

Pub. Res. Code § 30600(a) ..................................................................13

19

Streets & Hwys. Code § 10000. ............................................................28

Streets & Hwys. Code § 10002 ............................................................28

20

21

### CALIFORNIA CONSTITUTION

22

Art. 1 Sec. 19 (formerly Sec. 14) of the California constitution ....................22

23

### OTHER AUTHORITIES

24

Atty. Gen. Opinion 61-90 (1962)...........................................................29

25

Municipal Improvement Act of 1913 .....................................................28

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

Motion for Summary Judgment on Liability for Inverse Condemnation by Plaintiff Yamagiwa, C05-04149 VRW

**NOTICE OF MOTION AND MOTION FOR**

**SUMMARY JUDGMENT ON LIABILITY FOR INVERSE CONDEMNATION**

NOTICE IS HEREBY GIVEN that, on March 15, 2007 at 2:00 p.m., in Courtroom 6 (17th Floor), before the Honorable Vaughn R. Walker, United States District Chief Judge, plaintiff Joyce Yamagiwa, Trustee, will move, and hereby does move, under FRCP 56 for entry of summary judgment in her favor on liability for inverse condemnation.  In the alternative, if all of the relief asked for is not adjudicated in her favor, plaintiff Yamagiwa asks that the following facts be determined to be without substantial controversy under FRCP 56(d):

1.     Plaintiff Yamagiwa, as Trustee, is the owner of the Beachwood Property (Assessor's Parcel No. 048-280-020) in the City of Half Moon Bay.

2.     Defendant City of Half Moon Bay substantially participated in the planning, approval, construction, or operation of a public project or public improvement known as the Terrace Avenue Assessment District Project.

3.     Yamagiwa's property has been damaged by the emergence of wetlands on the property which were first found to exist on May 2, 2000 by the City in Res. No. C-26-00 (Exh. 179).

4.     The City's project, act, or omission to act was a substantial cause of the damage to Yamagiwa's property.

Yamagiwa's Motion will be based on this Notice, the accompanying brief in support of the Motion, the Declarations of Frank Weirich, Ph.D.; Michael Josselyn, Ph.D., PWS; Anne E. Mudge; Joyce Yamagiwa; and Edward G. Burg filed concurrently;

and the Exhibits referenced in the foregoing declarations and separately filed
concurrently with the Motion.

Dated:   February 7, 2007                MANATT, PHELPS & PHILLIPS, LLP


                                         By:   /s/ Edward G. Burg
                                               Edward G. Burg
                                               *Attorneys for Plaintiff* Joyce Yamagiwa, Trustee

1

## INTRODUCTION

2      This case is about the City of Half Moon Bay's role in creating wetlands on a

3   24.7-acre parcel located adjacent to Highway 1, known as Beachwood.

4      Back in 1983, when the property was undeveloped, the City built a public

5   project which involved construction of storm drain infrastructure on several properties,

6   including Beachwood.  The City's storm drain project changed the topography and

7   pre-existing drainage on Beachwood in several important ways:  first, it created a dam

8   barrier that prevented storm water from flowing *off* the Beachwood property; second, it

9   created a series of gaping depressions on Beachwood in areas where the City "borrowed"

10  dirt because of a dirt shortage that arose during construction of the project; and third,

11  due to the lack of an adequate maintenance plan, the City's largest storm inlet failed to

12  capture all the storm water it was supposed to.  The sum total of the drainage project

13  was that water that got on to the Beachwood property could not get off — it was trapped

14  there, and ponded in the depressions that the City dug.

15      On July 3, 1990, the City approved a vesting tentative map (VTM) for

16  Beachwood, granting vested rights to subdivide the property into 85 lots, including

17  83 residential lots.  According to the City Council, when the 1990 VTM was approved,

18  "wetlands covered a portion of the site, *and the map was approved so as to prevent*

19  *development of that area*."  Completion of the subdivision process was thwarted when the

20  City adopted a building permit moratorium due to limited capacity at the City's sewage

21  treatment plant.  The sewer moratorium was extended 11 times — ultimately lasting

22  8 years — during which time the Beachwood owner was assessed nearly $1 million to

23  pay for expansion of the treatment plant.  Once the plant expansion was completed, the

24  City in 2000 decided (in its own words) that there was now "a greater presence of

25  wetlands" on the site so it could *not* be subdivided into 83 residential lots after all.

26

27

28

1      The City's 1983 storm drain project was a substantial cause of the

2   development and expansion of wetlands on Beachwood.  Therefore, the City is liable in

3   inverse condemnation for the physical damage to the Beachwood property.

4      Plaintiff Yamagiwa asks the Court to grant summary judgment on liability for

5   inverse condemnation, leaving the issue of damages for trial.

6

7                           **FACTUAL BACKGROUND**

8   The Beachwood Property

9      The Beachwood Property ("Beachwood" or "the Property") is a rectangular

10  24.7-acre parcel on the east side of Highway 1 in the City of Half Moon Bay.

11  Immediately south of Beachwood is a single-family residential subdivision known as

12  Newport Terrace/Highland Park, which includes three primary streets: Terrace Avenue,

13  Silver Avenue, and Highland Avenue.  Immediately north of Beachwood is a vacant

14  parcel known as Glencree; and north of that is another single-family residential

15  subdivision known as Grand View Terrace.  While each of these subdivision parcels is

16  relatively flat, hills rise to the east of all of them.

17      An aerial orientation photograph from 2000 depicting Beachwood and the

18  relevant nearby properties is Exh. 425[1] and follows on the next page.

19

20      At least since the mid-1970s, Beachwood has been zoned by the City for

21  single-family residential use.  (Exh. 121.)

22

23  Pre-Project Drainage in the Beachwood Area

24      In the late 1970s, Terrace Avenue was an unpaved street, containing just a few

25  homes clustered near Highway 1.  One of its residents was Gary Whelen — who would

26

27  _____

28  [1]      References to Exhibits are to the exhibits separately filed.  The exhibits are authenticated in the declarations
    filed in support of this motion.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles



DATE: 2-17-2000

EXHIBIT
425

later become a City employee.  He lived on Terrace Avenue from 1973 through 2001. (Exh. 451 [Whelen Depo., 15:3-21].)

A 1978 aerial photograph shows the limited development at that time.  (Exh 9.)  Two seasonal creeks — both readily identifiable by a narrow band of trees — drained the eastern hills.  Creek #1 meandered down from the hills and then curved northward, flowing to Beachwood; and Creek #2 entered Beachwood at its southeast corner, flowing westward along its southerly border.  Creeks 1 and 2 met at roughly the middle of Beachwood's southern border; they then flowed northwesterly across Beachwood, to Glencree, and toward Grand View.  Whelen identified the path of stormwater flow — onto *and off of* Beachwood — on the 1978 aerial photograph.  (Exhs. 9, 451 [Whelen Depo, 26:1-27:13].)  The same drainage pattern was traced by Ben White, the City's project engineer, on a map his firm prepared.  (Exh. 70, 453 [White Depo, 59:3-60:7 and 60:11-14]; Weirich Decl, ¶¶ 13-18.)

A topographical map of the Beachwood property based on 1976 aerial photography shows a property with gently sloping topographic features which permitted surface water to flow off of Beachwood (to Glencree) at a natural low point on Beachwood's northern boundary.  (Weirich Decl. ¶¶ 15-17, Exhs. 122, 426.)

But there were problems.  In those early days, Creek #1 (south of Beachwood) sometimes overflowed and flooded Terrace Avenue.  (Exh. 451 [Whelen Depo, 28:4-21; 28:25-29:6].)  And the storm water that flowed onto and then off of Beachwood would then flow across Glencree, ultimately causing flooding to the Grandview Terrace homes to the north.  (Exh. 453 [White Depo, 54:23-55:3]; Decl. Weirich, ¶18.)

1    The City Planned and Constructed Improvements Pursuant to the

2    Terrace Avenue Assessment District ("TAAD")

3            The City created the Terrace Avenue Area Assessment District ("TAAD") in

4    1982.  TAAD placed assessment liens on all the properties within the District to pay for a

5    series of improvements, reflected in the TAAD project plans.  (Exh. 21.)  Beachwood was

6    one of the properties included in the TAAD and it was assessed a share of the cost of the

7    improvements.

8            A major component of the TAAD project was to collect stormwater from the

9    eastern hills that had flowed in Creeks 1 and 2 and direct the stormwater into an

10   underground pipe system.  The TAAD project also included grading of streets and lots

11   in the Newport Terrace/Highland Park subdivision south of Beachwood, the installation

12   of underground utilities there, and the paving of the streets.  (Weirich Decl, ¶ 19.)

13           In connection with the TAAD project, the then-owner of Beachwood granted

14   an easement to the City over portions of the property, including: (1) a 15'-wide strip

15   along the northerly border (which was 1837' long); (2) a 30'-wide strip along the westerly

16   border adjacent to Highway 1 (which was 576' long); and (3) a 15'-wide strip along

17   roughly half of the southern border, from the southeast corner to the middle of the

18   property.  The easement is mapped, and was accepted by the City pursuant to Res.

19   No. 103-82 on September 21, 1982.  (Exh. 75.)

20

21           To construct the TAAD improvements, the City hired a contractor — Bay

22   Cities Paving & Grading, Inc. — on August 18, 1983.  (Exh. 20.)  Gary Whelen, the City's

23   inspection enforcement officer (and, coincidentally, a long-time Terrace Avenue

24   resident, as described above), was the City Inspector for the TAAD project.  He visited

25   the construction site every day, kept a daily construction diary, and occasionally took

26   photographs as construction progressed.  In short, he was the City's "eyes and ears" on

27   the project.  (Exh. 451 [Whelen Depo, 83:6-84:7].)

28

1

2      An overview of the storm drain system constructed on Beachwood and the

3   adjacent property is Exh. 430 and a copy follows on the next page.  Several details

4   concerning the work done on Beachwood are noteworthy.

5      The Northern Drain.  Along the entire 1837-foot northerly border of

6   Beachwood, a 30" underground storm drain pipe was laid in an east/west direction ("the

7   Northern Drain").  (Exh. 21 [Sheets 7, 8].)  To lay the Northern Drain, the City's

8   contractor dug a trench from the pre-existing ground line down to the elevation of the

9   bottom of the pipe.  The trench depth thus varied from about 6 to 11 feet deep.  After the

10  storm drain was placed in the trench, the trench was then backfilled *with compacted soil*

11  — meaning the dirt was highly compressed in order to prevent later settlement which

12  could damage the storm drain.  (Exh. 451 [Whelen Depo, 66:9-68:7; 106:22-107:6; 117:2-

13  14].)  The effect of the compacted trench was to build an underground wall (1837 feet

14  long and 6 to 11 feet deep), and northerly-flowing near-surface water backed up behind

15  (i.e., south of) it — on Beachwood.  (Weirich Decl, ¶¶ 23-24.)

16      Seven vertical manhole shafts (see Exh. 430) were built by the City's

17  contractor, from the surface down to the pipe.  The plans meticulously stated the

18  elevation of the top (i.e., rim) of the manhole covers, and the compacted trench was

19  filled to the rim of the manhole covers.  (Exh. 451 [Whelen Depo, 64:24-65:6; 118:21-

20  119:4].)  Some of the manhole rims were <u>lower</u> than the pre-existing grade and some

21  were <u>higher</u>.  By filling the trenches to the top of the manholes, the pre-existing grade

22  along the north side of the Beachwood property was changed.  Specifically, the previous

23  low point on the north side — the exit point for northwesterly-flowing surface water —

24  was filled to a higher level, damming the pre-existing exit point and retaining flow

25  behind (i.e., south of) it — again, on Beachwood.  (Weirich Decl, ¶¶ 25-26.)

26

27

28



Terrace Avenue Assessment District Storm Drains

EXHIBIT

430

1    Attached to the vertical manhole shafts of the Northern Drain were several

2  horizontal Storm Stubs — smaller pipes (about 5' in length and 12" in diameter) that

3  extended in a north/south direction into Beachwood, essentially perpendicular to the

4  main east/west Northern Drain (see Exh. 430).  The openings, or inlets, of the Storm

5  Stubs were 3' to 6' underground, and the stubs then sloped gently toward and into the

6  manhole shafts.  Any water that got into the Storm Stubs could thus enter the Northern

7  Drain by flowing northerly into the manhole shaft and then dropping into the larger

8  east/west pipe below it.  (Exh. 451 [Whelen Depo, 68:16-69:25; 71:16-72:10]; Exh. 453

9  [White Depo, 29:15-23]; Weirich Decl, ¶ 27.)

10

11    The Western Drain.  At the northwest corner of Beachwood, the east/west

12  Northern Drain turned southerly, where it continued to run in the City's easement on

13  the west side of Beachwood, adjacent to Highway 1.  The Western Drain was

14  constructed in the same trench/backfill manner as the Northern Drain, though the trench

15  was even deeper (up to 17' deep).  (Exh. 21 [Sheet 6]; Weirich Decl, ¶28.)

16

17

18    The Southern Drain.  The final section of underground storm drain was placed

19  along a portion of Beachwood's southern boundary.  (Exh. 21 [Sheet 14].)  The Southern

20  Drain was the largest pipe of all, 48" in diameter, because it drained a large watershed

21  area from the eastern hills.  Although the City's easement began in the very southeast

22  corner of Beachwood, the inlet to the 48" pipe was actually 140-150 feet west of the

23  southeast corner.  (Exh. 453 [White Depo, 81:16-82:4].)  Upstream of the inlet, the

24  stormwater continued to flow through Creek #1, as it had in nature.

25    The inlet to the Southern Drain was placed in the pre-existing Creek #1.  (Exh.

26  451 [Whelen Depo, 76:23-77:4].)  Because the creek flows through a grove of eucalyptus

27  trees, and carries branches, leaves, and brush downstream, a large "debris rack" was

28

installed atop the inlet to the 48" storm drain.  The debris rack is a cylindrical metal cage with bars around the outside and on top of it, which is supposed to act like a large inverted colander, straining the debris but still letting the stormwater flow into the drain.  The debris rack was 4 feet high, and it was installed on top of the vertical inlet to the 48" Southern Drain.  (Exh. 451 [Whelen Depo, 77:5-16]; Exh. 453 [White Depo, 52:12-23]; Weirich Decl, ¶ 30.)

Ben White, the TAAD Project Engineer, explained that the debris rack requires maintenance to remove the debris that collects around the rack.  (Exh. 453 [White Depo, 122:18-21].)  Plaintiff's expert Frank Weirich agrees, explaining the importance of a plan of maintenance in order to allow the drain to work as it was designed to work.  (Weirich Decl, ¶¶ 44-45.)  But the City never adopted a plan of maintenance for the 48" drain inlet. *Indeed, the City's longtime Maintenance Supervisor testified that he wasn't even aware that there was a storm drain system on the Beachwood Property at all.*  (Exh. 450 [Moorhouse Depo, 5:7-9; 16:20-22; 18:14-19:13; 23:13-16].)  The City's Public Works Director also testified he was not aware of any plan of maintenance adopted by the City for the storm drain system in built on Beachwood.  (Exh. 449 [Nagengast Depo, 43:15-23].)  Without a maintenance plan, the result was predictable: debris blocked the entrance to the inlet, preventing the entry of water into the storm drain.  (Exh. 432 [Photos 1, 7, 12].)  When shown a 2003 photograph of the debris rack cage encased by debris, project engineer White testified that "it's not working and can't" in that condition.  (Exh. 84, 453 [White Depo, 121:9-122:11].)

When water could not flow into the inlet, the run-off instead was diverted onto Beachwood.  Whelen testified that, on the only occasion he inspected the 48" inlet after it was installed in the 1980s, water could "barely" get in and the water rose above the debris rack cage and spilled over onto Beachwood.  (Exh. 452 [Whelen Depo, 253:6-255:17; 256:17-257:20].)  The area upstream of the inlet, but still within the City's

easement, was also dammed by a collection of debris in the channel, as documented by 1999 observations of Richard Braden, one of the engineers involved in the original construction (Exh. 1163, 460), and Dr. Weirich, one of Yamagiwa's experts (Exh. 432 [Photos 3, 9, 14]).  Between obstructions in the channel and obstructions at the inlet, at least 50% of the flow did not get to or into the inlet; instead it flowed onto Beachwood. (Weirich Decl, ¶ 45.)

The Northern, Western, and Southern Drains were constructed on Beachwood by the City's contractor between September 14, 1983 and the end of March 1984. (Exh. 451 [Whelen Depo, 85:23-86:9; 94:8-95:3; 114:18-115:4; 120:18-21].)  An aerial photograph taken March 28, 1984 shows the condition of Beachwood after installation of the stormdrains.  (Exh. 35; 451 [Whelen Depo, 133:8-10; 134:11-17; 136:15-20].)

A Dirt Shortage Led to the "Borrowing" of Dirt
From Beachwood to Complete the TAAD Project

The TAAD project included the grading of streets and lots in the Newport Terrace/Highland Park subdivision to the south of Beachwood.  The grading was supposed to be "balanced," meaning that lower areas needing to be raised would be filled in with dirt from higher areas that needed to be lowered, thereby preventing the expensive importation or exportation of dirt from or to other sites some distance away. The TAAD plans contain an earthwork summary showing 56,165 cubic yards of excess and 56,165 cubic yards of shortage — i.e., a balanced project.  (Exh. 21 [Sheet 19]; 451 [Whelen Depo, 79:3-6; 80:9-81:12].)

The project engineer also included an "Earthwork Adjustment Note" on the plans.  In case the project ran short of dirt, a series of adjustments were to be made whereby portions of the project would be lowered in order to produce more dirt (or fill) for the areas where it was needed.  Then, if still more adjustments were required to

produce more dirt, they were to be made as directed by the engineer.  (Exh. 21 [Sheet 19]; 453 [White Depo, 70:15-24; 71:22-73:11].)

In the summer of 1984, the TAAD project did run short of dirt.  One cause of the shortage was a project change by which Silver Avenue would be connected directly to Highway 1; to build this connection required the construction of an embankment under the Silver Avenue extension, which required more fill.  (Exh. 453 [White Depo, 97:24-98:1; 99:18-24].)  The engineer's ability to direct further grading changes to create more dirt was hamstrung, however, because the City's contractor had already placed the water lines in the streets for the Newport Terrace/Highland Park subdivision.  Because the water lines required a minimum of 4 feet of overlying dirt cover, the street grades could not be lowered to meet the need for more dirt.  (Exh. 40, 41; 453 [White Depo, 104:25-105:15].)

Faced with the need for substantial fill that would be expensive to import from off-site, the City decided to "borrow" the needed fill from the Beachwood Property in order to complete the TAAD improvements.  A Change Order to the City's contract with its contractor was processed, and approximately 13,000 cubic yards of fill was borrowed from Beachwood.  (Exh. 43.)  Because a subdivision map was already approved for Beachwood, there were known locations where future streets on Beachwood were to be laid out.[2]  The future streets were staked out by a surveyor, and the City's contractor began hauling dirt from Beachwood in July 1984 by using a bladed scraper.  (Exh. 451 [Whelen Depo, 170:22-171:1].)

By the time the borrowing operation was completed, gaping 50-foot wide depressions had been dug on Beachwood, in the areas where the then-planned streets were to go.  An aerial photograph taken the next spring, on April 23, 1985, clearly shows

---

[2]     The City had approved a tentative subdivision map for Beachwood in 1977, containing 93 residential lots. The tentative map showed the location of the then-planned streets and the lots.  (Exh. 121.)

9

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

1   the areas on Beachwood from which the dirt was borrowed.  (Exh. 44; 453 [White Depo,

2   110:8-14, 110:24-111:3].)  A comparison of the April 23, 1985 aerial photo <u>after</u> the City's

3   dirt borrowing (Exh. 44) with the March 28, 1984 aerial photo <u>before</u> the City's dirt

4   borrowing (Exh. 35) is instructive and clearly shows the effects of the City's removal of

5   dirt from Beachwood.

6         Before the borrow pits were dug in July 1984, City Inspector Whelen had

7   never heard anyone, anywhere, at any time say that there were wetlands on the

8   Beachwood Property.  (Exh. 451 [Whelen Depo, 179:3-7].)  Indeed, White, the Project

9   Engineer, had completed the Environmental Checklist (under CEQA, the California

10  Environmental Quality Act) for the TAAD project in October 1982, before it was

11  constructed.  He had heard nothing from anyone about wetlands on Beachwood (other

12  than the old abandoned agricultural pond in the southeast corner) before TAAD was

13  constructed.  If there had been wetlands on the Beachwood Property at that time, he

14  would have noted it on the Environmental Checklist form.  (Exh. 77; 453 [White Depo,

15  83:19-22; 85:13-86:6].)  The City then adopted a negative declaration, finding that

16  construction of the TAAD project — including all of the storm drains on Beachwood —

17  "could not have a significant effect on the environment."  (Exh. 77.)

18

19

20  The Borrow Pits Filled Up With Water When the Winter Rains Came

21         What were simply open borrow pits in July 1984 became something else when

22  the winter rains came in late 1984 — namely, water-filled lakes.  After heavy rain on

23  October 16, 1984, Whelen recorded the next day that there was water standing in the

24  Beachwood borrow pits that had been dug by the City's contractor.  (Exh. 57, 451

25  [Whelen Depo, 195:5-12; 211:5-20].)  A week later, Whelen observed standing water in

26  the majority of the street sections that had been dug.  He photographed the standing

27

28

water on October 23, 1984.  (Exh. 58 [at 204375]; 451 [Whelen Depo, 212:3-11; 212:15-213:13].)

City Inspector Whelen referred to the water-filled borrow pits as "small lakes." They were 50' wide, the width of the planned streets.  As the rainwater got deeper and deeper in the borrow pits, ***Whelen was actually concerned that a child could drown in them***.  (Exh. 451 [213:14-16; 214:13-215:16; 217:13-218:5; 224:21-24].)

So Whelen asked Bay Cities, the City's contractor to do something about the standing water on Beachwood.  And Whelen carefully recorded the response — the City's contractor said "he didn't give a rat's ass about the water and wouldn't be responsible for it."  (Exh. 24 [at HM205488]; 451 [Whelen Depo, 213:20-214:15].)

Whelen remained concerned.  Because the Beachwood property generally sloped to the north, he wanted the contractor to open the Storm Stubs connected to the Northern Drain so some of the water collecting in the borrow areas could drain into the Northern Drain.  (Exh. 451 [Whelen Depo, 215:17-216:9].)  Ultimately, the City itself dug trenches to the Storm Stubs attached to the Northern Drain.  This drained a portion of the borrow pits, but did not solve the problem.  Whelen continued to see water collect in the borrow pits that the City had dug year after year, during the rainy season.  (Exh. 451 [Whelen Depo, 218:24-219:4; 220:15-221:6; 221:13-24].)

The short-term alleviation provided by the City-built trenches created still more long-term problems.  Because the inlets for the Storm Stubs were approximately 3 to 6 feet below the ground surface, exposing the stubs required digging down to the inlets.  This digging created new holes, just south of the Northern Drain.  Over time, the entrance to the Storm Stubs became clogged with silt and debris, and stormwater run-off could not get into the stubs.  Later photographs clearly depict ponded areas that built up just south of the manholes to the Northern Drain — water that could not get into the

1  Storm Stubs that had been exposed by the City back in the mid-1980s.  (Weirich Decl,

2  ¶¶ 34, 48; Exh. 432 [Photos 4, 5, 10, 15].)

3        The TAAD project was accepted as complete by the City on July 2, 1985.  (Exh.

4  63.)  The huge borrow areas on Beachwood remained where the streets had been

5  planned to go, indicated clearly on photographs taken on April 26, 1988.  (Exh. 64, 451

6  [Whelen Depo, 258:3-8; 259:3-260:12].)

7

8  <u>The City Approved the Beachwood Vesting Tentative Map in 1990</u>

9        On July 3, 1990, the City Council approved a Vesting Tentative Map for

10 Beachwood, approving its subdivision into 85 lots, including 83 residential lots.  (Exh.

11 141; 147; 462 [Gustin Depo, 55:9-56:1].)  The two lots that were set aside and were *not* to

12 be developed were Lots 1 and 19 of Block 3; these lots were to be dedicated to the City

13 for open space or park purposes.  Lot 19 was in the southeast corner of Beachwood,

14 where the creek, old abandoned stock pond, and the inlet to the Southern Drain were

15 located.  A copy of the 1990 Vesting Tentative Map (Exh 147) with the set-aside lots

16 highlighted in yellow is attached as Exh. 448.  With the exception of these two minor set-

17 asides, the City approved the remainder of Beachwood for development of streets and

18 83 residential lots.

19

20        Initiating the CEQA process for the subdivision, the City completed an Initial

21 Study that said nothing about wetlands on Beachwood.  (Exh. 135.)  The California

22 Department of Fish & Game asserted that there was "riparian wetland vegetation" on

23 approximately 15-20% of the Property, but did not say where.  (Exh. 1123.)  Ultimately,

24 the then-owner of Beachwood proposed that a "low-flow channel" be built along

25 Beachwood's southern border, and Fish & Game was satisfied with the subdivision,

26 approving a Streambed Alteration Permit for Beachwood.  (Exh. 186.)  The Army Corps

27 of Engineers declined to assert jurisdiction over Beachwood, indicating it found no

28

wetlands on Beachwood at that time that would prevent development of the 83-lot subdivision.  (Exh. 1032.)  And the City Council adopted a Mitigated Negative Declaration for the Beachwood subdivision, finding no significant environmental impacts that could not be mitigated to a level of insignificance.  The City Council's approval of the Vesting Tentative Map (Exh. 141) indicated that — regardless of whatever "riparian wetland habitat" or "riparian wetland vegetation" may have existed at that time, five years after the completion of the TAAD improvements — allowing 83 homes to be built on Beachwood would <u>not</u> have a significant effect on the environment. (Exh. 462 [Gustin Depo, 57:8-58:3].)

<u>The City's Sewer Moratorium Halted Construction of the Beachwood Subdivision for Over Seven Years</u>

For properties located in the coastal zone (like Beachwood), subdivision also requires a Coastal Development Permit (CDP) under the Coastal Act.  (Pub. Res. Code § 30600(a).)  Cities that have an approved Local Coastal Plan (LCP) can issue CDPs themselves.  But until a city's LCP is approved by the Coastal Commission, the CDPs must be issued by the Coastal Commission.  (Pub. Res. Code § 30519(a); *City of Half Moon Bay v. Superior Court (Yamagiwa)*, 106 Cal. App. 4th 795, 798 n. 4 [2003].)

Approval of an LCP is typically a two-step process.  First, the Coastal Commission must approve (or "certify," in Coastal Commission lingo) a Land Use Plan (LUP) proposed by the local entity.  Second, the Coastal Commission must certify the "implementing ordinances" by which the LUP will be implemented.  (Pub. Res. Code § 30511(b).)

Half Moon Bay's LUP was certified by the Coastal Commission in 1985.  (Exh. 136.)  Its implementing ordinances, and thus its entire LCP, was certified by the Coastal Commission in 1996.  (Exh. 204.)  Thus, when the City approved the Beachwood Vesting

Tentative Map in 1990, the City had a certified LUP, but not yet a fully-certified LCP. The effect was that Beachwood had to obtain a CDP from the Coastal Commission to proceed with the subdivision.

The then-owner of Beachwood applied to the Coastal Commission for a CDP in 1990. (Exh. 1131.) But a funny thing happened on the way to that forum. On March 28, 1991, the City adopted a 90-day moratorium on building permits that required sewer connections, due to a shortage at the local sewage treatment plant. (Exh. 270.) The Coastal Commission took the position that it could not process the Beachwood CDP application because the City would not reserve sewer capacity for the 83 homes. (Exh. 192.) As a result, Beachwood became caught in a Catch-22 — it could not proceed with the subdivision development until it had a CDP from the Coastal Commission, and it could not get a CDP until it had sewer connections reserved by the City.

Then the 90-day sewer moratorium was extended. And extended. And extended. Ultimately, the City extended the sewer moratorium a total of *11 times*; *it lasted over seven years*, from March 28, 1991 through March 31, 1998. (Exhs. 312, 313, 314, 316, 317, 319, 320, 323, 324, 326, 329.)

By the spring of 1998, much had changed.

In 1993, the then-owner of the Beachwood Property lost it in foreclosure to the holder of the second trust deed; and the holder of the second trust deed then lost it in foreclosure to the holder of the first trust deed, plaintiff Joyce Yamagiwa, as trustee for two family trusts set up by Charles Keenan III and his wife. (Yamagiwa Decl, ¶¶ 1-3.)

In 1994, the City formed an assessment district to finance expansion of its sewage treatment plant. Undeveloped properties in Half Moon Bay (the ones that would supposedly benefit from expansion of the treatment plant) were each assessed a share of the $12 million cost of the expansion. The amount of each property's assessment was determined based on a calculation of "benefit units." If a property was

undevelopable, it was assigned zero benefit units and assessed nothing for the plant expansion.  Beachwood was treated far differently.  Because it had a Vesting Tentative Map for 83 homes, and because it had water hook-ups for 83 homes, it was assigned 83 x 2 = 166 benefit units by the City.  (Exh. 453 [White Depo, 129:9-132:18].)

*Beachwood (Assessor's Parcel No. 048-280-020) was accordingly assessed $962,987.76 as its principal share of the cost of the sewage treatment plant expansion*.  Based on its favorable entitlement status, Beachwood was the second-highest assessed parcel in the entire City of Half Moon Bay — among 920 different parcels listed on the assessment roll.  (Exh. 89.)  Yamagiwa has paid principal and interest installments on the sewage treatment plant expansion assessment for 11 years.  Through December 10, 2006, **the total amount** (principal and interest) **paid by Yamagiwa** to help finance the expansion of the sewage treatment plant **was $929,079.03**.  (Yamagiwa Decl, ¶ 5.)

In 1996, the Coastal Commission certified the City's LCP in its entirety.  (Exh. 204.)  This meant that the authority to issue CDPs in the first instance passed from the Coastal Commission to the City.  (*City of Half Moon Bay*, 106 Cal. App. 4th at 798 n. 4.)

Of course, Yamagiwa was not paying huge sums to fund expansion of the sewage treatment plant for the sport of it.  What made Beachwood such an attractive investment opportunity was that it had a City-approved Vesting Tentative Map for 83 residential units.  Once the sewage treatment plant shortage was solved, the subdivision could proceed full speed ahead.

But then additional wetlands were "discovered" on Beachwood.

The City Denied the Beachwood CDP Based on the Presence of
New Wetlands on the Property in 2000

By 1997, completion of the sewage treatment plant expansion appeared within sight.  Plaintiff Yamagiwa therefore filed her application for a CDP with the City.[3]  (Exh. 1149.)

In short order, a dispute arose as to whether new wetlands had developed on Beachwood during the lengthy delay caused by the sewer moratorium.  The City hired a series of consultants who found wetlands on various places on the Property.  In January 1999, the hired Melanie Mayer Gideon to inspect Beachwood.  She wrote a written report opining that previously-undiscovered wetlands existed in a "horseshoe-shaped area" that precisely coincided with one of the borrow pit areas that had been dug by the City during construction of the TAAD project.  (Exh. 150; 433 [Josselyn Report, Exh. 2].)  The City then hired a second consultant, Dr. Terry Huffman.  Huffman mapped a large area of the Beachwood property as potential wetlands, deserving of more study.  (Exh. 91; 433 [Josselyn Report, Exh. 3].)  Significantly, Huffman determined in his March 4, 1999 letter report that the wetlands on Beachwood were "man-made."  (Exh. 109.)  The City then hired LSA Associates to do a third wetlands study, and LSA found a series of wetlands sprinkled over Beachwood — including several within the areas excavated for the borrow pits during the TAAD construction.  (Exh. 433 [Josselyn Report, Exh. 4].)

Yamagiwa hired Dr. Michael Josselyn to study whether wetlands existed on Beachwood.  Josselyn, a certified Professional Wetlands Scientist and Professor Emeritus at San Francisco State University, selected several areas for study.  (Exh. 434.)  He concluded that, with the exception of the undisputed wetlands in the southeast corner of Beachwood — the abandoned agricultural pond and the creek leading to the 48" inlet,

---

[3]    Initially, the City refused even to accept Yamagiwa's CDP application.  Yamagiwa was forced to sue the City to compel it to accept and review her application, in *Yamagiwa v. City of Half Moon Bay* (*Beachwood  I*), Case No. 402781, filed in 1997.  On September 24, 1998, the Court stayed the hearings on both sides' motions for summary judgment/summary adjudication pending the City's decision on Yamagiwa's CDP application.  (Mudge Decl, ¶ 2, Exh. 436.)

where no development had been permitted by the 1990 Vesting Tentative Map anyway — none of the other study areas on Beachwood constituted wetlands.  This was true, in Dr. Josselyn's opinion, both under the definition of wetlands used by the Army Corps of Engineers and the definition contained in the City of Half Moon Bay's LCP.  (Josselyn Decl, ¶¶ 9-12.)

On January 10, 2000, the Army Corps of Engineers agreed with Dr. Josselyn, finding no wetlands on Beachwood other than in the undisputed set-aside areas in the southeast corner.  (Exh. 168.)

Whether conditions on Beachwood met the definition of "wetlands" contained in the City's certified LCP was more complex.  The LCP definition of wetlands provided:

> "Wetland is an area where the water table is at, near, or above the land surface long enough to bring about the formation of hydric soils or to support the growth of plants which normally are found to grow in water or wet ground. . . . *Wetlands do not include . . . vernally wet areas where the soils are not hydric*."  (Exh 136, emphasis added.)

Although Dr. Josselyn found wetland plants predominated in his study areas on Beachwood, he concluded that the study areas were *not* wetlands under the italicized "vernally wet exception" contained in the last sentence — because they were vernally wet areas, but lacked hydric soils.  (Josselyn Decl, ¶¶ 8, 12.)

On March 21, 2000, the City Council voted to deny Yamagiwa's CDP application to subdivide Beachwood into 83 residential lots — precisely what it had *approved* when it granted the Vesting Tentative Map in 1990.  (Exh. 147.)  Its lawyers then took six weeks to carefully craft written findings, which the City Council adopted in Res. No. C-26-00 on May 2, 2000.  (Exh. 179.)

With regards to the 1990 Vesting Tentative Map, the City Council found:

> "At the time that the VTM was approved, it was determined that wetlands covered a portion of the site, *and the map was*

*approved so as to prevent development of that area.*"  (Exh. 179, at p. 1, emphasis added.)

Thus, the City acknowledged that its 1990 Vesting Tentative Map had required the wetlands portion of the site to be set aside, as reflected on Exh. 448.

The City Council, however, concluded that *new wetlands had emerged on Beachwood since the time it had approved the Vesting Tentative Map in 1990*.  The City Council repeatedly referred to the new areas as "additional and previously unstudied wetlands;" "previously unknown wetlands;" or "the nine new wetlands areas."  (Exh. 179, at pp. 2, 3, 9.)  Indeed, noting the disagreement among the experts, the City Council framed the issue thusly:

> "In this matter, the City Council finds that [Yamagiwa's experts] disagree with [the City's experts] with regard to *the issue of whether the site has seen an increase in the presence of wetlands since the 1990 approval of the VTM*."  (Exh. 179, at p. 3, emphasis added.)

Not surprisingly, the City Council agreed with its own experts, concluding that "the extent of wetlands on the site is greater than was determined at the time the VTM was approved."  (Exh. 179, p. 9.)

Whelen, the TAAD City Inspector, was perhaps the only City employee as of 2000 who had been intimately involved in the TAAD construction from 1983-1985.  He immediately made a connection between the "wetlands" the City found on Beachwood in 2000 and the earlier TAAD construction over which he had been the City's "eyes and ears" 15 to 17 years earlier.  He was emphatic that the Beachwood wetlands were "man-made" wetlands, *created by the work the City did in connection with TAAD*.  But his efforts to explain the history to a City Councilmember fell on deaf ears.  (Exh. 451 [Whelen Depo, 226:25-229:19; 230:10-12] Exh. 452 [Whelen Depo, 272:12-19].)

1    In short, after charging Yamagiwa roughly $1 million to help pay for

2  expansion of the sewage treatment plant, the City Council found that new wetlands had

3  emerged on Beachwood during the lengthy moratorium period.  It therefore denied

4  Yamagiwa's request for a CDP for the same subdivision it had approved in 1990.

5

6  <u>The Lengthy Litigation History Between The Parties</u>

7    Yamagiwa disputed the City's determination of new wetlands on two distinct

8  grounds:

9      • <u>First</u>, she believed that the new wetlands on

10      Beachwood did *not* meet the City's own definition of

11      wetlands, so the areas were not wetlands at all; and

12

13      • <u>Second</u>, she believed that even if the new wetlands on

14      Beachwood *did* meet the City's definition of wetlands,

15      the City was responsible for the physical damage to

16      Beachwood, because the wetlands were substantially

17      caused by the TAAD improvements.

18

19    Yamagiwa accordingly filed two lawsuits simultaneously.  In *Beachwood II*

20  (filed May 17, 2000), Yamagiwa alleged the physical damage to her property caused by

21  the TAAD-induced wetlands.  In *Beachwood III* (filed May 19, 2000), Yamagiwa alleged

22  that the new wetlands on Beachwood did not meet the City's definition of wetlands.

23  (Mudge Decl, ¶ 7.)

24    The Coastal Commission intervened in *Beachwood III*, joining the fight over

25  proper interpretation of the City's LCP definition of wetlands.  (Mudge Decl, ¶ 7.)

26    On January 26, 2001, the trial court issued its written decision in *Beachwood*

27  *III*.  The decision entirely vindicated Yamagiwa's position, and rejected the legal

28  arguments by the City and the Coastal Commission.  The trial court found that the new

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

"wetlands" did not qualify as wetlands, because the City's definition provided an exception for "vernally wet areas where the soils are not hydric." (Exh. 439; Mudge Decl, ¶ 8.) On February 23, 2001, the trial issued a writ of mandate commanding the City to issue the CDP to Yamagiwa consistent with the 1990 Vesting Tentative Map, i.e., for 83 residential lots. (Exh. 440.) In compliance with the trial court's order, the City issued the CDP to Yamagiwa on March 20, 2001. (Exh. 289; Mudge Decl, ¶ 9.)

The City and the Coastal Commission then embarked on a course of action typifying what one Court once called "a virtuoso performance in the theatres of bureaucracy." (*Healing v. California Coastal Com.*, 22 Cal. App. 4th 1158, 1168 [1994].) Having lost before the trial court, the Coastal Commission filed an *administrative* appeal to itself. Not surprisingly, the Coastal Commission upheld its own litigation position, disagreed with the trial court, and found substantial wetlands on Beachwood — not only where the City's expert LSA Associates had found them, but in all of the areas studied by Dr. Josselyn, Yamagiwa's expert, as well. (Mudge Decl, ¶ 10.)

Yamagiwa was therefore forced to return to court to challenge these administrative shenanigans in a new lawsuit, *Beachwood IV* (filed June 11, 2001). Again, the trial court in *Beachwood IV* vindicated her position, setting aside all actions of the Coastal Commission in response to the "appeal" from the Court-ordered CDP. The trial court's decision was handed down on June 17, 2002. (Exh. 441; Mudge Decl, ¶ 11.) Then the City and the Coastal Commission challenged the 2002 ruling by a writ petition to the Court of Appeal. In a published decision, the Court of Appeal upheld the trial court's ruling, *City of Half Moon Bay v. Superior Court (Yamagiwa)*, 106 Cal. App. 4th 795 (2003). (Exh. 442.)

Following the Court of Appeal's decision in *Beachwood IV*, the parties took two significant actions in the other lawsuits.

1    In the physical takings case (*Beachwood II*), the parties stipulated that

2  Yamagiwa could dismiss her claims without prejudice, with a tolling of all statutes of

3  limitation.  The reason for the stipulation was simple:  so long as Yamagiwa was

4  prevailing on her position that the new wetlands on her property did <u>not</u> qualify as

5  wetlands under the City's LCP, there was no damage, and the issue of how those

6  "wetlands" had been caused did not need to be litigated.  (Exh. 443; Mudge Decl, ¶ 13.)

7    In *Beachwood III*, the action challenging the City's decision that there were

8  new wetlands on Beachwood, the parties reached a non-cash stipulated settlement.  A

9  final subdivision map was conditionally approved by the City, to be recorded only if

10  Yamagiwa successfully defended the Court-ordered CDP on appeal.  A stipulated

11  judgment reflecting these terms was filed in *Beachwood III*.  (Exh. 444; Mudge Decl, ¶ 14.)

12    In short, had the City accepted the writ of mandate issued by the trial court

13  in *Beachwood III* in February 2001 (Exh. 440), Yamagiwa would have been permitted to

14  develop Beachwood and the City would have escaped all claims for monetary damage.

15    Instead — as was concededly its right — the City appealed the trial court's

16  writ of mandate in *Beachwood III*.  On July 27, 2005, the Court of Appeal reversed the trial

17  court's ruling in a unpublished decision, disagreeing with the trial court's application of

18  the "vernally wet areas where the soils are not hydric" exception.  (Exh. 445; Mudge

19  Decl, ¶ 15.)  The net result of the Court of Appeal's ruling is that, where wetlands

20  vegetation exists on Beachwood, that is enough to meet the LCP's definition of wetlands.

21    Having ultimately lost the first prong of her litigation position — i.e., that

22  the new wetlands on Beachwood did <u>not</u> meet the LCP definition of wetlands —

23  Yamagiwa revived the second prong — i.e., that the City's construction during TAAD

24  was a substantial cause of the development of wetlands on Beachwood.  This is the

25  revival that the parties had agreed to in order to induce Yamagiwa to dismiss her

26  previous physical takings case, *Beachwood II* (Exh. 443.)

1   In short, the Court of Appeal's 2005 decision settled the dispute regarding

2   *whether* there were new wetlands on the Beachwood Property.  The issue in this case is

3   what caused those wetlands to develop.

4   The short answer is this:  the City's construction of the TAAD improvements

5   was a substantial cause of the physical damage to Beachwood.  Accordingly, the City is

6   liable in inverse condemnation for that physical damage.

7

8   **THE CITY IS LIABLE IN INVERSE CONDEMNATION FOR THE**

9   **PHYSICAL DAMAGE TO THE BEACHWOOD PROPERTY**

10   Inverse condemnation is a *constitutional* remedy under Art. 1 Sec. 19 of the

11   California constitution for consequential damages to real property caused by the

12   construction of public projects.  Tort concepts like foreseeability and fault do *not* apply

13   to claims for inverse condemnation; recovery is permitted under a standard of strict

14   liability.

15

16   A.   Background on the Law of Inverse Condemnation

17   Art. 1 Sec. 19 (formerly Sec. 14) of the California constitution provides in

18   relevant part:

19

20   "Private property may be taken *or damaged* for public use only
     when just compensation, ascertained by a jury unless waived,
21   has first been paid to, or into court for, the owner."
     (Emphasis added.)
22

23   The words "*or damaged*" were added to the California constitution in 1879,

24   and the California Supreme Court made it clear early on in *Reardon v. City and County of*

25   *San Francisco*, 66 Cal. 492 (1885) that the "or damaged" clause allowed for recovery even

26   in the absence of negligence by the government.  *Reardon* involved a claim for property

27

28

damage that arose from the City's constructing a sewer and grading a street:

> "We are of opinion that the right assured to the owner by the provision of the constitution is not restricted to the case where he is entitled to recover as for a tort at common law.  If he is consequently damaged by the work done, whether it is done carefully and with skill or not, he is still entitled to compensation for such damage under this provision."  (*Reardon*, 66 Cal. at 505.)

Nearly a century later, the Supreme Court handed down its landmark decision in *Albers v. County of Los Angeles*, 62 Cal. 2d 250 (1965).  *Albers* involved the County's construction of an extension of Crenshaw Boulevard to the Palos Verdes Peninsula, through a known pre-historic slide area which had been dormant for several thousand years.  (*Albers*, 62 Cal. 2d at 254-255.)  Developers granted easements to the County to extend the street, and the County removed 175,000 cubic yards of dirt, placing it within and on either side of the easement areas.  The pressure exerted by the dirt, or fill, reactivated the ancient landslide within the entire ancient slide area.  (*Albers*, 62 Cal. 2d at 255.)

The trial judge found no negligence or nuisance, but awarded judgments to the developers totaling over $5.3 million for inverse condemnation.  (*Albers*, 62 Cal. 2d at 255.)  The County appealed, contending that there could be no liability for inverse condemnation when there would have been no cause of action against a private individual.

The Supreme Court rejected the County's argument.  It held that liability under the constitutional provision was broader than liability between private parties:

> " 'Any definite physical injury to land or an invasion of it cognizable to the senses, depreciating its market value, is a damage in the constitutional sense, regardless of whether it is such an injury as a neighboring owner might inflict without liability at common law.' "  (*Albers,* 62 Cal. 2d at 260.)

23

1          And the Court laid down the general constitutional rule of inverse

2  condemnation thusly:

3               "[A]ny actual physical injury to real property proximately
                caused by the improvement as deliberately designed and
4             constructed is compensable under article I, section 14, of our
                Constitution *whether foreseeable or not*." (*Albers,* 62 Cal. 2d at
5             263-264, emphasis added.)

6

7          In *Holtz v. Superior Court*, 3 Cal. 3d 296 (1970), the landowners sought inverse

8  condemnation recovery for damage to their Market Street property during construction

9  of BART.  The trial court had restricted BART's liability for excavations to the same

10  extent as a private owner's liability (under Civ. Code § 832), and struck the inverse

11  condemnation claim.  Following *Albers,* the Supreme Court reversed.  It noted that the

12  *Albers* "general rule of compensability" did not derive from statutory or common law

13  tort doctrine, but from the interpretation of the constitutional clause as a matter of

14  policy.  (*Holtz*, 3 Cal. 3d at 303.)  The underlying purpose of inverse condemnation is "to

15  distribute throughout the community the loss inflicted upon the individual by the

16  making of public improvements."  (*Holtz*, 3 Cal. 3d at 303.)

17          The Supreme Court applied its constitutional analysis to deny recovery in

18  inverse condemnation in *Customer Co. v. City of Sacramento*, 10 Cal. 4th 368 (1995).  A

19  felony suspect took refuge in Customer Co.'s liquor store.  The police fired tear gas into

20  the store, causing extensive property damage, in the course of apprehending him.

21  Customer Co. sought recovery for the damage on several theories, including inverse

22  condemnation, but the Supreme Court found no inverse condemnation because there

23  was no "public improvement" or "public work" of any kind.  (*Customer Co.*, 10 Cal. 4th at

24  383.)

25          Regarding the "or damaged" clause, the Court wrote:

26

27               "It seems apparent that the addition of the words 'or
                damaged' to the 1879 Constitution was intended to clarify
28             that application of the just compensation provision is not

24

limited to physical invasion of property taken for 'public use' in eminent domain, but also encompasses special and direct damage to adjacent property resulting from the construction of public improvements." (*Customer Co.*, 10 Cal. 4th at 379-380.)

Thus, under the applicable *Albers* standard, inverse condemnation is a constitutional remedy permitting recovery of consequential damages arising from public projects.  Foreseeability is not required (*Albers*, 62 Cal. 2d at 263-264), and the tort concepts of fault or negligence are not applicable.  (*Bunch v. Coachella Valley Water Dist.*, 15 Cal. 4th 432, 436 [1997]; *Marin v. City of San Rafael*, 111 Cal. App. 3d 591, 595 [1980].)  Instead, the government is strictly liable for any physical injury to property substantially caused by a public improvement as deliberately designed and constructed.  (*Bunch*, 15 Cal. 4th at 440; *Los Osos Valley Associates v. City of San Luis Obispo*, 30 Cal. App. 4th 1670, 1680 [1994]; *Marshall v. Department of Water & Power*, 219 Cal. App. 3d 1124, 1139 [1990] ["[A] governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause of the plaintiff's damages even if only one of several concurrent causes."].)

B.      The Elements of Inverse Condemnation Liability Are Indisputably Established Here

Four elements are required to be shown by Yamagiwa to establish liability for inverse condemnation here: First, that she has an interest in real or personal property; Second, the City substantially participated in the planning, approval, construction, or operation of a public project or public improvement; Third, Yamagiwa's property suffered damage; and Fourth, the City's project, act, or omission was a substantial cause of the damage.  (*Imperial Cattle Co. v. Imperial Irrigation Dist.*, 167 Cal. App. 3d 263, 269 [1985]; *Wildensten v. East Bay Regional Park Dist.*, 231 Cal. App. 3d 976,

979-980 [1991]; *California State Automobile Assoc. Inter-Insurance Bureau v. City of Palo Alto*, 138 Cal. App. 4th 474, 480 [2006].)

### 1.   Yamagiwa's Ownership Interest in Beachwood

As trustee of two family trusts set up by Charles J. Keenan III and Anne Marie Keenan, Yamagiwa owns the Beachwood Property.  She acquired it in 1993, *after* the City had approved the Vesting Tentative Map for the Beachwood subdivision in 1990.  (Yamagiwa Decl, ¶ 1-5.)  At that time, the City had imposed a "sewer moratorium" until its sewage treatment plant could be expanded.  To date, Yamagiwa has paid $1,635,827.75 in special assessments and costs to widen Highway 1 in anticipation of exercising her vested rights to develop Beachwood.  (Yamagiwa Decl, ¶ 5-8, Exh. 447.)

There is no dispute that Yamagiwa owns Beachwood, nor that she has paid hefty sums levied by the City toward development of 83 residential lots on the Property.

### 2.   TAAD Is a Public Work of the City

Nor is there any reasonable dispute that the City substantially participated in TAAD, a public work of the City of Half Moon Bay.

For purposes of inverse condemnation, "public use" has been defined broadly as "a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government."  (*Frustuck v. City of Fairfax*, 212 Cal. App. 2d 345, 358 [1963]; *California State Automobile Assoc.*, 138 Cal. App. 4th at 479-480.)  A drainage system certainly meets this test:

> "The construction and maintenance of storm drainage systems are matters of 'public policy,' and such a system created by a public entity becomes a 'public improvement' and a 'public use.'  (*Bauer v. County of Ventura* (1955) 45 Cal. 2d 276, 284-285 [289 P.2d 1].)  'Drainage systems concern the whole community.'  (*Frustuck v. City of Fairfax, supra*, 212 Cal. App. 2d, p. 362.)"  (*Marin*, 111 Cal. App. 3d at 595.)

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1       In *Frustuck*, the City approved subdivision plans which led to development,

2   with more impervious surfaces, uphill from the Frustuck property.  The City enlarged a

3   drain under the street adjacent to the property as well as a ditch on Frustuck's property

4   to handle the increased runoff.  The Court found that approval of the uphill

5   development by the City constituted "substantial participation incident to the serving of

6   a public purpose." (*Frustuck*, 212 Cal. App. 2d at 362.)  The enlargement of the storm

7   drain pipe and the ditch on the property were also sufficient bases to impose liability for

8   inverse condemnation.  (*Frustuck*, 212 Cal. App. 2d at 363-365.)

9       Even a natural creek, when utilized as part of a storm drain system, is a

10  public work.  In *Souza v. Silver Development Co.*, 164 Cal. App. 3d 165 (1985), public storm

11  drains directed surface water into Pinole Creek, and the City of Pinole required the

12  developers to dedicate a drainage easement along the creek channel.  The trial court

13  found that the creek constituted a public improvement or public project because it "was

14  utilized by the City as part of its storm drainage system."

15

16          "Even though a part of the system was not man-made, *the
            entire system was a public improvement or project which might
17          subject the City to liability in inverse condemnation*." (*Souza*, 164
            Cal. App. 3d at 170, emphasis added.)

18

19      Here, the evidence is overwhelming that the TAAD project was a public

20  project and all work done pursuant to it constitutes a public work of the City, done for

21  public use.

22      First, the City approved the entire project and ordered that the improvement

23  be done.  (Exh. 17.)  The City hired MacKay & Somps to provide engineering services for

24  TAAD on March 16, 1982.  (Exh. 69.)  Ben White, the Project Engineer for MacKay &

25  Somps, prepared the plans and specifications for the TAAD project on September 15,

26  1982 (Exh. 21); the City approved them on June 21, 1983 (Exh. 17, ¶ 6); and its Public

27  Works Director approved and signed the plans (Exh. 21)  The City entered into a

28

contract with Bay Cities Paving and Grading to construct the improvements on August 18, 1983 (Exh. 20).[4]  The City acquired an easement for the storm drain system on Beachwood, including the area of the natural creek 140-150 feet *upstream* from the 48" inlet to the southeast corner of the Property.  (Exh. 75; Exh. 453 [White Depo, 81:16-82:4].)  The City negotiated and approved Change Orders to the contract, including for the borrow of dirt from Beachwood when the project ran short of fill.  (Exh. 40, 41, 43.) The City's Inspection Enforcement Officer visited the construction site every day during construction and kept a daily construction diary.  (Exh. 451 [Whelen Depo, 83:6-84:7].) Finally, the City accepted the TAAD improvements as complete on July 2, 1985 (Exh. 63.)

Significantly, the TAAD project was planned and approved pursuant to the *Municipal Improvement* Act of 1913, Streets & Hwys. Code §§ 10000 *et seq.*  (Exh. 17, p. 1.) This provides the mean to levy an assessment on all properties within the district determined to be especially "benefited" by the project, which here included Beachwood. (Exh. 21, Sheet 1 [Beachwood included in TAAD]; Yamagiwa Decl, ¶ 6.)  An "improvement" under the Act includes "all work and improvements authorized to be done under this division *which are for a public purpose or which are necessary or incidental to a public purpose*."  (Streets & Hwys. Code § 10002, emphasis added.)

Formation of a local assessment district like TAAD *requires* that the work to be done must be a public improvement:

> "The elements which an improvement must possess in order to justify a local assessment based on the theory of benefits are certainly two in number, and possible three.  The first is that *the improvement must be a public one; that is, it must be one which confers a general benefit upon the public at large*, and which, therefore, the public, acting through its government, may construct without the consent of the particular individuals affected. . . .  The second element essential to a valid local assessment is that the improvements must confer an especial and local benefit upon the property which is to be assessed."  (*Federal Construction Co. v. Ensign*, 59 Cal. App. 200, 209 [1922].)

---

[4]   Any work of improvement contracted for by a public entity is a public work.  (Civ. Code § 3100.)

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1  See also, Atty. Gen. Opinion 61-90 (1962).

2          As the City substantially participated in the design and construction of the

3  TAAD improvements, all of the work done pursuant to TAAD is a public improvement

4  for purposes of inverse condemnation liability.

5

6          3.       The Beachwood Property Was Damaged By The

7                   Development of Additional Wetlands on the Property

8          Clearly Beachwood has been damaged by the emergence of wetlands on the

9  Property.

10          In 1990, the City approved a Vesting Tentative Map for 85 lots, including 83

11  residential lots, finding no significant environmental impacts would arise from the

12  subdivision. (Exh. 141, 147.)  Only two lots were set aside from development. (Exh.

13  448.)  As the City found in Res. No. C-26-00, the 1990 Vesting Tentative Map was

14  approved to prevent development where wetlands then existed. (Exh. 179, p. 1.)  From

15  1990 to 2000 — during which time the Beachwood subdivision could not go forward

16  because of the City-adopted sewer moratorium — additional wetlands developed on

17  Beachwood. (Exh. 179, pp. 2, 3, 9; Josselyn Decl, ¶13.)  The additional wetlands now

18  render Beachwood undevelopable as a residential subdivision. (Josselyn Decl, ¶¶ 14,

19  24.)  The City denied the CDP for 83 residential lots on Beachwood in 2000 due to the

20  emergence of the new wetlands, and the Coastal Commission also found wetlands

21  throughout the property. (Exh. 179; Mudge Decl, ¶¶ 6, 10.)

22

23          Thus, what was once an approved 83-home subdivision is now nothing but

24  a wetland preserve, where water can stand but people cannot.  Yamagiwa's "vested

25  right" to develop 83 residential lots on Beachwood was snatched away from her, all

26  while she was paying nearly $1 million for expansion of the City's sewage treatment

27

28

plant — overtaken by a scientific debate about hydrology, hydrophytic vegetation, and hydric soils.

Any definite physical injury to land or an invasion of it cognizable to the senses, depreciating its market value, is a damage in the constitutional sense.  (*Albers*, 62 Cal. 2d at 260.)  "[D]amage from invasions of water or other liquid effluents often provides the basis for inverse liability."  (*Varjabedian v. City of Madera*, 20 Cal. 3d 285, 297 [1977].)  The new wetlands on Beachwood have clearly damaged Yamagiwa's Property.

4.    The City's Public Works Are a Substantial Cause of the Damage to Beachwood

The final element of liability for inverse condemnation is "substantial causation,"  which is different from the tort concept of "proximate causation."[5]

As the Supreme Court explained in *Belair v. Riverside County Flood Control Dist.*, 47 Cal. 3d 550, 559 (1988):

> "Thus, in order to establish a causal connection between the public improvement and the plaintiff's damages, there must be a showing of ' '"a substantial cause-and-effect relationship excluding the possibility that other forces *alone* produced the injury."' "

Critically, the public improvement must be *a* substantial cause of the damage, not *the* substantial cause.  In *Blau v. City of Los Angeles*, 32 Cal. App. 3d 77 (1973), city streets were constructed in 1937 and 1938 by cutting into the toe (i.e., the bottom) of a hillside.  A landslide occurred in 1966 after heavy rainfall, damaging Blau's property.  Blau sued in inverse condemnation, claiming the earlier cut was the primary

---

[5]    In *Albers*, the California Supreme Court initially used the phrase "proximate causation."  (*Albers*, 62 Cal. 2d at 263-264.)  But five years later in *Holtz*, the Supreme Court recognized the "greater precision" of accepting the term used by Professor Van Alstyne — "substantial causation" — to make clear that there was no element of foreseeability in the inverse condemnation standard.  (*Holtz*, 3 Cal. 3d at 304 n. 9.)

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

1    cause of the landslide.  (*Blau*, 32 Cal. App. 3d at 81.)  The jury returned a verdict in favor

2    of the City, and Blau appealed.

3            The Court of Appeal reversed, agreeing with Blau's contention that the jury

4    was improperly instructed on causation.  (*Blau*, 32 Cal. App. 3d at 83 n. 2.)  This was

5    error:

6            "[T]here well may be more than one substantial factor and
             even more than one *sine qua non* or 'substantial cause'
7            operating to produce property damage . . . [but] . . . *each such*
             *important causal element is legally responsible notwithstanding the*
8            *contribution of another . . . .*"  (*Blau*, 32 Cal. App. 3d at 85,
             emphasis added.)
9

10

11   Accordingly, the special verdict form which asked if the street construction was "*the*"

12   substantial cause of the damage was improper; only "*a*" substantial cause need be

13   shown.  (*Blau*, 32 Cal. App. 3d at 86.)

14           Thus, "inverse condemnation liability may be established where the public

15   improvement constitutes *a substantial cause of the damage, albeit only one of several*

16   *concurrent causes*."  (*Belair*, 47 Cal. 3d at 559 [emphasis added]; *Souza*, 164 Cal. App. 3d at

17   171; *Ingram v. City of Redondo Beach*, 45 Cal. App. 3d 628, 633-634 [1975].)

18           Applied here, the TAAD improvements need only be *a* substantial cause of

19   the damages to Beachwood.  Beyond doubt, they are.

20

21           First, there is the testimony of Gary Whelen, the only eyewitness who

22   observed construction of the TAAD improvements every day from September 1983

23   through 1985 and who was still a City employee in 2000 when the City found new

24   wetlands on the Property.  He knew immediately that the wetlands were caused by the

25   TAAD construction:

26           "Q.    The construction of improvements on the
             Beachwood property in the course of the Terrace Avenue
27           Assessment District Project by the City's contractor, based on
             your involvement in that process as the City inspector, when
28

1

2

3

you ultimately heard years later that there were wetlands on the Beachwood property, you felt that the City's construction contributed to that.  True?
     A.    *That's correct.*"  (Exh. 452 [Whelen Depo, 272:12-19], emphasis added.)

4

5

6

7

8

     The TAAD improvements were "*a*" substantial cause of the emergence of new wetlands on Beachwood because topographic changes to the property during construction of the TAAD improvements created the low-lying areas where stormwater was able to collect.  (Josselyn Decl, ¶¶ 15-24; Weirich Decl, ¶¶ 38, 46-52.)

9

10

11

12

13

14

15

16

17

18

19

     Dr. Weirich's declaration points out three ways in which the TAAD construction created conditions conducive to the formation of wetlands.  First, the Northern Drain dammed the historic northwesterly path of flow of surface water *off* of Beachwood toward Glencree (and causing flooding on Grand View).  Pre-TAAD, the Beachwood topography showed a gently sloping property with a low spot on its northern border.  Post-TAAD, the low spot was dammed both by construction of the 1837-foot long and 6- to 11-foot deep compacted trench and the borrowing of dirt from the area of the then-planned street on the north side of Beachwood.  (Weirich Decl, ¶¶ 21, 24, 26, 35-37.)

20

21

22

23

24

25

26

27

28

     Second, the gaping borrow "pits" that the City dug on Beachwood when the project ran short of fill became elongated pits in which storm water was trapped.  (Weirich Decl, ¶¶ 31-33, 46-52; Josselyn Decl, ¶¶ 16-18.)  These huge "borrow areas" did not exist pre-TAAD; the July 1984 excavations are clearly visible on the post-borrow April 23, 1985 aerial photo (Exh. 44), but <u>not</u> on the pre-borrow March 28, 1984 aerial photo (Exh. 35).  The borrow areas immediately filled up with rainwater like "small lakes" when the first winter rains came, in October 1984.  And the City's effort to try to drain them into the Storm Stubs created depressions south of the Storm Stubs in which water simply sat.  (Exh. 432 [Photos 4, 5, 10, 15].)

1    Third, there was no plan of maintenance for the 48" debris rack/inlet in the

2  southeast corner of Beachwood.  Debris that was washed down the channel encased

3  what were supposed to be 4-foot high metal bars, covering them completely or leaving

4  barely any room for water to get into the drain.  (Exh. 432 [Photos 1, 7, 12].)  The City

5  followed a head-in-the-sand "fix it when it breaks" policy when it came to maintaining

6  its public works on Beachwood.  (Exh. 450 [Moorhouse Depo, 23:13-21].)  That is no

7  maintenance plan at all; a "fix it when it breaks" policy is enough to establish inverse

8  condemnation liability when the inevitable "break" happens.  (*Pacific Bell v. City of San*

9  *Diego*, 81 Cal. App. 4th 596, 608 [2000]; *McMahan's of Santa Monica v. City of Santa Monica*,

10  146 Cal. App. 3d 683, 698 [1983].)

11    Weirich's 19 site photographs — attached collectively as Exh. 432 — from

12  2003 through 2005 show the standing water on various places on Beachwood.  Water is

13  repeatedly seen standing in low areas created by the City during the TAAD project.  Dr.

14  Josselyn's declaration demonstrates that the water standing in these low-lying areas has

15  produced wetlands.  Most of the wetlands precisely track the locations of the borrow

16  areas dug by the City's contractor, or the trenches to the storm drains dug by the City

17  itself in an unsuccessful effort to drain the borrow pits.  Others are in areas where the

18  historical northwesterly-flowing stormwater had its path dammed at the north side of

19  Beachwood.  (Josselyn Decl, ¶¶ 15-22.)

20

21    In the final analysis, the issue of substantial causation in this case is rather

22  simple.  As the Court in *Jorgensen v. Beach 'N' Bay Realty, Inc.*, 125 Cal. App. 3d 155, 163

23  (1981) noted, quoting Bob Dylan:  "You don't need a weatherman to know which way

24  the wind blows."  That adage applies here as well.  When you dig large holes,

25  stormwater will collect in them.  If the water can't drain out, it will stand in the holes for

26  long periods of time.  After enough years, the City-created "small lakes" have become

27

28

1    City-certified "wetlands."  The science may be a bit complicated, but the issue of

2    "substantial causation" under these facts is not.

3            The City's public works during the construction of TAAD were a substantial

4    cause of the damage to Beachwood.

5

6                              **CONCLUSION**

7            "The tendency under our system is too often to sacrifice the
        individual to the community; and it seems very difficult in
8        reason to show why the State should not pay for property
        which it destroys or impairs the value, as well as for what it
9        physically takes."  (*Albers*, 62 Cal. 2d at 263 [internal
        quotation marks omitted].)
10

11

12           The City of Half Moon Bay is asking Yamagiwa to sacrifice the Beachwood

13   Property — from what was a developable 83-home subdivision to what is now a

14   dormant wetlands preserve.  Because the wetlands on Beachwood were substantially

15   caused by the City's own public project, the City is liable in inverse condemnation.

16           Yamagiwa concedes that the *amount* of her damages for inverse

17   condemnation cannot be resolved on summary judgment.  But the undisputed material

18   facts entitle her to summary judgment on *liability* for inverse condemnation.  Yamagiwa

19   therefore respectfully requests the Court to grant summary judgment in her favor on the

20   issue of liability for inverse condemnation.

21

22

23   Dated:  February 7, 2007           MANATT, PHELPS & PHILLIPS, LLP

24

25                                     By:  /s/ Edward G. Burg
                                           Edward G. Burg
26                                         *Attorneys for Plaintiff* Joyce Yamagiwa, Trustee

27

28   41082898.1

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES