1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  JOYCE YAMAGIWA, TRUSTEE OF THE          No   C  05-4149  VRW
    TRUST CREATED UNDER TRUST
12  AGREEMENT DATED JANUARY 30, 1980            ORDER
    BY CHARLES J KEENAN, III AND ANNE
13  MARIE KENNAN, FOR THE BENEFIT OF
    CHARLES J KEENAN IV, AS TO AN
14  UNDIVIDED 50% INTEREST, AND
    TRUSTEE OF THE TRUST CREATED
15  UNDER TRUST AGREEMENT DATED
    JANUARY 30, 1980, BY CHARLES J
16  KEENAN III AND ANNE MARIE KEENAN
    FOR THE BENEFIT OF ANN MARIE
17  KEENAN, AS TO AN UNDIVIDED 50%
    INTEREST,
18
            Plaintiff,
19
        V
20
    CITY OF HALF MOON BAY, COASTSIDE
21  COUNTY WATER DISTRICT AND DOES 1-
    50,
22
            Defendants.
23
    _____/
24

25

26          Joyce Yamagiwa ("Yamagiwa"), brings this action alleging

27  that defendant City of Half Moon Bay ("City") damaged certain real

28  property that she holds in trust.  Doc #1-2.  The property, known

United States District Court

For the Northern District of California

as the Beachwood Property, is located in the City of Half Moon Bay at Assessor's Parcel No 048-280-020 ("Property" or "Beachwood Property").  Id.

Yamagiwa brings a federal claim for inverse condemnation and pendent state claims for inverse condemnation, nuisance, trespass and recovery of amounts paid to finance public improvements.  Id.  Yamagiwa moves for summary judgment on liability as to the state inverse condemnation claim.  Doc #39. The City moves for summary judgement on all claims.  Doc #47.  For reasons discussed below, plaintiff Yamagiwa's motion is DENIED. Defendant City of Half Moon Bay's motion is DENIED.


I

The following facts are undisputed:

A

The Beachwood Property is an undeveloped rectangular 24.7-acre parcel on the east side of Highway 1 in the City of Half Moon Bay.  Doc #70, Ex 7 at 1; Doc #46, Ex 125.  Plaintiff alleges that a storm drain project changed the topography of the area in which the Property is located, preventing water from flowing off the land and creating a trap that collects water in depressions dug by the City.  Stabilization of this condition, plaintiff contends, physically damaged the Property and forms the grounds for plaintiff's claims.

At least since the mid-1970s, Beachwood has been zoned by the City for single-family residential use.  Doc #45, Ex 121.  For properties located in the coastal zone (like Beachwood), subdivision requires a Coastal Development Permit ("CDP") under the

**United States District Court**
For the Northern District of California

Coastal Act.  Cal Pub Res Code § 30600(a).  Cities that have an approved Local Coastal Plan ("LCP") can issue CDPs themselves.  But until a city's LCP is approved, the CDPs must be issued by the Coastal Commission.  Cal Pub Res Code § 30519(a); <u>City of Half Moon Bay v Super Ct</u>, 106 Cal App 4th 795 (2003).

Approval of an LCP is typically a two-step process.  First, the Coastal Commission must certify a Land Use Plan (LUP) proposed by the local entity.  Second, the Coastal Commission must certify the "implementing ordinances" by which the LUP will be implemented.  Cal Pub Res Code § 30511(b).

Half Moon Bay's LUP was certified by the Coastal Commission in 1985.  Doc #45, Ex 136.  Its implementing ordinances, and thus its entire LCP, were certified in 1996.  Id at 204.

**B**

William Lyon (Lyon) acquired the Beachwood Property in the late 1970s.  Doc #52, Ex 2 at 148:19-149:25.  Lyon also owned neighboring properties.  Doc #52, Ex 20 at HM213044-213061.  In 1976, the City approved a tentative map for 97 residential lots on Beachwood.  Doc #1-2 at ¶7.

While the Beachwood parcel is relatively flat, hills rise to the east.  Doc #46, Ex 425.  A 1978 aerial photograph shows two seasonal creeks on the Property that drained the eastern hills.  Doc #44, Ex 9.  Creek 1 flowed down from the eastern hills and curved northward onto Beachwood.  Creek 2 entered Beachwood at its southeast corner, flowing westward along its southerly border.  Doc #48, Ex 451 at 26:1-27:13; Doc #45, Ex 70; Doc #48, Ex 453 at 59:3-60:7; Doc #49 (Weirich Dec) at ¶¶13-18.  Creek 1 sometimes overflowed and flooded Terrace Avenue, south of Beachwood.  Doc

3

United States District Court

For the Northern District of California

#48, Ex 451 at 28:4-21, 28:25-29:6.  And the storm water that flowed onto and then off of Beachwood sometimes caused flooding to the Grandview Terrace area to the north of the Property.  Doc #48, Ex 453 at 54:23-55:3; Doc #49 (Weirich Dec) at ¶18.  In 1982, Lyon and other property owners in the area petitioned the City to form an assessment district to remedy area-wide drainage and flooding problems.  Doc #52, Ex 2 at 167:4-169:1, 169:18-25 & sub-exs 1008, 1009.

The City created the Terrace Avenue Assessment District (TAAD) in 1982.  Doc #44, Ex 21; Doc #71 at 1.  As part of the TAAD, Lyon offered, and the City accepted, a storm drain easement over the portion of the Property containing TAAD improvements.  Doc #45, Ex 75.

Several details concerning the work done on Beachwood are noteworthy:

The Northern Drain.  Along the entire 1,837-foot northerly border of the Property, a 30" underground storm drain pipe was laid in an east-west direction.  Doc #49, Ex 21.  After the storm drain was placed in the trench, the trench was backfilled with compacted soil.  Doc #48, Ex 451 at 66:9-68:7, 106:22-107:6, 117:2-14.  Seven vertical manhole shafts were built from the surface down to the pipe, and the compacted trench was filled to the rim of the manhole covers.  Id at 64:24-65:6, 118:21-119:4; Doc #46, Ex 430.

The Western Drain.  At the northwest corner of Beachwood, the east/west Northern Drain turned southerly, where it continued to run in the City's easement on the west side of Beachwood, adjacent to Highway 1.  The Western Drain was constructed in the

4

same trench/backfill manner, though the trench was deeper.  Doc #44, Ex 21, Sheet 6; Doc #49 (Weirich Dec) at ¶28.

        **The Southern Drain.**  Along Beachwood's southern boundary, the City placed a pipe 48" in diameter to drain a large watershed area from the eastern hills.  Doc #44, Ex 21, Sheet 14.  The inlet to the Southern Drain was placed in Creek 1.  Doc #48, Ex 451 at 76:23-77:4.  A large debris rack was installed atop the inlet to catch downstream brush.  Id at 77:5-16; Doc #48, Ex 453 at 52:12-23; Doc #49 (Weirich Dec) at ¶30.

        **Borrowing of Dirt.**  During construction, the contractor identified a shortage of fill, and the City approved a change order.  Doc #71, Ex 3.  At the request of the owner, fill was taken from the Property where the streets were being proposed.  The contractor staked out the roads according to the street locations on the 1976 tentative map.  Doc #52, Ex 1 at 161:6-23, Ex 2 at 187:6-188:19, Ex 25 at 4:17-19.  Lyon used 8,000 cubic yards of fill from the Property for his development of a neighboring site.  Doc #52, Ex 1, sub-ex 43.  Another 5,000 cubic yards went to construct a connection to Highway 1.  Id.  The grading left depressions in the areas where the then-planned streets were to go.  Doc #45, Ex 44; Doc #48, Ex 453 at 110:8-14, 110:24-111:3.

        The TAAD project was accepted as complete by the City on July 2, 1985.  Doc #45, Ex 63.  It is the TAAD project that plaintiff alleges is responsible for physical damage to the Property.

                                    C

        In June 1987, Lyon applied for a tentative subdivision map for a 97-lot single-family subdivision on the Property.  Doc

**United States District Court**
For the Northern District of California

#52, Ex 10.  The City prepared a Negative Declaration for the proposal, which stated:

> The site currently has some drainage problems.  Storm drains have been installed along the north and south property lines as part of the Terrace Avenue Assessment District.  However, the center portion of the site still does not drain properly during periods of intense rainfall.  The installation of typical subdivision improvements including catch basins and a storm drain system could solve the drainage problems that exist on the site.  Doc #71, Ex 6 at HM306338.

In January 1989, the California Department of Fish & Game ("CDFG") commented that the Negative Declaration was inadequate due to "the presence of riparian wetland habitat on the project site, which was not identified in the document * * * During a field visit by Dept. Personnel, approximately 15-20 percent of the project site had riparian wetland vegetation."  Id, Ex 5 at 24-25.

In response to CDFG's comment, the Property owner hired an expert, Harding Lawson Associates ("HLA"), which held on-site meetings with CDFG.  Doc #52, Ex 13.  HLA prepared a 1989 report, which was completed in April 1990, and provided:

> During these meetings, CDFG representatives indicated that CDFG would require mitigation for the loss of all areas onsite that supported facultative, facultative wet and/or obligate wetland plant species.  Id at 1874.

> Wetland vegetation were found to be dominant on approximately 2.5 acres on the center portion of the property.  Hydric soils and wetland hydrology characteristics are not present.  Id at 1877.

> Construction of the proposed Beachwood Subdivision would result in the loss of approximately 2.5 acres of wetland/riparian vegetation as defined by the CDFG * * *. Id at 1884.

In January 1990, Pilarcitos Valley Associates (PVA) purchased the Property and entered into an Agreement Regarding Proposed Stream or Lake Alteration with CDFG, which mitigated the

United States District Court
For the Northern District of California

loss.  Doc #52, Ex 11.  In July 1990, the City Council approved the Beachwood Subdivision vesting tentative map ("VTM") for 83 residential lots.  Doc #93, Ex 1.  Lots 1 and 19 of Block 3 were to be set aside and dedicated to the City for open space or park purposes.  Lot 19 was in the southeast corner where the creek, old abandoned stock pond and the inlet to the Southern Drain were located.  Doc #45, Exs 141, 147; Doc #48, Ex 462 at 55:9-56:1.

In October 1990, PVA applied to the Coastal Commission for a CDP.  Doc #52, Ex 27 at 2136-43.  In March 1991, however, the City adopted the first of a series of urgency ordinances placing a moratorium on the issuance of building permits that would require new sewer service, due to a shortage at the local sewage treatment plant.  Doc #52, Ex 16.  Collectively these ordinances resulted in a sewer moratorium that lasted until 1998.  Id.  Because of the lack of sewer capacity, the Coastal Commission would not process PVA's application for a CDP.  Doc #70, Ex 2 at ¶47.

D

Yamagiwa purchased the Property in 1993.  Doc #52, Ex 14, sub-ex 1246.  In April 1996, the Coastal Commission certified the City's LCP, thereby transferring to the City the authority to issue CDPs.  Id, Ex 27 at 4026.  In February 1998, with the sewage capacity issue solved, Yamagiwa filed an application for a CDP.  Doc #48, Ex 1149.  In October 1998, the City prepared an initial study, which stated that CDFG had designated "2.5 acres of the Property as wetland/riparian habitat, and required on-site mitigation in the form of a 1.6 acre conservation area and a City Park."  Doc #71, Ex 8 at HM213843.  The record does not establish the location of this 2.5 acres of wetlands; indeed, there is some

United States District Court

For the Northern District of California

question whether it exists at all.  Doc #87, Ex 8, App C, HLA-1, Site 1-6 (HLA work papers).

In 1999, the case of <u>Bolsa Chica Land Trust v Super Ct</u>, 71 Cal App 4th 493 (1999) was decided.  Prior to that decision, the Commission had interpreted the Coastal Act to allow residential development of wetlands, so long as the loss of wetlands was mitigated.  <u>Bolsa Chica</u> held for the first time that the Coastal Act does not allow residential development of protected wetlands in the Coastal Zone.  Accordingly, in 2000, the City denied Yamagiwa's request for a CDP, finding that new wetlands had developed on Beachwood since the approval of the VTM in 1990.  Doc #71, Ex 7; Doc #45, Ex 179 at ¶¶2,3,9.

E

On May 17, 2000, Yamagiwa filed a complaint in state court for inverse condemnation, nuisance and trespass, based on allegations of a physical invasion of the Property (the "Physical Taking Case").  Doc #70, Ex 1.

On May 19, 2000, Yamagiwa filed a second lawsuit, also in state court, challenging the City's denial of the CDP (the "CDP Denial/Regulatory Taking Case").  Id, Ex 2.  In addition to seeking a petition to set aside the City's denial of the CDP, the complaint contained a cause of action "for damages caused by a taking 42 U.S.C. § 1983, U.S. Const. amend. 5; Cal Const. art. 1, §19)."  Id at 39.

On February 22, 2001, the trial court granted the writ petition and ordered the City to issue a CDP.  Id, Ex 4.  In March 2003, because she prevailed in the CDP Denial/Regulatory Taking Case, Yamagiwa dismissed her Physical Taking Case <u>without</u>

8

United States District Court

For the Northern District of California

1    <u>prejudice</u>, with an agreement that all applicable statutes of
2    limitations would be tolled from May 17, 2000.  Id, Ex 3.

3          In January 2004, the parties reached a non-cash
4    stipulated settlement in the CDP Denial/Regulatory Taking Case.
5    Id, Exs 4 & 6.  A final subdivision map was conditionally approved
6    by the City, to be recorded only if Yamagiwa successfully defended
7    the court-ordered CDP on appeal.  Id.  Yamagiwa dismissed <u>with</u>
8    <u>prejudice</u> the remaining causes of action in the CDP
9    Denial/Regulatory Taking Case, "including all of Yamagiwa's damage
10   claims for alleged takings and violations of various civil rights,
11   * * * Yamagiwa shall take nothing by way of these claims."  Id.

12         The City appealed the trial court decision ordering the
13   City to approve the CDP and, on July 27, 2005, the state court of
14   appeal reversed and upheld the City's determination of wetlands and
15   the City's denial of the CDP.  <u>Yamagiwa v City of Half Moon Bay</u>,
16   2005 WL 1774402.

17                              F

18         On September 8, 2005, Yamagiwa filed this action,
19   reviving the claims in the Physical Taking Case that were
20   previously dismissed without prejudice.  The City removed the
21   action to this court on October 13, 2005.  Doc #1-1.

22         The state court of appeal 2005 decision arguably settled
23   the dispute *whether* there were new wetlands on the Property.  Based
24   on the assumption of new wetlands, the issue in this case is what
25   caused those wetlands to develop.  Yamagiwa alleges that a
26   substantial cause of the creation of the newly formed wetlands was
27   the City's TAAD public works construction.  Doc #1-2 at ¶9.
28   \\

                              9

United States District Court
For the Northern District of California

Yamagiwa alleges that several features of the construction have caused water to invade, come onto and remain on the Property, including construction of a berm that directs water to the Property, street improvements in the Highland Park Subdivision that channel surface water to the Property and problems with the City's storm drain system that cause water to be deposited on the Property.  Id at ¶11.

Yamagiwa also alleges that the removal of fill left depressions on the surface of the Property and that water collects or "ponds" in those depressions.  Id at ¶12.  Yamagiwa further alleges that the ponding continued during the seven year sewer moratorium.  Id.

II

When reviewing a motion for summary judgment, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322–23 (1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56(c).

10

In response to the motion, the non-moving party may not simply rely on the pleadings, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists. <u>TW Elec Serv v Pacific Elec Contractors Assn</u>, 809 F2d 626, 630 (9th Cir 1987). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id at 249. Furthermore, the evidence presented by both parties must be admissible. FRCP 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. <u>Thornhill Publishing Co, Inc v GTE Corp</u>, 594 F2d 730, 738 (9th Cir 1979).

III

*Inverse Condemnation Claims*

Both parties have moved for summary judgment on Yamagiwa's inverse condemnation claims. For reasons discussed below, the court DENIES both sides's motions.

A

The court first addresses Yamagiwa's motion. Yamagiwa moves for summary judgment only as to her state inverse condemnation claim, brought under Article 1, Section 19 of the California Constitution. Section 19 provides in relevant part: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Four elements are required to establish liability for inverse condemnation: First, Yamagiwa has an interest in the Property; Second, the City

substantially participated in the planning, approval, construction or operation of a public project or public improvement; Third, Yamagiwa's property suffered damage; and Fourth, the City's project, act or omission was a substantial cause of the damage. <u>Imperial Cattle Co v Imperial Irrigation Dist</u>, 167 Cal App 3d 263, 269 (1985), disapproved on other grounds in <u>Bunch v Coachella Valley Water Dist</u>, 15 Cal 4th 432 (1997).

Here, there is no dispute as to the first and third elements: Yamagiwa owns the Property, and the Property suffered damage. The issues in this case go to the extent of the City's participation in the public projects and, relatedly, whether the City was a substantial cause of the alleged damage. Specifically, the City argues that the motion can be denied on any one of five separate grounds: First, the substantial cause of the wetland development was the conduct of the prior Property owners in requesting storm drain improvements that were intended to service a finished subdivision and not drain the raw land. Second, there is considerable disputed evidence on whether the TAAD improvements were a substantial cause of the wetland development. Third, Yamagiwa cannot show unreasonable conduct by the City, a requirement for flood control cases. Fourth, Yamagiwa cannot show that she took reasonable measures to protect the Property. And fifth, there are intervening causes for the wetlands. Doc #83 at 10-11. As discussed below, the court need only address the City's second argument.

Yamagiwa argues that the following evidence establishes beyond dispute that the TAAD measures were a substantial cause of the wetlands: First, Gary Whelen, the City's Building Inspector and

**United States District Court**
For the Northern District of California

the only person who observed construction of the TAAD improvements every day from September 1983 through July 1985 gave testimony that he "felt that the City's construction contributed to [the wetlands]." Doc #48, Ex 452 at 272:12-19. Second, Yamagiwa's experts, Dr Josselyn and Dr Weirich, testify to how the TAAD construction created conditions conducive to the formation of wetlands, including how the TAAD measures created low-lying areas where stormwater was able to collect. Doc #49. Dr Weirich, a hydrology expert, opines that the Northern Drain dammed the historic northwesterly path of flow of surface water off of Beachwood. Id, (Weirich Dec) at ¶¶21, 24, 26, 35-37. Dr Weirich also opines that the City's grading activities, when the City removed fill, created gaping "borrow pits" in which storm water was trapped and that the City's efforts to drain them into storm stubs created depressions south of the storm stubs in which water sat. Id at ¶¶31-33, 46-52. Finally, Dr Weirich opines that the City's failure to maintain the 48" debris rack/inlet in the southeast corner of the Property created conditions conducive to wetland formation. Id at ¶¶39-45. Yamagiwa also refers to 19 site photographs from 2003 to 2005 that show where standing water has produced wetlands. Doc #46, Ex 432. According to Dr Josselyn, most of these wetlands track the locations of the City's grading, trenches to the storm drain dug by the City or the dammed path on the northside of the Property. Doc #49, (Josselyn Dec) at ¶¶ 16-22, 24.

The City places these asserted "facts" in dispute or weakens their probative value. The City first correctly points out that Whelen is not a wetlands expert, and his lay opinion is not

United States District Court
For the Northern District of California

definitive evidence of causation.  Doc #87, Ex 11 at 16:13-22.
Regarding Dr Weirich's opinions: The City also points out that
photographs taken from 2003 to 2005 have little, if any, relevance
to how the TAAD inlets functioned from 1985-2000.  Doc #46, Ex 432.
Further, Whelen testified that as late as February 1999, "the 48-
inch and the 30-inch storm systems appear[ed] to be clear and
working as designed."  Doc #87, Ex 1 at 292:3-293:4, 293:13-21.
Finally, the City's expert, Dr Coats, concludes that the TAAD
improvements *reduced* the average external contribution of water to
the Property by 97-98 percent when compared with pre-TAAD levels
and that "[i]f not for the TAAD improvements, the duration and
frequency of ponding on the site would be greater than it is
today."  Doc #87, Ex 7 at 3-5.  Dr Coats could find no physical
evidence that water had overtopped the drainage basin surrounding
the 48-inch inlet or that the debris in the drainage channel was
causing water to bypass it.  Id at 8.  Regarding Dr Weirich's
opinion that the 30-inch storm drain created a dam, the City's
expert, Dr Huffman, disagrees that the northern drain is preventing
all water from leaving the Property and opines that the drain did
not substantially alter subsurface flow of water.  Doc #87, Ex 12
at 2-4.  The City also points out that Dr Weirich's dam theory is
refuted by evidence of a pre-TAAD central depression where water
ponded on the Property.  Doc #87, Ex 8 at 24, Ex 3 at 00617 &
00636.  Finally, regarding Dr Weirich's opinion that the borrow
"pits" created wetlands, Dr Coats and Dr Huffman theorize that the
actual amount of water on the site is not more than before TAAD,
and that the ponding is simply easier to see on aerial photographs
due to removal of topsoil.  Doc #87, Ex 9 at 6, Ex 7.

**14**

United States District Court
For the Northern District of California

        Further, the City submits evidence to refute the
inference that TAAD measures substantially caused the wetlands.  Dr
Huffman concludes that, based on his examination of historical
evidence, wetlands pre-dated the TAAD and that normal rainfall, in
and of itself, is enough to support wetlands on the Property.  Doc
#87, Ex 8 at 2, 23-27, 36-37.  Dr Huffman also discovered wetlands
on the Glenacre Property directly to the North.  Id.  Finally, the
City points out that Yamagiwa and prior owners have engaged in
continuous development activities on the Property since the late
1970s that could have impacted topography, hydrology and plant
growth.  Doc #52, Ex 4, Ex 9 at 12:5-16, 13:3-14:16, Ex 11, Ex 25
at 5:2-8; Doc #87, Ex 2 at 82:17-22, 97:8-20, 99:4-102:15, 122:17-
126:5, 132:20-133:18.  This included grading, compacting of lots,
disking for fire protection, construction of improvements to
connect to Highway 1 and removal of piles of debris, some as large
as "whole houses."  Id.

        Yamagiwa does not refute these points in her reply brief.
Doc #88-1.  In sum, the City correctly points out that proof of
"substantial causation" will involve a battle of the experts over
material facts, preventing the court from granting summary
judgment.  Accordingly, Yamagiwa's motion is DENIED.

                                  B

        The court next addresses the City's motion for summary
judgment on both the state and the federal inverse condemnation
claims.  The City first argues that Yamagiwa's claims are time
barred.  In California, the statute of limitation is three years
for a physical taking claim arising out of physical damage to real
property and five years for a complete physical taking of title to

15

property.  Cal CCP §§ 318, 319, 338.  There is no federal statute of limitations for physical taking claims, and, therefore, federal courts apply relevant state statutes.  See Johnson v Railway Express Agency, Inc, 421 US 454, 462 (1975); Sierra Club v Chevron USA, Inc, 834 F2d 1517, 1521 (9th Cir 1987).  Here, Yamagiwa alleges physical damage caused by the presence of City-created wetlands on the Property and her claim is, therefore, controlled by either the three- or five-year statute of limitations.

It is undisputed that the alleged physical taking – the drainage measures and removal of fill – occurred in 1984 and 1985. The source of the claim – wetland formation resulting from these measures – is not a single event; it is continuous.  Where alleged damage to private property results from a "continuous process of physical events" rather than a single event, federal law provides that a claim accrues when the taking has "stabilized."  United States v Dickinson, 331 US 745, 749 (1947).

> [S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined.  Thus, during the time when it is uncertain whether the gradual process will result in a permanent taking, the plaintiff need not sue, but once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run.

Boling v US, 220 F3d 1365, 1370-71 (Fed Cir 2000).  The flexible approach of Dickinson has been followed by the California courts. See Pierpont Inn, Inc v State of California, 70 Cal 2d 282, 291-93 (1969), disapproved on other grounds in Los Angeles MTA v Continental Development Corp, 161 Cal 4th 694 (1997).

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

It is undisputed that Yamagiwa first filed a claim for physical taking on May 17, 2000 and that the statute was tolled from that date.  Yamagiwa argues that her claim is timely because it did not accrue until the City denied her CDP application on May 2, 2000.  Doc #80 at 15.  Because she filed her physical taking claim in 2000 and because that claim was tolled for purposes of this action, Yamagiwa argues that the present claim is timely.  The City argues that the 2000 denial was a regulatory act and cannot form the basis for a physical taking claim.  Further, the City argues that Yamagiwa's inverse claim accrued, at the latest, in 1989.

1

The City's argument that if the denial of the CDP constituted any taking, it had to be a regulatory taking is predicated on the following:

> Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation.  But where the government merely regulates the use of property, compensation  is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole.  The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

Yee v City of Escondido, 503 US 519, 522-23 (1992) (citations omitted).  Yamagiwa dismissed her regulatory taking claim with prejudice in 2004.  The City argues that Yamagiwa cannot merge the accrual of her dismissed regulatory taking claim with her physical taking claim to avoid the statute of limitations.  Doc #92 at 2.

17

United States District Court

For the Northern District of California

While Yamagiwa admits this is not a regulatory taking case, Doc #80 at 1, she contends that "the world is not so neatly divided into physical and regulatory takings."  Id at 12.  Here, according to Yamagiwa, denial of the CDP was the "manifestation" of constitutional damages, and an earlier complaint would have been dismissed as premature for lack of damages.  Id at 13-14.

The court agrees.  Damages are a required element of a physical taking claim.  <u>Frustruck v City of Fairfax</u>, 212 Cal App 2d 345, 368 (1963) ("Actions for the taking and damaging of private property are subject to the rule that proof of damage is an essential part of the plaintiff's case"); <u>Northwest LA Fish & Game Preserve Com'n v US</u>, 446 F3d 1285, 1291 (Fed Cir 2006) ("a claim does not accrue until the claimant suffers damage.")  Indeed the "stabilization" rule governing the statute of limitations can be read as an iteration of this basic doctrine. "*Dickinson* established the principle that, when the government allows a taking of land to occur by a continuing process of physical events, plaintiffs may postpone filing suit until the nature and extent of the taking is clear." <u>Northwest</u> at 1291 (citation omitted).

Indeed, the Federal Circuit's opinion in <u>Northwest</u> is instructive.  In <u>Northwest</u>, a Louisiana state agency brought suit against the United States alleging that actions of the Army Corps of Engineers damaged a lake, called Black Lake, that the state agency maintained for recreation.  The agency was required periodically to drain the lake by directing water into the adjacent Red River in order to remove aquatic weeds.  <u>Northwest</u> at 1286-87.  The Army Corps constructed a project that created a series of pools, locks and dams on the river.  In 1984, the Corps approved a

design to impound water in one of the pools.  Id.  This reduced the state agency's ability to drain the lake.  In 1996, hydrilla, a submerged weed, became a problem in the lake.  Id at 1287-88. Hydrilla had first been discovered in 1993 and was also found in 1995; but the extent of the weed in 1996 led the state to request permission to draw down the lake.  Id.  In January of 1997, the Corps refused to allow the drawdown.  Id.  The state agency filed suit in 2001, alleging in part appropriation of lands, waters and properties without compensation.  Id at 1288-89.  The Court of Federal Claims dismissed the action on statute of limitations grounds, finding the 6-year statute under the Tucker Act, 28 USC § 1491, was triggered in 1994.  Id at 1289.

The Federal Circuit reversed, finding that the Corp's refusal to drawdown the lake in 1997 triggered the statute.  It wrote:

> A taking occurs when governmental action deprives the owner of all or most of its property interest. (The word "property" "denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it."). For example, "[w]here the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the Fifth Amendment."

Northwest at 1289 (citations omitted).

The court continued:

> [A] claim does not accrue until the claimant suffers damage.  Because some growth of hydrilla is normal, the damage in this case, which was uncontrolled *overgrowth* and the Corps [sic] refusal to reduce the water level, did not occur until January 1997. In 1994, when the Corps had not yet issued a final refusal, there was only the possibility or threat of damage or a taking. A possible future taking of property cannot give rise to a present action for damages. Thus, in this case, until the hydrilla had grown, *and* had grown to harmful levels, *and*

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

the Corps refused to drain the lake to alleviate the harm
caused by the *overgrowth* of hydrilla, damages were not
"present," i.e. they were still unquantifiable and
speculative.

Northwest at 1291 (citations omitted).

Accordingly, while the Federal Circuit found that
significant hydrilla growth appeared by 1997, it chose that date at
least in part because that is when the Corp took governmental
action – by refusing the drawdown.  Similarly here, the City denied
Yamagiwa's application for a CDP in 2000, thereby fixing the date
Yamagiwa sustained damage.

Finally, the court notes that Yamagiwa, through agreement
with the City, dismissed her physical taking claim without
prejudice in 2003.  The City argues that damage stabilized by 1989,
requiring Yamagiwa to bring the claim by 1994 at the latest.  The
agreement between the City and Yamagiwa in 2003, however,
specifically reserved Yamagiwa's right later to re-assert her
physical taking claim.

For the reasons above, the court finds that Yamagiwa's
claim did not stabilize, i e, she did not suffer damage caused by
City-created wetlands, until the 2000 denial of the CDP deprived
her of any right to develop the Property.

The City implies that Yamagiwa could not be damaged by
the 2000 denial because the right to develop in the Coastal Zone
was always contingent on obtaining a CDP.  Doc #92 at 9.  This, of
course, is sophistry.  While the extent and prospects of Yamagiwa's
ability to develop may be relevant to the measure of damages, it
does not change the fact that the extent of the damages, large or
small, first materialized with the 2000 denial.  Indeed it is

undisputed that Yamagiwa purchased the Property with a vesting
tentative map, and the City admits that "Yamagiwa may have suffered
*additional* wetlands damage when the City denied the CDP in 2000."
Doc #92 at 2 (emphasis in original).

**2**

Even assuming arguendo that the 2000 denial did not
trigger the accrual of the inverse condemnation claim, the City has
not met its burden to show that the claim accrued earlier than five
years before the complaint was filed, i e, prior to May 17, 1995.

The City points to the fact that HLA, in consultation
with CDFG, charted wetlands on the Property in 1989, a finding
verified by Yamagiwa's expert, Dr Michael Josselyn. Doc #52, Ex 19
at 52:8-58:8, 60:7-11, 133-137, 164:11-16, 163:5-16. As described
above, the presence of wetlands in 1989-1990 resulted in conditions
imposed on development through the Streambed Alteration Agreement
and the conditions placed on the 1990 VTM. Doc #52, Ex 11, Ex 27
at 1938-39.

Yamagiwa argues, however, that evidence as to the
location and extent of any wetlands in 1989/1990 is unclear and
disputed. Doc #80 at 6. The court agrees. Specifically, the City
fails to establish that any wetlands existing in 1989 were the
alleged City-created wetlands.

The CDFG's 1989 memo stated: "During a field visit by
Department personnel, approximately 15-20 percent of the project
site had riparian wetland vegetation with three small retention
ponds." Doc #71, Ex 5 at 24-25. No map accompanied CDFG's memo,
and no further detail was provided as to what "15-20 percent" of

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

the site CDFG meant, such as whether it referred to the creek channel and abandoned stock pond in the southeast corner.  Doc #49 at 24.   There has never been any dispute that the creek channel and the pond in the southeast corner constituted wetlands and so would not be developed.  Id.  The City argues that, while no map accompanied the CDFG memo, the wetlands report prepared by HLA was created after extensive consultation with CDFG, and the HLA report *did* include a map.  The City submits a copy of this map.  Doc #94, Ex 2.  The City fails to establish, however, what exactly the map is supposed to show and nowhere suggests that the map shows wetland areas corresponding to TAAD areas.  If it wanted to show that the map represented vegetation caused – or even potentially caused – by the TAAD, the City could have easily done so in its brief or any of its several expert reports.  Quite to the contrary, the City admits in its opposition to Yamagiwa's motion that "as shown by the wetlands maps produced by Harding Lawson Associates in 1989 and again by various wetlands experts in 1999, most of the wetlands lie outside of areas allegedly graded by the City."  Doc #83 at 14.  The City continues, "Moreover, even if some of the graded areas and some of the wetland areas are located in similar parts of the Property, such simple correlation is insufficient to show the causation necessary to find liability as a matter of law."  Id.

     The City also points to a portion of the 1989 HLA report identifying wetland vegetation on approximately 2.5 acres on the center portion of the property.  Doc #52, Ex 13 at 1877.  While it is unclear what "center" means, the City, again in its opposition to plaintiff's motion, cites to "evidence of ponding in the *pre-TAAD* central depression."  Doc #83 at 2 (emphasis added).  As noted

22

United States District Court
For the Northern District of California

previously, supra at 7-8, this "evidence" is at best disputed, if not in doubt.

The City further admits that "evidence establishes that the Property contains a large topographic depression where flooding and ponding occurred that predates the construction of the TAAD improvements." Doc #83 at 1, 17. And "according to the City's experts, there were wetlands on the Property before the TAAD improvements were even constructed" and "normal rainfall, in and of itself, is enough to support wetlands on the Property." Id at 2-3, 18, 25.

Finally, Yamagiwa submits compelling affirmative evidence refuting any inference that City-created wetlands had substantially developed by 1989/1990. Specifically, Yamagiwa points to the language of the City's May 2, 2000 Resolution, denying Yamagiwa's CDP. Doc #45, Ex 179. The City Council made the following finding:

> The owners of a 24.7 acre parcel of land generally known as the Beachwood subdivision sought and obtained approval of a vesting tentative map ('VTM' herein) from the City of Half Moon Bay in 1990. That tentative map approved certain conditions which if satisfied would allow for the subdivision of the parcel into 83 buildable lots. <u>At the time that the VTM was approved, it was determined that wetlands covered a portion of the site, and the map was approved so as to prevent the development of that area.</u>

Id at 9274 (emphasis added).

The City Council went on to describe the issue in 2000 as "whether the site has seen an increase in the presence of wetlands since the 1990 approval of the VTM." Id at 9276. It found that there were "additional and previously unstudied wetlands on the property" (id at 9275); that "the extent of the wetlands on the

23

United States District Court
For the Northern District of California

1    site is greater than was determined at the time the VTM was

2    approved" (id at 9282); that there were "nine new wetland areas" on

3    Beachwood (id at 9282); and that an EIR would be required even

4    though the City approved a negative declaration in 1990 due to "new

5    information of substantial importance, which was not known and

6    could not have been known with the exercise of reasonable diligence

7    at the time the negative declaration was adopted."  Id at 9283.

8         The City does not dispute this language but argues that

9    it does not necessarily show that there were "new" wetlands on the

10   Property in 2000 that did not exist in 1989.  Doc #83 at 14.  The

11   City argues that "[s]ince the City was not responsible for the CDP,

12   it had no reason to study, and did not study the presence of

13   Coastal Act wetlands on the property at that time [1990]."  Id at

14   9.  The court is unpersuaded.  The language of the City's 2000

15   denial and the evidence of non-City-created wetlands raise a

16   factual dispute as to when the alleged City-created wetlands

17   developed to the point of stabilization.

18        A reasonable jury could find that, if wetlands existed in

19   1989, they were not as extensive as (or co-extensive with) the

20   wetlands found in 2000.  Accordingly, the court finds that the time

21   at which the alleged City-created wetlands developed is a disputed

22   fact, providing a separate and independent reason to deny the

23   City's request for summary judgment on statute of limitations

24   grounds.

25

26                              3

27        The preceding discussion uncovers a tension in this

28   litigation for both parties and especially for the City.  Yamagiwa

                                 24

**United States District Court**
For the Northern District of California

alleges that the City's 1984 actions created the wetlands.  For purposes of opposing the City's motion, however, Yamagiwa must maintain that evidence of City-created wetlands was insubstantial prior to May 1995.  Conversely, while the City in defending this case disclaims that its actions were a substantial cause of the wetlands, its statute of limitations argument requires the City to argue that *City-created* wetlands were developed and established by 1995.  Yamagiwa's position, while the more straightforward, depends on evidence in dispute.  The City's position, also hinged on disputed evidence, suffers also from an inherent inconsistency that makes its presentation problematic.  The court cannot, through the vehicle of summary judgment, choose a position for the parties.

C

The City alternatively argues that the court should grant summary judgement on the inverse condemnation claims because Yamagiwa's predecessors consented to the alterations to the Property.  Doc #47 at 26.  The City argues that the prior owner, William Lyon, not only consented to the TAAD improvements, but filed the petition requesting that the City undertake the project. Id.  Likewise, when the TAAD construction ran short of fill, William Lyon not only consented, but paid for and used more than half of the dirt removed from the Property.  Id at 26.

Yamagiwa correctly points out that the applicability of the consent defense turns on the consent.  Doc #80 at 26-27.  In Albers v Los Angeles County, 62 Cal 2d 250 (1965), a group of developers voluntarily granted an 80-foot right of way to Los Angeles County for construction of Crenshaw Boulevard.  The

developers also consented to cuts and fills within and outside the dedicated right of way to construct the road.  Id at 264.  The county built the road, cutting and filling as the landowners had authorized.  Id.  A large landslide ensued, damaging the owners' property.  Id.  As the City argues here, the county in <u>Albers</u> contended that the developers could not recover because they had consented to the project and had donated the property necessary for the road.  Id.  The California Supreme Court disagreed, holding that the developers could be estopped from claiming damages "reasonably to be anticipated by such fills," but not damages arising from the ensuing landslide.  Id at 265.

> [W]e cannot say that the companies in accepting such benefit as accrued to them through the construction of Crenshaw Boulevard and the making of the fills consented to the damage of their land which was not a natural, necessary and reasonable incident to the construction of the road and the making of the fills.

<u>Albers v Los Angeles County</u>, 62 Cal 2d 250, 266 (1965) (internal quotes omitted).  Here, Yamagiwa argues, while the prior owners donated the easement and favored development of the storm drain system, there is no evidence that Yamagiwa or her predecessors consented to the development of wetlands on the Property.  Doc #80 at 27.

The City does not dispute that consent is no defense where a defendant's conduct exceeds the scope of the consent. Rather, the City argues:

> While [the storm drain dedications] constitute part of the consent, they are not the entirety of the consent. The undisputed facts also show that Property owners consented to, and indeed paid for the bulk of the removal of the 13,000 cubic yards of fill from the Property.  It is these areas which Yamagiwa claims have filled up with

United States District Court
For the Northern District of California

water and formed wetlands. * * * [T]he formation of
wetlands here was, according to Yamagiwa, the direct and
natural result of removal of the fill.  Doc #92 at 17.

This is disingenuous.  As discussed above, Yamagiwa alleges that
both the removal of fill and the storm drain easements caused
wetland formation.  The City does not argue that wetland formation
was a direct and natural result of the latter project.  Further,
Yamagiwa points out that the City's report on environmental impacts
of the TAAD project, prepared before the TAAD was built, did not
identify wetlands as a likely impact.  Doc #45, Ex 77.

Accordingly, a reasonable jury could very well find that
Yamagiwa and her predecessors did not consent to the alleged
wetland formation.  For all the above reasons, the City's motion
for summary judgment on the inverse condemnation claims is DENIED.


IV

*Nuisance & Trespass Claims*

The City argues that Yamagiwa's nuisance and trespass
claims are also barred by both the statute of limitations and the
consent doctrine.  Doc #47 at 25.

First, the City argues that the claims are time-barred
under the California Tort Claims Act, which provides that no suit
for "money or damages" may be brought against a public entity
unless a written claim was presented to the entity within one year
of the accrual of the cause of action.  Cal Gov Code §§ 905, 911.2,
945.4.  A suit for "money or damages includes all actions where the
plaintiff is seeking monetary relief, regardless of whether the
action is founded in tort, contract or some other theory."  Hart v
Alameda County, 76 Cal App 4th 766, 778 (1999).  The City contends

27

that "[a]s with the inverse [condemnation] claim * * * there is
undisputed evidence that the nuisance and trespass claims also
accrued in 1989, at the latest." Doc #47 at 25.  As discussed
above, the court rejects this argument.

The City also points out, however, that Yamagiwa's
attorney wrote a letter to the City in March 1999, "alleging the
same theory of damage that Yamagiwa puts forth in this case."  Id.
Accordingly, under the California Tort Claims Act, the City argues,
Yamagiwa's tort claim, filed on May 17, 2000 was still outside of
the one-year limitations period. Id at 25-26.  Yamagiwa fails to
address this argument in her opposition.

The court has reviewed the March 1999 letter, however,
and disagrees with the City's characterization.  Yamagiwa's
attorney wrote a letter to the City's Planning Commission on March
10, 1999 responding to a staff report that concerned the Beachwood
CDP.  Doc #52, Ex 5.  The staff report had concluded that, based on
the discovery of potential new wetlands on the site, the City could
not act on the pending CDP application.  Id at 1.  The letter first
informed the Commission that in 1989, the Army Corps of Engineers
had determined that no wetlands would be affected by the project
and that in 1998, the City had circulated a negative declaration
reaching the same conclusion.  Id.  The letter also informed the
Commission that news of potential wetlands had focused the owner's
attention "on the issue of ponding water on the site."  Id at 2.
The owner had learned that "the existing publicly-owned and
operated drainage system on the site [had] ceased to function
properly and [was] spilling water onto the property."  Id.  The
letter nowhere, however, conceded that wetlands existed on the

28

Property or that the CDP should be denied, and states in pertinent part:

> If the City denies a CDP on the grounds that wetlands that did not previously exist now prevent the property from being developed, the City will be liable to the owner for a physical as well as a regulatory taking of property.  It will also, of course, have to return to Beachwood all of the assessments Beachwood has paid for public improvements designed to serve the development of the site.  Id at 3 (emphasis added).

While the City is correct that Yamagiwa alleges in this case that the drainage system has failed, the crux of the current action is that the City-created wetlands have damaged Yamagiwa's property – a position that she rejects in the March 1999 letter.

Finally, as discussed at length above, Yamagiwa could not know the extent of her damages for the alleged taking until the City denied her CDP in 2000.  While measure of damages may differ depending on the cause of action, the basis for her takings damage claim – loss of value in property caused by wetlands and manifested by the 2000 denial – provides the same basis for damages alleged under the nuisance and trespass claims.  Accordingly, Yamagiwa's nuisance and trespass claims are not time-barred.

The City's argument that the nuisance and trespass claims are barred by the consent doctrine is easily disposed.  As with the inverse condemnation claim, consent may be a defense to trespass and nuisance, but the applicability of the defense turns on the consent.  See Mangini v Aerojet-General Corp, 230 Cal App 3d 1125, 1140-41 (1991).  As discussed above, what Yamagiwa and her predecessors consented to, i e, whether they could have reasonably anticipated the wetlands when accepting the TAAD improvements, is a

United States District Court
For the Northern District of California

29

disputed issue of fact.  Accordingly, the City's motion for summary
judgment on nuisance and trespass is DENIED.

V

*Claim for Recovery of Amounts Paid*

Last, the City seeks summary judgment on Yamagiwa's claim
for recovery of amounts paid.  Yamagiwa seeks refunds of the
following amounts: (1) over $300,000 paid to TAAD for the drainage
improvements; (2) over $300,000 paid to install improvements to
Highway 1 to satisfy conditions imposed on its 1990 tentative
subdivision map; and (3) over $790,000 paid to a sewer assessment
district to provide sewage capacity to serve development of the
Property and other properties in the City.  Doc #1-2 at ¶¶34-36.

A

The City first argues that Yamagiwa is not entitled to
reimbursement for payments to TAAD because TAAD was created at the
behest of a prior owner.  Doc #47 at 29.  Under the Ninth Circuit's
decision in <u>Furey v City of Sacramento</u>, 780 F2d 1448 (9th Cir
1986), the City argues, the creation of the TAAD thus constitutes
"private investment," which was voluntarily taken.  Id.  In <u>Furey</u>,
the City of Sacramento assessed the owners of agricultural land for
sewer improvements that would service urban development of the
land.  After the sewer improvements were built and the owners had
paid much of their assigned assessment, the City amended its
general plan and re-zoned the land as open space, preventing the
owners, including plaintiff Furey from developing and making use of
the sewer improvements.  Id at 1452.  Furey alleged that the
assessment constituted a taking of his property.  The Ninth Circuit

30

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

held that "when a private landowner * * * undertakes to construct improvements at his own expense, no government taking has occurred when a subsequent exercise of the government's police power restricts the landowner's ability to make use of the improvement." Id at 1454.  Applying the Furey factors here, the City concludes that the TAAD payments fall "on the private investment side of the line."  Doc #47 at 31.

Yamagiwa clarifies in her opposition brief, however, that she does not bring her claim for return of amounts paid under the Fifth Amendment takings clause or the Ninth Circuit's Furey opinion. Doc #80 at 28.  Rather, Yamagiwa's fourth cause of action is a pendent state claim brought under the California Supreme Court's decision in Furey v City of Sacramento, 24 Cal 3d 862 (1979).  Both the federal and state Furey cases arose from the same dispute described above.  Two landowners brought suit in state court, Furey and Webster.  Furey's federal action was stayed pending resolution of the state case.  Furey, 24 Cal 3d at 870.  At the time Furey was decided, damages were not available for inverse condemnation owing to diminution in the value of land, resulting from city-imposed regulations.  (This rule, first established in Agins v City of Tiburon, 24 Cal 3d 266 (1979) was later repudiated by First Evangelical Lutheran Church v County of Los Angeles, 482 US 304, (1987)).  Despite the then-existing limitation on damages, the California Supreme Court in Furey created an equitable remedy for situations in which "actions have operated to bring about substantial financial commitment on the part of taxpayers included in a special assessment district who are precluded by a later governmental action from realizing substantially all benefits

1  generated by the district." <u>Furey</u>, 24 Cal 3d at 873.  Specifically,
2  the court held:

> [I]f the allegations made in the complaints before us are
> demonstrated at trial, relief would lie by way of
> declaratory relief or mandate precluding the application
> of the subject land-use regulations to plaintiffs.  We
> also believe, however, that prior to the issuance of any
> judgment the trial court should afford defendants a
> reasonable opportunity to make use of * * * reassessment
> procedures * * * or to take other appropriate action
> directed toward ameliorating in equitable fashion the
> gross inequities which here appear.  <u>Furey</u>, 24 Cal 3d at
> 877-78.

9  Yamagiwa argues that her claim is one for "equitable" relief and
10 that, "[h]aving vigorously litigated and defended its CDP denial,
11 the only alternative left for the City is to refund the assessments
12 paid."  Doc #80 at 30.

13        The City correctly points out, however, that the <u>Furey</u>
14 court expressly held that plaintiffs could <u>not</u> compel the city to
15 refund assessments.  <u>Furey</u>, 24 Cal 3d at 871-72, 874, 877-78.
16 Rather, it recognized that the relevant California statutes left it
17 to the discretion of the public agency whether to re-assess
18 plaintiff's property to provide relief, and that "it has been held
19 that a writ of mandate to compel reassessment will not lie in such
20 circumstances."  Id at 874.  Further, the <u>Furey</u> court held that,
21 where a city assesses property for public improvements and then
22 later re-zones such property, preventing it from realizing the
23 benefits of the improvements, the sole relief the property owner can
24 obtain is "declaratory relief or mandate precluding the application
25 of the subject land-use regulations to plaintiffs."  Id at 877-78.
26 <u>Furey</u> held that a city could <u>elect</u> to provide a refund in lieu of
27 being estopped from applying its regulations, but it did not hold
28 that the city could be forced to pay in the first instance.  Id.

**United States District Court**
For the Northern District of California

1   Accordingly, Yamagiwa cannot recover amounts paid for the drainage

2   improvements.

3          This does not, however, preclude Yamagiwa from seeking

4   equitable relief from the City's assessments.  See <u>Furey</u>, 24 Cal 3d

5   at 878; <u>Yamagiwa v City of Half Moon Bay</u>, 2005 WL 1774402 (Cal App 1

6   Dist 2005) at 10 fn 13.  Accordingly, the City's motion for summary

7   judgment on Yamagiwa's claim directed to the assessments must be

8   DENIED.

9                                      B

10         The above analysis also prevents Yamagiwa from recovering

11  amounts paid for the Highway 1 improvements and for the sewer

12  assessment district.  While both involved substantial financial

13  commitments by Yamagiwa and her predecessors, and while Yamagiwa was

14  prevented from realizing the benefits of these payments, the court

15  cannot, under equitable theories, compel the City to refund these

16  assessments.  Again, while Yamagiwa cannot recover damages unless

17  the City determines that is a suitable alternative to declaratory or

18  equitable relief, Yamagiwa may still pursue equitable relief.

19  \\

20  \\

21  \\

22  \\

23  \\

24  \\

25  \\

26  \\

27  \\

28  \\

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

## VI

   For reasons discussed above, plaintiff Yamagiwa's motion for summary judgment is DENIED.  Defendant City of Half Moon Bay's motion for summary judgment is DENIED.  The parties are to appear for a pre-trial conference on May 1, 2007 at 9:00 am and for trial on June 4, 2007 at 8:30 am.

   IT IS SO ORDERED.



_____

VAUGHN R WALKER

United States District Chief Judge