Tab 20

Mangini v. Aerojet-General Corp.
Cal.App.3.Dist.
CATHERINE HOLTHOUSE MANGINI et al., Plaintiffs and Appellants,
v.
AEROJET-GENERAL CORPORATION et al., Defendants and Respondents.
**No. C004771.**

Court of Appeal, Third District, California.
May 30, 1991.

SUMMARY

In an action by property owners against defendants who leased the property from prior owners and allegedly contaminated the property with hazardous waste during the leasehold, defendants' demurrer to the complaint was sustained without leave to amend. The complaint alleged multiple causes of action including public and private nuisance, negligence, trespass, and strict liability. Defendants had leased the property from the former owners in 1960 through 1970, and plaintiffs acquired it in 1975. (Superior Court of Sacramento County, No. 500170, William A. White, Judge. [FN*])

The Court of Appeal reversed and remanded for further proceedings. The court held that the complaint stated a cause of action for creation of a nuisance and also for trespass, and further held plaintiffs should be allowed to amend their complaint to allege facts showing continuing nuisance and trespass to avoid the bar of the statute of limitations. The court further held, however, that the counts for negligence, negligence per se, and strict liability were barred by the statute of limitations.

FN* Retired judge of the Sacramento Superior Court sitting under assignment by the Chairperson of the Judicial Council.(Opinion by Sims, J., with Sparks, Acting P. J., and Marler, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1)** Nuisances § 3--Nature and Elements--Nuisance on Owner's Property.
California nuisance law is a creature of statute. The pertinent statutes (Civ. Code, §§ 3479, 3480, 3481, 3493; Code Civ. Proc., § 731) and is construed according to its broad terms to allow an owner of property to sue for damages caused by a nuisance created on the owner's property. Under California law, it is not necessary that a nuisance have its origin in neighboring property. Invasions of plaintiff's property, otherwise amounting to a trespass, may also constitute a nuisance under the statute. The broad language of Civ. Code, § 3479, sanctions recovery for direct injury to a plaintiff's property constituting an obstruction to the free use of property.
[11 **Witkin,** Summary of Cal. Law (9th ed. 1990) Equity, § 121.]
**(2)** Nuisances § 8--Persons Liable--Nonpossessor.
In a nuisance action by property owners against parties who had leased the property from prior owners who had allegedly contaminated the property with hazardous waste during the period of the leasehold, it was immaterial to the nuisance cause of action that defendants allegedly created the nuisance at some time in the past but did not currently have a possessory interest in the property. Not only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages.

**(3)** Nuisances § 5--Public and Private Nuisances--Special Injury.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In a nuisance action by property owners against defendants who had leased the property from prior owners and had allegedly contaminated the property with hazardous waste during the period of the leasehold, plaintiffs alleged special injuries sufficient to allow them to sue for damages for public nuisance, where they alleged that they were required to undertake testing of the property, which costs were sufficient to constitute "special injury" to plaintiffs under Civ. Code, § 3493, allowing a private person to maintain an action for public nuisance if it is especially injurious to himself or herself. Generally, a public nuisance does not furnish ground for action by a private person, but the public nuisance may inflict on an individual such peculiar injury as to entitle the individual to maintain a separate action for its abatement or to recover damages therefor. The injury to the individual must be different in kind and not merely in degree from that suffered by the general public.

(4) Nuisances § 10--Defenses--Consent.
When a property owner seeks damages for creation of a nuisance by a prior lessee, the lessee has a defense that his use of the property was lawful and was authorized by the lease.

(5) Nuisances § 10--Defenses--Consent--Prior Lessee--Hazardous Waste.
In an action for private and public nuisance action by property owners against defendants who had leased the property from prior owners and had allegedly contaminated the property with hazardous waste during the period of the leasehold, the complaint did not demonstrate consent and lawful use as a matter of law. The relevant provisions of the lease, attached to the complaint, were patently ambiguous with respect to whether the lease authorized hazardous waste disposal during the term of the lease and whether the lease imposed an obligation on defendant to clean up any hazard before termination of the lease. Thus, extrinsic evidence was necessary to determine the rights and obligations of the parties to the lease, and the issue could not be determined on demurrer.

(6) Trespass § 2--Definitions and Distinctions--Nuisance--Contamination of Property by Lessee.
In an action by property owners against defendants who had leased the property from prior owners and had allegedly contaminated the property with hazardous waste during the leasehold, the complaint stated a cause of action for trespass by alleging defendant wrongfully deposited hazardous waste on the property and failed to clean it up as the lease required. Trespass is an unlawful interference with possession of property, and may occur if the party entering the land pursuant to a limited consent proceeds to exceed those limits by divergent conduct on the land of another. A conditional restricted consent to enter land creates a privilege to do so only insofar as the condition or restriction is complied with.

(7) Nuisances § 14--Defenses--Statute of Limitations--Public Nuisance.
Under Civ. Code, § 3490, which provides that no lapse of time can legalize a public nuisance, the statute of limitations is no defense to a public entity's action to abate a nuisance. However, when a private citizen has sued for damages for special injury based on a public nuisance, the nuisance may be either "continuing" or "permanent"; in the case of a permanent nuisance, the statute of limitations begins to run on creation of the nuisance, while with a continuing nuisance, every continuation gives rise to a separate claim for damages caused by the nuisance. The continuing/permanent nuisance distinction applies to private suits for damages based on public nuisances. Thus, when a private citizen sues for damages to real property caused by a public nuisance and the nuisance is permanent, the three-year statute limitation in Code Civ. Proc., § 338, subd. (b), for trespass or injury to property, begins to run when a permanent nuisance is created.

(8a, 8b) Nuisances § 7--Continuing Nuisances--Hazardous Waste.
In a nuisance action by property owners against defendants who had leased the property from prior owners and had allegedly contaminated the property with hazardous waste during the period of the leasehold, plaintiffs were entitled to amend their complaint to allege a continuing nuisance to avoid the bar of the statute of limitations, where they could allege the contamination could be abated and defendant had entered into a federal consent decree

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agreeing to clean up the property, which proposed averment sufficiently alleged a continuing nuisance. The crucial distinction between a permanent and continuing nuisance is whether the nuisance may be discontinued or abated. Plaintiffs' land could be subject to a continuing nuisance even though defendants' offensive conduct ended years before. The "continuing" nature of the nuisance refers to the continuing damage caused by the offensive condition, not the acts causing the offensive condition to occur. Plaintiffs also were prepared to prove that the contamination had migrated or spread on the property continuously since it was initially dumped, and that its impact has thus varied over time, another feature of a continuing nuisance.
[See **Cal.Jur.3d**, Nuisances, § 3.]

**(9)** Pleading § 21--Demurrer to Complaint--Relation to Prayer for Relief.
The validity of a demurrer to a complaint is determined with reference to the pleaded facts alleged to constitute a wrong, not the prayer for relief.

**(10)** Trespass § 7--Accrual of Cause of Action; Statute of Limitations.
The application of the statute of limitations for trespass has historically been the same as for nuisance and has depended on whether the trespass has been continuing or permanent. The crucial test of the permanency of a trespass is whether it can be discontinued or abated.

**(11a, 11b, 11c)** Limitation of Actions § 44--Commencement of Period--Torts--Negligence--Injury to Real Property--Hazardous Waste--Discovery.
In an action by property owners against defendants who had leased the property from prior owners and had allegedly contaminated the property with hazardous waste during the leasehold, causes of action for negligence, negligence per se, and strict liability were barred by the three-year statute of limitations of Code Civ. Proc., § 338, subd. (b), where plaintiffs had good reason to inquire about and learn of the contamination more than three years before their complaint was filed. The complaint alleged that defendants released toxic substances on the property from 1960 to 1970, plaintiffs acquired their interest between 1975 and 1983, and more than three years before filing the actions plaintiffs knew that the recorded lease gave notice that defendant had engaged in activities of a potentially hazardous nature on their land; the Department of Justice had investigated defendants' practices regarding disposal of hazardous waste; and defendants had asked plaintiff for permission to inspect their property. The combination of those facts together established as a matter of law that when defendant contacted plaintiffs in 1984 they had sufficient information to put them on notice of the possibility that defendant had dumped hazardous waste on their land. Defendant's evasive answers gave further reason for suspicion.

**(12)** Limitation of Actions § 31--Commencement of Period--Accrual of Cause of Action--Discovery Rule.
The traditional rule that a statute of limitations begins to run on the occurrence of the last element essential to the cause of action, even if the plaintiff is unaware of his cause of action, has been ameliorated in cases when it would be manifestly unjust to deprive a plaintiff of a cause of this action before he is aware he has been injured. A cause of action under the discovery rule occurs when plaintiff either actually discovered his injury and its negligent cause, or could have discovered injury and cause through the exercise of reasonable diligence. The limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry. Subjective suspicion is not required. If a person becomes aware of facts that would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters that would have been revealed by such an investigation.

**(13)** Limitation of Actions § 71--Pleading--Discovery Rule.
Whether the discovery-rule exception to the running of a statute of limitations applies at all is initially a matter of pleading. A plaintiff who relies on the exception must plead facts justifying delayed accrual and the complaint must allege the time and manner of discovery and the circumstances excusing delayed discovery.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(14)** Appellate Review § 102--Briefs--As Admissions.
While briefs and arguments on appeal are outside the record, they are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party.

**(15)** Limitation of Actions § 24--Period of Limitation--Obligations Not Founded on Written Instruments--Implied and Quasi-contracts--Indemnity.
In the absence of a contrary statutory command, a cause of action for equitable indemnity does not come into existence until the indemnitee has suffered loss through payment. A tort defendant does not lose his own independent right to seek such recovery simply because the injured party is barred from pursuing its separate claim against the additional defendant by the applicable statute of limitations.

**(16)** Limitation of Actions § 74--Pleading--Demurrer--Necessity That Bar Appear From Pleadings.
In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows merely that the action may be barred.

**(17)** Limitation of Actions § 17--Period of Limitation--Declaratory Relief.
The statute of limitations governing a request for declaratory relief is the one applicable to an ordinary legal or equitable action based on the same claim.

**(18)** Unfair Competition § 3--Unfair Practices Act--Nuisance--Hazardous Waste.
In an action by property owners against defendants who had leased the property from prior owners and had allegedly contaminated the property with hazardous waste during the period of the leasehold, a count alleging the nuisance created and maintained by defendant constituted unfair business practices in violation of Bus. & Prof. Code, § 17200, failed to state facts sufficient to constitute a cause of action. A "practice" requires, at a minimum, ongoing conduct, while a reasonable interpretation of the complaint showed that defendant's alleged misconduct occurred some 20 years ago. Relief under § 17200 is unavailable to remedy past misconduct.

COUNSEL
McCutchen, Doyle, Brown & Enersen, Christopher Berka, Edward L. Strohbehn, Jr., and Jennifer S. Rosenberg for Plaintiffs and Appellants.
Lasky, Haas, Cohler & Munter, Moses Lasky and Janet Morgan for Defendants and Respondents.
**SIMS, J.**
In this case, we consider a variety of issues arising out of claims by owners of real property against parties who leased the property from prior owners and who allegedly contaminated the property with hazardous waste during the leasehold. [FN1] ***1131**

FN1 We are aware that the disposal of hazardous waste is subject to substantial regulation under federal and state law. (See, e.g., Comprehensive Environmental Response Compensation Liability Act (42 U.S.C. § 6901 et seq.); Clean Water Act ( 33 U.S.C. § 1251 et seq.); Safe Drinking Water Act (42 U.S.C. § 300f et seq.); California Hazardous Waste Control Act ( Health & Saf. Code, § 25100 et seq.); California Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.).) The parties to this action make no argument that relief is either available or unavailable on account of the cited statutes. We express no view as to whether the cited statutes may either authorize or preclude the relief sought by plaintiffs in this action. (See generally, Hingerty, *Property Owner Liability for Environmental Contamination in California* (1987) 22 U.S.F. L.Rev. 31; Note, *Hazardous Wastes: Preserving the Nuisance Remedy* (1981) 33 Stan.L.Rev. 675.)

Plaintiffs Catherine Holthouse Mangini and Mark Vernon Holthouse, owners of 2,400 acres of land in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Sacramento County, filed suit against Aerojet-General Corporation and its wholly owned subsidiary Cordova Chemical Company (hereafter collectively defendant), lessees of the property before plaintiffs acquired it, for allegedly contaminating the property with hazardous waste. Defendant's demurrer to the multicount complaint was sustained without leave to amend. Because we conclude some of plaintiffs' counts should survive demurrer, we shall reverse the judgment of dismissal.

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" ( *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

The complaint, filed January 14, 1998, alleges the following material facts:

Defendant leased the property in question from its former owners, the Cavitts, from 1960 to 1970. Plaintiffs acquired the property pursuant to an exchange of other real property from the executor and administrator of the Cavitts' estate, codefendant James H. Cavitt, in 1975. [FN2]

FN2 Defendant James H. Cavitt is not a party to this appeal.

Defendant's lease (attached to the complaint as an exhibit) provided, "The term of this lease is for a period of ten (10) years, commencing [in 1960] and ***1132** ending [in 1970] ...." The lease also stated, among other things, "Upon termination of this lease, Lessee shall surrender the premises in as good state and condition as when received by Lessee, reasonable use and wear thereof consistent with the business engaged in by Lessee ... excepted." [FN3] Despite this provision, defendant failed to remove millions of pounds of waste rocket fuel materials and other hazardous substances which it burned, buried, or otherwise disposed of on the property during the term of its lease, creating hazardous conditions which remain on the property.

FN3 Other pertinent provisions of the lease are discussed below.

Plaintiffs have been compelled by the Sacramento County Air Pollution Control District to undertake testing of the property and may be required under state and federal law to abate the hazardous conditions created by defendant.

Plaintiffs did not learn of the hazardous conditions until "recently."

Based on these alleged facts plaintiffs pled nine " causes of action" against defendant:

Creation of a *public nuisance* (first count);

Creation of a *private nuisance* (second count);

*Negligence* (third count);

*Negligence per se,* based on the contention that defendant's activities violated Health and Safety Code section 25601 (requiring the safe disposal of radioactive waste), Water Code sections 13304, 13264, and 13265 (requiring the cleanup and abatement of waste discharges into the waters of the state, and prohibiting the discharge of any waste that could affect the quality of the waters of the state, including groundwaters), and Order No. 62-21 of the Regional Water Quality Control Board (requiring defendant to dispose of all waste discharges originating on its leased properties so as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to avoid creating harmful concentrations of waste in usable groundwaters) (fourth count);

*Trespass*, based on the allegation that defendant wrongfully deposited harmful waste on the property and failed to remove the waste after plaintiffs acquired the property (fifth count);

*Strict liability* for ultrahazardous activities (sixth count); *1133

*Violation of Business and Professions Code section 17200* (prohibiting unfair or unlawful business practices) (ninth count);

*Equitable indemnity* for testing and cleanup costs incurred by plaintiffs at the direction of governmental entities (10th count); and

*Declaratory relief* with respect to the parties' obligations for testing and clean-up costs (11th count).

Defendant demurred to all the "causes of action" on the grounds they failed to state facts sufficient to constitute a cause of action and were barred by the statute of limitations. The trial court sustained the demurrer without leave to amend on those grounds. This appeal followed.

Discussion

I *The Complaint States a Cause of Action for Damages for Creation of a Nuisance*

A. *Plaintiffs may sue in nuisance for direct injury to their property.*

Defendant contends the complaint fails to state a cause of action for nuisance.

Defendant argues: "The critical fact of this case is that the claim of nuisance is being made by a present owner of property for alleged injury to that property resulting from acts of a defendant *committed on that very property*. This takes it entirely outside the area of nuisance. ... In other words, conduct committed *on* a piece of land cannot be attacked as a nuisance to that land or the owner of it. Nuisances are committed by 'neighbors' to the land claimed to have been damaged. Apart from special statutory definitions of specific situations, to be assailable as a 'nuisance' the acts causing the claimed injury must be committed by someone outside the land. Otherwise, actionability of the conduct must be examined under the law of trespass." (Original italics.)

In support of this argument, defendant cites general treatises. Thus, for example, Prosser and Keeton remark as follows: "The distinction which is now accepted is that trespass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an interference with his use and enjoyment of it. The difference is that between walking across his lawn and establishing a bawdy house next door; between felling a tree across *1134 his boundary line and keeping him awake at night with the noise of a rolling mill. ... [¶] As the term 'private nuisance' is used in this edition, the tort is committed only if, and in the absence of an intrusion on land amounting to an intentional entry and a trespass, ..." (Prosser and Keeton, Torts (5th ed. 1984) § 87, p. 622, fn. omitted.)

Similarly, Wood on Nuisances (3d ed. 1893) states, "They [nuisances] are always injuries that result as a consequence of an act done outside of the property injured, and are the indirect and remote effects of an act, rather than a direct and immediate consequence. It is a species of invasion of another's property by agencies operating entirely outside of the property itself, ..." (P. 33.) FN4

FN4 Defendant also cites 58 Am.Jur.2d for the following: "[N]uisance is the unreasonable, unusual, or unnatural use of one's property so that it substantially impairs the right of another to peacefully enjoy his property, ..." (*Id., Nuisances,* § 2, at p. 672, fn. omitted.) Defendant also cites to 47 Cal.Jur.3d, Nuisances, section 1, page 199.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant also relies upon *Philadelphia Elec. Co. v. Hercules, Inc.* (3d Cir. 1985) 762 F.2d 303, certiorari denied 474 U.S. 980 [88 L.Ed.2d 337, 106 S.Ct. 384], where the federal court applied Pennsylvania law to conclude that a successor owner of property could not sue a prior owner for nuisance because, inter alia, the historical role of private nuisance law was limited to a resolution of conflicts between neighboring contemporaneous land uses. [FN5] (Pp. 313-314.)

FN5 Defendant also cites *Amland Properties Corp. v. Aluminum Co. of America (D.N.J. 1989) 711 F.Supp. 784, a case that followed Philadelphia Elec Co.* ( *Id.* at p. 807.)

(1) We cannot accept defendant's argument because, as we shall explain, the authorities on which it is premised do not correctly reflect California law. In particular, defendant fails to recognize that California nuisance law is a creature of statute. The California nuisance statutes have been construed, according to their broad terms, to allow an owner of property to sue for damages caused by a nuisance created *on* the owner's property. Under California law, it is not necessary that a nuisance have its origin in neighboring property.

The following provisions of the Civil Code are pertinent here (all further statutory references are to the Civil Code unless noted otherwise):

Section 3479: "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance. " ***1135**

Section 3480: "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

Section 3481: "Every nuisance not included in the definition of the last section is private."

Section 3493: "A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise."

Code of Civil Procedure section 731 (hereafter section 731) provides in pertinent part: "An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as the same is defined in section thirty-four hundred and seventy-nine of the Civil Code, and by the judgment in such action the nuisance may be enjoined or abated as well as damages recovered therefor."

Sections 3479 and 731 have their origin in section 249 of the Practice Act of 1851 (Stats. 1851, ch. 2, p. 92) which provided as follows: "Anything which is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action. Such action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance; and by the judgment the nuisance may be enjoined or abated, as well as damages recovered."

Under the Practice Act, it was recognized that a property owner could sue for nuisance where miners entered the owner's property without consent and dug ditches that interfered with the free use of the property. (*Courtwright v. B. R. & A. W. & M. Co.* (1866) 30 Cal. 573; *Weimar v. Lowery* (1858) 11 Cal. 104; *Fitzgerald v. Urton* (1854) 4 Cal. 235.) In *Courtwright*, the court said, "A nuisance is defined by the statute (Practice Act, Sec. 249) as 'anything which is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.' This definition is perhaps more comprehensive than that given by Blackstone, (3 Black. Com. 216) which is 'anything done to the hurt or annoyance of the lands, tenements or hereditaments of another.' Injuries

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

occasioned by wrongfully causing or permitting the water from water ditches to flow upon or over the lands or mining claims of others, have always been treated in this State as nuisances, and actions to prevent or abate such nuisances are of every day occurrence." (30 Cal. at pp. 575-576.) *1136

More modern California cases have recognized that, "The statutory definition of nuisance appears to be broad enough to encompass almost every conceivable type of interference with the enjoyment or use of land or property." (*Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 919 [162 Cal.Rptr. 194]; see *People v. Stafford Packing Co.* (1924) 193 Cal. 719, 725-726 [227 P. 485].) Numerous cases have therefore sanctioned recovery on a nuisance theory for direct injury to a plaintiff's property.

Thus, for example, in *Phelan v. Quinn* (1900) 130 Cal. 374 [62 P. 623] it was held that defendant's obstruction of plaintiff's *private* road with a gate constituted a nuisance. (Pp. 378-379.) Similarly, in *Smith v. Smith* (1913) 21 Cal.App. 378 [131 P. 890], defendant's actual obstruction of a *private* alley was a nuisance. And in *Baldocchi v. Four Fifty Sutter Corp.* (1933) 129 Cal.App. 383 [18 P.2d 682] defendant was held liable for creation of a nuisance where they destroyed plaintiff's private sidewalk. (P. 388.)

California cases have also recognized that invasions of plaintiff's property, otherwise amounting to a trespass, may also constitute a nuisance under the statutes. [FN6] Thus, in *L. A. Brick etc. Co. v. City of Los Angeles* (1943) 60 Cal.App.2d 478 [141 P.2d 46], the city's discharge of water on to plaintiff's property was held to be both a trespass and a nuisance. (Pp. 485-486.) In *Griffin v. Northridge* (1944) 67 Cal.App.2d 69 [153 P.2d 800], the court found both a trespass and a nuisance where plaintiff's neighbors trespassed on plaintiff's property, destroyed flowers, and caused paint to be cast upon the walls and windows of plaintiff's home. (Pp. 71, 73, 76.) And in *Mattos v. Mattos* (1958) 162 Cal.App.2d 41 [328 P.2d 269], a nuisance was found where defendant's trees were blown down on plaintiff's property. *1137

FN6 This is also the view of the Restatement Second of Torts: "There may ... be some overlapping of the causes of action for trespass and private nuisance. An invasion of the possession of land normally involves some degree of interference with its use and enjoyment and this is true particularly when some harm is inflicted upon the land itself. The cause of action for trespass has traditionally included liability for incidental harms of this nature. If the interference with the use and enjoyment of the land is a significant one, sufficient in itself to amount to a private nuisance, the fact that it arises out of or is accompanied by a trespass will not prevent recovery for the nuisance, and the action may be maintained upon either basis as the plaintiff elects or both. Thus the flooding of the plaintiff's land, which is a trespass, is also a nuisance if it is repeated or of long duration; and when the defendant's dog howls under the plaintiff's window night after night and deprives him of sleep, there is a nuisance whether the dog is outside the plaintiff's land or has entered upon it, and the defendant's negligence in looking after the dog would make him liable either for trespass if there was an entry or for nuisance whether there was entry or not.

"The two actions, trespass and private nuisance, are thus not entirely exclusive or inconsistent, and in a proper case in which the elements of both actions are fully present, the plaintiff may have his choice of one or the other, or may proceed upon both." ( Rest.2d Torts, § 821D, com. e, p. 102; but see *Wilson v. Interlake Steel Co.* (1982) 32 Cal.3d 229 [ 185 Cal.Rptr. 280, 649 P.2d 922] [noise is nuisance but not trespass].)

Finally, the breadth of California's nuisance statutes is illustrated by *Stoiber v. Honeychuck, supra,* 101 Cal.App.3d 903. There, tenants were permitted to recover damages from their landlord on a nuisance theory for the defective condition of the rented premises.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

These authorities make clear that the California statutes do not limit recovery for nuisance to instances where there is an offensive use of neighboring lands. Rather, the broad language of section 3479 sanctions recovery for direct injury to a plaintiff's property constituting "an obstruction to the free use of property." Defendant's contention to the contrary is not well taken.

B. *Defendant may be liable for having created the nuisance.*

(2) Nor is it material that defendant allegedly created the nuisance at some time in the past but does not currently have a possessory interest in the property. "[N]ot only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages." (*Shurpin v. Elmhirst* (1983) 148 Cal.App.3d 94, 101 [195 Cal.Rptr. 737]; *Hardin v. Sin Claire* (1896) 115 Cal. 460, 463 [47 P. 363]; *Selma Pressure Treating Co. v. Osmose Wood Preserving, Inc.* (1990) 221 Cal.App.3d 1601, 1619- 1620 [271 Cal.Rptr. 596] [designer and installer of chemical treatment facility liable for nuisance]; *Portman v. Clementina Co.* (1957) 147 Cal.App.2d 651, 659-660 [305 P.2d 963] [contractor who dumped fill and created nuisance would be liable in damages].) [FN7]

FN7 These authorities refute defendant's assertion, unsupported by authority that " one cannot be guilty of committing a nuisance unless it [*sic*] is in the position to abate it."

C. *Plaintiffs have alleged special injury sufficiently to allow them to sue for damages for public nuisance.*

(3) Defendant contends plaintiffs "lack standing" to sue for public nuisance.

Defendant notes section 3493 allows a private person to maintain an action for public nuisance "if it is specially injurious to himself, ..." "Generally speaking, a public nuisance does not furnish ground for action by a private person, but such public nuisance may inflict upon an individual such peculiar injury as to entitle him to maintain a separate action for its abatement, or to recover damages therefor. (Civ. Code, sec. 3493.) The injury to the individual must, however, be different in kind and not merely in degree from that suffered by the general public. [Citations.]" (*Brown v. Rea* (1907) 150 Cal. 171, 174 [88 P. 713].) ***1138**

Defendant argues plaintiffs have failed to allege special injury. However, plaintiffs have alleged, among other things, that they have been required to undertake testing of the property. These testing costs are sufficient to constitute "special injury" to plaintiffs under section 3493. (See *Westwood Pharmaceuticals v. Nat. Fuel Gas Dist.* (W.D.N.Y. 1990) 737 F.Supp. 1272, 1281.)

D. *The complaint on its face does not show that defendant's acts were undertaken lawfully with the consent of the owner/lessor.*

In a variety of different contexts, defendant asserts that any disposal of waste was done lawfully and pursuant to the authority of the lease.

(4) We agree that where, as here, an owner of property seeks damages for creation of a nuisance by a prior lessee, the lessee has a defense that his use of the property was lawful and was authorized by the lease; i.e., his use of the property was undertaken with the *consent* of the owner. An absence of consent is necessarily implied in the early California cases, discussed above, holding construction of ditches on plaintiff's property constituted a nuisance. (See *Courtwright v. B. R. & A. W. & M. Co., supra,* 30 Cal. at p. 574 ["the defendant with force and arms entered upon the land ..."]; *Weimar v. Lowery, supra,* 11 Cal. at p. 104 ["defendants, against [plaintiff's] will, had dug a ditch across a portion of the lot ..."]; *Fitzgerald v. Urton, supra,* 4 Cal. at p. 236 ["defendants persisted in trespassing, although warned off and forbidden by the plaintiff ..."].)

Consent as a defense is also acknowledged by section 839 of the Restatement Second of Torts: "A

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and

"(a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and

"(b) he knows or should know that *it exists without the consent of those affected by it*, and

"(c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it." (Italics added.)

Moreover, consent as a defense is necessary to avoid absurd results. Suppose, for example, A leases Blackacre to B for the purpose of operating ***1139** a quarry. B lawfully uses the land for that purpose and, at the end of the lease term, returns the land to A with a substantial and inevitable hole in the ground. We dare say it would be absurd to allow A to sue B for having created the inevitable hole that was the very object of the lease. The reason is that B, having acted lawfully with A's consent, has done nothing wrong and has therefore committed no tort. Nor is a successor owner in any better position than A. "Where the original owner has lost the right to sue by authorizing the construction of the private nuisance ... he clearly can pass no right to sue to his grantee." (Note, *Torts: Nuisance: Defenses: " Coming to the Nuisance" as a Defense* (1953) 41 Cal.L.Rev. 148, 149, fns. omitted.) Nor is a defense of consent vitiated simply because plaintiffs seek damages based on special injury from public nuisance. "Where special injury to a private person or persons entitles such person or persons to sue on account of a public nuisance, both a public and private nuisance, in a sense, are in existence." (47 Cal.Jur.3d, Nuisances, § 24, p. 237, fns. omitted.)

By these remarks, we do not suggest that consent of an owner/lessor can impede the *abatement* of a public nuisance. This case involves a claim for *damages* for special injury from a public nuisance and our remarks are necessarily limited to the present context.

We are aware that, in his Summary of California Law, Witkin remarks that consent is not a defense to an action for nuisance. (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 150, p. 830.) However, the text accompanying the remark is as follows: "The so-called doctrine of 'coming to a nuisance' has generally been repudiated; i.e., the plaintiff may obtain injunctive relief even though the nuisance was already in operation, with his knowledge, when he acquired his own property." ( *Ibid.*) "The early common law 'coming to the nuisance' rule, as stated in the leading case of *Rex v. Cross,* FN[8] was that if a noxious trade were established in a place remote from habitations, those who afterward acquired property in the vicinity were barred from obtaining either damages or an injunction, having assumed the risk of the nuisance by purchasing property with knowledge of the conditions." (Note, *op. cit. supra,* 41 Cal.L.Rev. at p. 148; see *Eaton v. Klimm* (1933) 217 Cal. 362, 369 [18 P.2d 678]; *Williams v. Blue Bird Laundry Co.* (1927) 85 Cal.App. 388, 392 [259 P. 484].)

FN[8] 2 C. & P. 483, 172 Eng. Rep. 219 (1826).

Here, we have no occasion to quarrel with the rejection of the doctrine of "coming to a nuisance." This action does not involve a new use of property " coming to" an older, established neighboring use. As is abundantly clear, this case involves a wholly different context: the assertion of a claim for damages by an owner of property against a former lessee. In these circumstances, for reasons already advanced, we are convinced that the lessee must ***1140** have a defense that his use of the property was lawfully undertaken pursuant to the consent of the lessor.

(5) Although we think that consent (as described) is a defense in this action, we cannot agree with defendant's argument that the complaint demonstrates consent and lawful use as a matter of law. Defendant relies upon paragraph 11 of the lease, which provides in part: "Lessors acknowledge that they are aware that certain activities of Lessee on the leased premises may be of a hazardous nature and that from time to time

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activities conducted on the premises may have an element of nuisance about them or resulting from them. In this connection, Lessors hereby convenant that they will acquiesce in any nuisance or hazard caused by Lessee on the premises."

This paragraph does not identify either the nature of the contemplated hazardous activity nor the nature of the contemplated nuisance. Moreover, other provisions of the lease make it unclear whether the lease contemplated the disposal of waste of the kind and in the amounts pleaded in the complaint. Thus, paragraph 11 further provides in part: "The leased premises may be used by Lessee for any and all lawful purposes. Lessee shall use and occupy the premises in conformity with all ordinances and laws solely at Lessee's risk. ..." Paragraph 18 provides in part: "Lessee further agrees, during the term, not to ... commit waste to the reversionary interest of Lessors." Moreover, as we have noted paragraph 8 provides in part, "Upon termination of this Lease, Lessee shall surrender the premises in as good state and condition as when received by Lessee, reasonable use and wear thereof consistent with the business engaged in by Lessee ... excepted."

Construed together, these provisions are patently ambiguous with respect to whether the lease authorized hazardous waste disposal during the term of the lease and whether the lease imposed an obligation upon defendant to clean up any hazard before termination of the lease. Contrary to defendant's assertion, extrinsic evidence is necessary to determine the rights and obligations of the parties to the lease; the issue cannot be determined on demurrer. [FN9] (*Southern Pacific Land Co. v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807, 814-817 [233 Cal.Rptr. 794]; see *Sierra Screw Products v. Azusa Greens, Inc.* (1979) 88 Cal.App.3d 358, 367-368 [151 Cal.Rptr. 799].)

FN9 Defendant contends the lease contained convenants or equitable servitudes running with the land. However, we see no immediate need to address this contention. It's import appears to be that the lease authorized defendant's conduct. That issue is properly embraced within our discussion of the defense of consent to creation of a nuisance. In any event, as we have recounted, the question whether the lease authorized defendant's conduct cannot be resolved on demurrer.

Putting aside the question of the possible bar of the statute of limitations-a subject we shall address in a moment-the complaint states causes of action for damages for creation of public and private nuisances. *1141

### II *The Complaint States a Cause of Action for Trespass*

(6) Defendant contends the complaint fails to state a cause of action for trespass. We cannot agree.

The complaint pleads in pertinent part: "Aerojet has interfered with plaintiffs' right to possession of the Subject Property by wrongfully depositing hazardous substances on the Subject Property and failing and refusing to remove them at any time since plaintiffs acquired the Subject Property."

"Trespass is an unlawful interference with possession of property. [Citation.] Peaceable entry on land by consent is not actionable. [Citation.]" ( *Girard v. Ball* (1981) 125 Cal.App.3d 772, 788 [ 178 Cal.Rptr. 406].)

Defendant contends one cannot trespass upon land in his own possession. However, as we have discussed, the lease arguably did not give defendant unrestricted possession of the land. Whether the lease authorized the disposal of the hazardous waste described in the complaint must be determined by extrinsic evidence. By plaintiffs' construction of the lease, defendant (a) wrongfully deposited hazardous waste on the property and (b) failed to clean it up as the lease required. These pleaded theories are sufficient to state a cause of action for trespass.

"[A] trespass may occur if the party, entering [land] pursuant to a limited consent, i.e., limited as to purpose or place, proceeds to exceed those limits by divergent conduct on the land of another. 'A conditional or restricted consent to enter land

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

creates a privilege to do so only in so far as the condition or restriction is complied with.' (Rest.2d Torts, § 168.)" (*Civic Western Corp. v. Zila Industries, Inc.* (1977) 66 Cal.App.3d 1, 17 [135 Cal.Rptr. 915]; see *Rogers v. Duhart* (1893) 97 Cal. 500, 506 [32 P. 570]; *Red Bluff v. Southern Pacific Co.* (1919) 44 Cal.App. 667, 674 [187 P. 152]; 5 Witkin, Summary of Cal. Law, *op. cit. supra,* Torts, § 607, p. 706.) Moreover, section 160 of the Restatement Second of Torts provides in pertinent part: "A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land ***1142**

"(a) with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated, ..." FN10

FN10 Defendant contends this section is inapplicable because plaintiffs did not have possession of the land when the trespass occurred. This view overlooks the Restatement's characterization of the rule of section 160 as one of continuing trespass as comment h to section 160 makes clear: "The rule of continuing trespass is applicable not only where the ownership or possession of the structure, chattel, or other thing is transferred after such thing comes upon the land ... but also where the possession of the land is transferred thereafter ...."

These authorities support plaintiffs' theories of trespass. Putting aside for the moment the question of the bar of the statute of limitations, the complaint states a cause of action for trespass.

III *Plaintiffs Should Be Allowed to Amend Their Complaint to Allege Facts Showing Continuing Nuisance and Trespass.*

Defendant contends all of plaintiffs' counts are barred by the statute of limitations and that plaintiffs cannot escape this bar by any amendment to their complaint.

A. *A claim for damages for a permanent public nuisance is subject to the three-year statute of limitations in Code of Civil Procedure section 338, subdivision (b).*

(7) Plaintiffs assert their count based upon public nuisance is not barred by the statute of limitations because in their view a claim based on public nuisance is never barred by the statute of limitations. This argument is not well taken.

Plaintiffs assert there is no statute of limitations running on their claim for public nuisance because section 3490 provides: "No lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right."

Section 3490 has been construed to mean that the statute of limitations is no defense to an action brought by a public entity to abate a public nuisance. (*Cloverdale v. Smith* (1900) 128 Cal. 230, 235 [60 P. 851]; *City of Turlock v. Bristow* (1930) 103 Cal.App. 750, 756 [284 P. 962]; 11 Witkin, Summary of Cal. Law, *op. cit. supra,* Equity, § 124, p. 805.) However, where *private citizens* have sued for *damages for special injury* based on public nuisance, our Supreme Court has characterized the nuisance as either "continuing" or ***1143** "permanent" and has used the characterization to determine whether the suit is subject to the statute of limitations. As we shall explain, where a private citizen sues for damage from a permanent nuisance, the statute of limitations begins to run upon creation of the nuisance. Where a continuing nuisance is alleged, every continuation of the nuisance gives rise to a separate claim for damages caused by the nuisance.

Thus, for example, in *Phillips v. City of Pasadena* (1945) 27 Cal.2d 104 [162 P.2d 625], plaintiff sued for damages for the unlawful obstruction of a public road. Although the Supreme Court did not expressly characterize the nuisance as "public," the court cited section 3493, quoted above, which is applicable only to public nuisances and which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allows a private person to maintain an action if the public nuisance is specially injurious. (*Id.* at p. 106.) In any event, it is settled that the obstruction of a public road or street is a public nuisance. ( *Gardner v. Stroever* (1891) 89 Cal. 26, 29 [26 P. 618].)

Addressing defendant's contention that plaintiff's claim was barred by the statute of limitations, the *Phillips* court concluded, "Where a nuisance is of such character that it will presumably continue indefinitely it is considered permanent, and the limitations period runs from the time the nuisance is created. [Citations.] On the other hand, if the nuisance may be discontinued at any time it is considered continuing in character. [Citations.] Every repetition of a continuing nuisance is a separate wrong for which the person injured may bring successive actions for damages until the nuisance is abated, even though an action based on the original wrong may be barred. [Citations.]" ( *Phillips v. City of Pasadena, supra,* 27 Cal.2d at pp. 107-108.)

Our Supreme Court recently applied *Phillips*'s rule in *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862 [218 Cal.Rptr. 293, 705 P.2d 866]. There, plaintiffs sued for (among other things) nuisance caused by noise, smoke, and vibrations from flights over their homes. The trial court ruled the action was barred by the statute of limitations. (*Id.* at p. 868.) In reversing the trial court, our Supreme Court framed the issue as whether the nuisance was permanent or continuing: " Two distinct classifications have emerged in nuisance law which determine the remedies available to injured parties and the applicable statute of limitations. On the one hand, permanent nuisances are of a type where ' "by one act a permanent injury is done, [and] damages are assessed once for all." ' ... In such cases, plaintiffs ordinarily are required to bring one action for all p ast, present and future damage within three years after the permanent nuisance is erected. ... Damages are not dependent upon any subsequent use of the property but are complete when the nuisance comes into existence. ... *1144

"On the other hand, if a nuisance is a use which may be discontinued at any time, it is considered continuing in character and persons harmed by it may bring successive actions for damages until the nuisance is abated. ... Recovery is limited, however, to actual injury suffered prior to commencement of each action. Prospective damages are unavailable." ( 39 Cal.3d at pp. 868-869, citations and fns. omitted.)

Although *Baker,* like *Phillips,* does not expressly characterize the nuisance at issue as "public," the disturbance caused by flights over homes is indisputably a public nuisance because it affects at the same time an entire community or neighborhood. (§ 3480.) We therefore conclude the continuing/permanent nuisance distinction drawn by *Phillips* and *Baker* applies to private suits for damages based upon public nuisances.

Additional (albeit oblique) support for this conclusion is found in *McLean v. Llewellyn Iron Works* (1905) 2 Cal.App. 346 [83 P. 1082]. There, an owner of property abutting on public streets sued the owner of property on the other sides of the streets for having constructed structures that encroached on the streets. The trial court entered judgment for plaintiff on a nuisance theory. The court of appeal rejected defendant's claims that plaintiff had failed to show an injury special to himself and that the injury was barred by the statute of limitation. (*Id.* at pp. 349-350.) On the latter point, the court of appeal concluded, "A public nuisance cannot be legalized by prescription (Civ. Code, sec. 3490); nor, so long as the streets remain such, can the rights of abutting land owners be thus affected." (*Id.* at p. 350.)

Defendant petitioned for a hearing in our Supreme Court. That court denied a hearing, issuing an unusual opinion on the denial that provided in part: " It is, however, proper to say that we are not to be understood as affirming that portion of the opinion of the district court of appeal to the effect that the right of action by a private party to abate a public nuisance, because of special injury arising therefrom to him, may not be barred by the statute of limitations." (2 Cal.App. at p. 350)

Thus, where a private citizen sues for damages to real property caused by a public nuisance, [FN11]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and the nuisance is permanent, the three-year statute of limitations in Code of Civil Procedure section 338, subdivision (b) (for trespass or injury to real property), begins to run when the permanent nuisance is created. (*Baker, supra,* 39 Cal.3d at p. 869; *Phillips, supra,* 27 Cal.2d at p. 107.) The authorities cited by plaintiffs-*Tucker v. Watkins* (1967) 251 Cal.App.2d 327 [59 Cal.Rptr. 453] and ***1145***Wade v. Campbell* (1962) 200 Cal.App.2d 54 [19 Cal.Rptr. 173, 92 A.L.R.2d 966]-are not at odds with this rule because both cases involved continuing nuisances. FN12

FN11 We have no occasion to examine claims for personal injury based on public nuisance. (But see *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 937-938 [ 101 Cal.Rptr. 568, 496 P.2d 480].)

FN12 Although not cited by plaintiffs, we note that continuing nuisances were also at issue in *Strong v. Sullivan* (1919) 180 Cal. 331 [181 P. 59, 4 A.L.R. 343] and in *Bowen v. Wendt* (1894) 103 Cal. 236 [37 P. 149].

B. *Plaintiffs may amend their complaint to plead facts showing a continuing nuisance.*

(8a) This leaves the question whether the nuisance alleged in the instant case is permanent or continuing. "In case of doubt as to the permanency of the injury the plaintiff may elect whether to treat a particular nuisance as permanent or continuing. [Citation.]" (*Baker v. Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d at p. 870; *Spaulding v. Cameron* (1952) 38 Cal.2d 265, 268 [ 239 P.2d 625].)

Defendant argues that plaintiffs' complaint manifests an election of permanent nuisance. FN13 Defendant points out that plaintiffs have alleged their property is "unusable and extremely difficult to market for an indefinite period of time" and there is "little likelihood that the Subject Property will ever be as valuable as it would have been if not contaminated." Moreover, defendant notes that plaintiffs seek to recover all diminution in the market value of their property by seeking an injunction that would make defendant buy the property from plaintiffs at its market value unaffected by contamination. This *form of relief* is incompatible with a claim based on injuries caused by continuing nuisance. (*Spaulding v. Cameron, supra,* 38 Cal.2d at pp. 269-270; *Plonley v. Reser* (1960) 178 Cal.App.2d Supp. 935, 937 [3 Cal.Rptr. 551, 80 A.L.R.2d 911].)

FN13 Should plaintiffs' complaint be construed as one for permanent nuisance, it would be barred by the statute of limitations for reasons discussed in part IV, *post.*

On the other hand, plaintiffs allege they can amend their complaint to allege facts showing a continuing nuisance, i.e., the contamination can be abated and defendant has entered into a federal consent decree agreeing to clean up the property. The question is whether these proposed averments sufficiently allege a continuing nuisance.

"The cases finding the nuisance complained of to be unquestionably permanent in nature have involved solid structures, such as a building encroaching upon the plaintiff's land (*Rankin v. DeBare* (1928) 205 Cal. 639 [271 P. 1050]), a steam railroad operating over plaintiff's land (***1146***Williams, supra,* 150 Cal. 624), or regrade of a street for a rail system (*Eachus v. Los Angeles etc. Ry. Co.* (1894) 103 Cal. 614 [37 P. 750]). ...

"

. . . . . . . . . . .

"The classic example of a continuing nuisance is an ongoing ... disturbance, ... caused by noise, vibration or foul odor. (E.g., *Vowinckel v. N. Clark & Sons* (1932) 216 Cal. 156, 158 [13 P.2d 733] [vibration, noise and noxious soot, smoke and gases emanating from pottery factory].) Indeed, even more substantial physical invasions of land have been held to be continuing in character. (E.g., *Tracy v. Ferrera* (1956) 144 Cal.App.2d 827, 828 [301

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

P.2d 905] [deflection of rain water and emission of noxious odors and fumes from neighbor's pipes and furnace].) As emphasized in *Tracy,* the distinction to be drawn is between encroachments of a permanent nature erected upon one's lands, and a complaint made, not of the location of the offending structures, but of the continuing use of such structures. (*Id., supra,* 144 Cal.App.2d at p. 828.) The former are permanent, the latter is not." (*Baker v. Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d at pp. 869-870, fns. omitted.)

Here, according to plaintiffs, no structures are involved and the nuisance consists of the offensive chemical pollution which can be abated. In the decisions of our Supreme Court, the crucial distinction between a permanent and continuing nuisance is whether the nuisance may be discontinued or abated. (39 Cal.3d at p. 869; *Kornoff v. Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 270-271 [288 P.2d 507]; *Spaulding v. Cameron, supra,* 38 Cal.2d at p. 268; *Phillips v. City of Pasadena, supra,* 27 Cal.2d at p. 107; *Kafka v. Bozio* (1923) 191 Cal. 746, 751 [218 P. 753, 29 A.L.R. 833]; 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 425, p. 458.) We do not read *Baker v. Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d 862, as deviating from this rule. The majority opinion of Justice Reynoso expressly states that a continuing nuisance is one that may be discontinued at any time. (*Id.* at p. 869.) The majority opinion argued defendant was obligated by statute to curb noise pollution at the airport. (*Id.* at p. 873.) The ability of the airport to discontinue the noise pollution is therefore necessarily implied in the argument. The dissenting opinion of Justice Mosk argued the nuisance was permanent because injunctive relief against airplane flights was unavailable. (*Id.* at p. 875.) Therefore, the dispute between majority and dissent appears to focus not on whether a continuing nuisance is one that is abatable but rather on whether injunctive relief must be available in order for a nuisance to be abatable. That issue is not present in this case. ***1147**

Plaintiffs' proposed pleading therefore meets the crucial test of a continuing nuisance: that the offensive condition is abatable. [FN14]

FN14 Needless to say, the continuing or permanent nature of the nuisance remains subject to proof at trial. Our task in reviewing the demurrer is to ascertain whether plaintiffs' proposed pleading should allow them to try to prove a continuing nuisance.

We note plaintiffs' land may be subject to a continuing nuisance even though defendant's offensive conduct ended years ago. That is because the "continuing" nature of the nuisance refers to the continuing damage caused by the offensive condition, not to the acts causing the offensive condition to occur. The point is illustrated by *Kafka v. Bozio, supra,* 191 Cal. 746. There, defendant constructed a building next to plaintiffs' building. As originally constructed, the defendant's building was straight and plumb. However, part of the building was built on soft ground, and, over time, the building tipped and leaned against plaintiffs' building, causing damage to the latter. Concluding plaintiffs had a good claim for continuing nuisance, the court said, " 'Where continuing or recurring injury results from a wrongful act or from a condition wrongfully created and maintained, such as a continuing nuisance or trespass, there is not only a cause of action for the original wrong arising when the wrong is committed, but separate and successive causes of actions, for the consequential damages arise as and when such damages are from time to time sustained; and therefore so long as the cause of the injury exists and the damages continue to occur, plaintiff is not barred of a recovery for such damages as have accrued within the statutory period beyond the action, although a cause of action based solely on the original wrong may be barred.' " (*Id.* at p. 751; see also *Phillips v. City of Pasadena, supra,* 27 Cal.2d 104 [city's act of installing locked gate on road constituted continuing nuisance].)

We are aware that the Second District Court of Appeal has recently concluded, "The salient feature of a continuing trespass or nuisance is that its impact may vary over time." (*Field-Escandon v. DeMann* (1988) 204 Cal.App.3d 228, 234 [251 Cal.Rptr. 49].) Assuming this test correctly states the law, plaintiffs suggest they can amend their complaint to satisfy the test. Thus, plaintiffs aver

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

they "are prepared to prove at trial that the contamination has migrated or spread on the property continuously since it was initially dumped, and that therefore, its impact has varied over time." Presumably, plaintiffs are prepared to amend their complaint along these lines, thereby satisfying *Field- Escandon*'s test.

Plaintiffs' proposed pleadings do not directly contradict any facts pleaded by plaintiffs in their complaint. (9) Although these proposed averments are necessarily at odds with the *relief* requested by plaintiffs, the validity of a demurrer is determined with reference to the pleaded facts alleged to ***1148** constitute a wrong, not the prayer for relief. (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 123 [109 Cal.Rptr. 799, 514 P.2d 111].)

(8b) In cases of doubt respecting the permanency of an injury caused by a nuisance, courts are inclined to favor the right to successive actions. (*Kafka v. Bozio, supra,* 191 Cal. at p. 752.) "... [W]e should be particularly cautious not to enlarge the category of permanent nuisances beyond those structures or conditions that truly are permanent. Where some means of abatement exists, there is little or no incentive to make remedial efforts once the nuisance is classified as permanent." (*Baker v. Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d at p. 872.) Whether contamination by toxic waste is a permanent or continuing injury is ordinarily a question of fact turning on the nature and extent of the contamination. (See, e.g., *Piccolini v. Simon's Wrecking* (M.D.Pa. 1988) 686 F.Supp. 1063, 1075-1077; *Merry v. Westinghouse Elec. Corp.* (M.D.Pa. 1988) 684 F.Supp. 852, 855-856.) We therefore conclude plaintiffs should be allowed to amend their complaint to state their proposed facts so as to aver a theory of continuing nuisance and to seek damages caused them within three years of the date of filing the complaint. [FN15] (Code Civ. Proc., § 338, subd. (b); *Baker v. Burbank- Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d at p. 869.)

FN15 Plaintiffs have pleaded counts for both public and private nuisance. As we have said, a public nuisance is one that affects an entire community or neighborhood or any considerable number of persons. (§ 3480.) A private nuisance is any nuisance not otherwise defined as a public nuisance. (§ 3481.) Our analysis of the application of the statute of limitations applies equally to plaintiffs' counts for public and private nuisance.

C. *Plaintiffs may amend their complaint to allege a continuing trespass.*

(10) Historically, the application of the statute of limitations for trespass has been the same as for nuisance and has depended on whether the trespass has been continuing or permanent. (See *Kafka v. Bozio, supra,* 191 Cal. 746, see also *Kornoff v. Kingsburg Cotton Oil Co., supra,* 45 Cal.2d 265; *Spaulding v. Cameron, supra,* 38 Cal.2d at p. 268.) As we have recounted, the crucial test of the permanency of a trespass or nuisance is whether the trespass or nuisance can be discontinued or abated. ( *Baker v. Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d at p. 869; *Kafka v. Bozio, supra,* 191 Cal. at p. 751.) We have already seen how plaintiffs' proposed amendments to their complaint meet this test.

We note that plaintiffs' theory of continuing trespass is sanctioned by the Restatement Second of Torts, which states: "(b) Continuing trespass. The actor's failure to remove from land in the possession of another a thing which he has tortiously ... placed on the land constitutes a continuing ***1149** trespass for the entire time during which the thing is on the land and ... confers on the possessor of the land an option to maintain a succession of actions based on a theory of continuing trespass or to treat the continuance of the thing on the land as an aggravation of the original trespass." (*Id.* at § 161, com. b; see *Merry v. Westinghouse Elec. Corp., supra,* 684 F.Supp. at p. 855.)

We therefore conclude plaintiffs should be afforded the opportunity to amend their complaint clearly to allege facts that show a continuing trespass.

IV *Plaintiffs' Counts for Negligence, Negligence*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Per Se, and Strict Liability Are Barred by the Statute of Limitations.*

(11a) We have no occasion to determine whether plaintiffs' counts for negligence, negligence per se, or strict liability state facts sufficient to constitute a cause of action because, assuming they do, each is barred by the statute of limitations. The parties agree each of these counts is subject to the three-year statute of limitations in section 338, subdivision (b) of the Code of Civil Procedure. As we shall explain, plaintiffs had good reason to inquire about (and therefore learn about) these matters more than three years before their complaint was filed.

In the third count, the complaint avers defendant was negligent by selecting the subject property as a site for hazardous substance disposal, improper disposing of hazardous substances, failing to determine the nature and extent of the contamination, failing to contain or remedy the contamination, and failing to inform plaintiffs of the contamination.

The fourth count, for negligence per se, is premised on defendant's alleged violation of statutes and regulations by their discharge of hazardous waste on the property and into the waters of the state.

The sixth count, for strict liability, is premised on defendant's alleged use, disposal, storage and maintenance of hazardous substances on the subject property.

(12) The traditional rule is that a statute of limitations begins to run upon the occurrence of the last element essential to the cause of action, even ***1150** if the plaintiff is unaware of his cause of action. [FN16] (*Leaf v. City of San Mateo* (1980) 104 Cal.App.3d 398, 406 [163 Cal.Rptr. 711].) [FN17] The harshness of that rule has been ameliorated in cases where it would be manifestly unjust to deprive a plaintiff of a cause of action before he is aware he has been injured. (*Ibid.*) A cause of action under this discovery rule accrues when " 'plaintiff either (1) actually discovered his injury and *its negligent cause* or (2) could have discovered injury *and cause* through the exercise of reasonable diligence [italics added].' " (*Id.* at p. 407, citing *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 96-97 [132 Cal.Rptr. 657, 553 P.2d 1129].) The limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-1111 [245 Cal.Rptr. 658, 751 P.2d 923].) Subjective suspicion is not required. If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation. (*Ibid.*; *Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177].)

FN16 Both sides argue the traditional accrual rule applies, but with different results. Plaintiffs claim they did not sustain an injury (hence the statute did not begin to run) until they recently tried to sell their property, without success. However, the only case cited by plaintiffs, *Allred v. Bekins Wide World Van Services* (1975) 45 Cal.App.3d 984 [120 Cal.Rptr. 312], merely held a cause of action under the discovery rule accrues when the person sustains some damage and discovers or should discover his cause of action. Here, the injury was sustained by 1970. The infliction of appreciable and actual harm, however uncertain in amount, will commence the statutory period. (*DeRose v. Carswell* (1987) 196 Cal.App.3d 1011, 1025 [242 Cal.Rptr. 368].)

In view of our disposition, we need not address defendant's argument that the statute of limitations ran while the Cavitts, who had contemporaneous knowledge of the injury and its cause, still owned the land.

FN17 In *Leaf, supra,* the trial court granted summary judgment to the defendant on the theory that the plaintiffs' cause of action was barred by the 10-year statute of limitations under Code of Civil Procedure section 337.15 (latent defects in construction of real estate). Claims under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> Code of Civil Procedure section 337.15 do not receive the benefit of the delayed discovery rule, because that statute specifies that claims accrue upon "substantial completion" of the construction. However, the reviewing court there found Code of Civil Procedure section 337.15 inapplicable and held that Code of Civil Procedure section 338, subdivision (2) (now (b)) governed. (*Id.* at pp. 402, 405 fn. 2.) Therefore defendant's assertion that plaintiffs have not alleged any latent defect within Code of Civil Procedure section 337.15 is a red herring.

(13) Whether the discovery rule applies at all is initially a matter of pleading. As this court has held, "A plaintiff who relies on this exception must plead facts justifying delayed accrual; the complaint must allege (1) the time and manner of discovery and (2) the circumstances excusing delayed discovery. [Citations.]" (*G. D. Searle & Co. v. Superior Court* (1975) 49 Cal.App.3d 22, 26 [122 Cal.Rptr. 218] [mandamus issued to compel trial court to sustain demurrer to products liability complaint against drug manufacturer].) This pleading requirement is a procedural safeguard against *1151 lengthy litigation on the issue of accrual. (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 832 [195 Cal.Rptr. 421].)

(11b) Here, the complaint alleges that defendant released toxic substances on the property from 1960 to 1970. Plaintiffs acquired their interests in the property between 1975 and 1983. The lawsuit was filed on January 14, 1988, and alleges that plaintiffs did not learn of the hazardous conditions until "recently." The complaint fails to allege when plaintiffs made the discovery, the circumstances of the discovery and why, in the exercise of reasonable diligence, they could not have made the discovery sooner.

The question then becomes whether the defect can be cured by amendment, a question properly before us despite plaintiffs' failure to seek leave to amend in the trial court. (Code Civ. Proc., § 472c.) The burden is on plaintiffs to show that amendment can save the complaint. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.)

Plaintiffs set forth the following additional facts which they intend to plead if allowed to do so:

"In late 1979, the Manginis were contacted by an investigator for the California Department of Justice, who informed the Manginis that he was conducting an investigation of [defendant's] hazardous waste disposal practices and was interviewing people who owned land near [defendant's] Sacramento facilities. The investigator asked the Manginis whether they had any knowledge of [defendant's] waste disposal practices in the area. The Manginis told him that they did not. He informed them that there was no reason for them to be concerned about any environmental problems on their property."

"On or about April 24, 1984, more than four years later, the Manginis received a letter from [defendant] asking for permission to inspect the property. For the next two years, [defendant] discussed with the Manginis its plans for inspecting and conducting tests on the property. Never during that period of time did [defendant] tell the Manginis anything about the nature of [defendant's] activities while it had leased the property." An access agreement sent by defendant to plaintiffs indicated defendant had used the property as a "buffer zone." "[Defendant] did not inform the Manginis that the property had been used for disposal of hazardous substances. Nor did [defendant] tell the Manginis why it was interested in conducting tests on the property. When the Manginis asked questions, [defendant] put them off with vague answers, telling them that the planned investigation was part of [defendant's] general environmental analysis of the area." *1152

At some undisclosed time, defendant took soil samples and plaintiffs hired an independent laboratory. In January 1987, defendant gave plaintiffs its laboratory test results, which appeared to show chemical contamination in the soil, but told plaintiffs this was laboratory error. In April 1987, the Sacramento Air Pollution Control District informed plaintiffs their property was contaminated with hazardous substances. In mid-1987, plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

retained an attorney and obtained United States Environmental Protection Agency (EPA) records, including 1979-1980 Department of Justice investigative reports.

Plaintiffs state, "Those reports disclosed for the first time to the Manginis the nature of [defendant's] activities while it had leased the property from 1960 to 1970. The reports showed that [defendant] had disposed of thousands of pounds of trichloroethylene (TCE), ammonium perchlorate rocket fuel and other chemical contaminants on the property. Trenches were dug, barrels of waste were ignited, and ponds on the property were used as a hazardous waste dumping ground. These alterations were subsequently covered. The reports also showed that the California Attorney General's Office and the EPA had filed lawsuits against [defendant] to compel it to clean up contamination on property which [defendant] owned or leased in the Sacramento area." FN18 Plaintiffs filed their complaint on January 14, 1988.

FN18 Defendant's request that we take judicial notice of the government's lawsuit is denied. That the lawsuit specifically refers to plaintiffs' property, as defendant concedes, is unnecessary to our resolution of this case.

(14) We treat these facts as admissions. " '[W]hile briefs and arguments are outside the record, they are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party.' " (*DeRose v. Carswell* (1987) 196 Cal.App.3d 1011, 1019, fn. 3 [242 Cal.Rptr. 368].)

(11c) Thus, in 1984, more than three years before filing the complaint, plaintiffs knew the following facts: (1) the recorded lease gave notice that defendant had engaged in activities of a potentially hazardous nature on their land (see *Fair v. Stevenot* (1866) 29 Cal. 486, 488-489; *American Medical International, Inc. v. Feller* (1976) 59 Cal.App.3d 1008, 1020 [131 Cal.Rptr. 270]); (2) the Department of Justice investigated defendant's practices regarding disposal of hazardous waste in the area; and (3) defendant asked plaintiffs for permission to inspect their property.

Whether any of these three facts in isolation would be sufficient to impart notice is open to dispute. However, the combination of these facts together establish as a matter of law that, when defendant contacted plaintiffs in *1153 1984, plaintiffs had sufficient information to put them on notice of the possibility that defendant had dumped hazardous waste on their land.

That defendant gave evasive, or even untruthful, reasons for the inspection did not relieve plaintiffs of their duty of inquiry once they had sufficient facts to suspect the cause of action. Indeed, the evasiveness gave further reason for suspicion.

Here, had plaintiffs investigated in a timely fashion, they would have discovered the Department of Justice reports, which they admittedly received shortly after requesting them from the EPA in 1987. Plaintiffs are charged with knowledge of the information in those reports. "[W]hen knowledge had by or imputed to plaintiff is such as to compel the conclusion that a prudent man would have suspected [the cause of action], the court may determine, as a matter of law, that there had been discovery." (*National Automobile & Cas. Ins. Co. v. Payne* (1968) 261 Cal.App.2d 403, 409 [67 Cal.Rptr. 784].)

We therefore conclude the statute of limitations on plaintiffs' claims for negligence, negligence per se, and strict liability began to run no later than April 24, 1984, when plaintiffs received defendant's letter asking to inspect the property. These claims, asserted in the complaint filed January 14, 1988, are barred by the three-year statute of limitations. ( Code Civ. Proc., § 338, subd. (b).)

V *Plaintiffs Counts for Equitable Indemnity and Declaratory Relief Are Not Barred by the Statute of Limitations.*

In their 10th count, plaintiffs allege they have been compelled by governmental authorities to undertake testing of the property and may be required to abate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hazardous conditions. The complaint pleads, "The costs incurred by plaintiffs in investigating and abating the conditions at the Subject Property are and will be the result of defendants' illegal and improperly management of hazardous substances at the Subject Property and failure to inform plaintiffs of the hazardous condition of the Subject Property. [ ¶] ... [P]laintiffs are entitled to full, equitable indemnity from ... defendants for all costs presently incurred, or which may be incurred, by plaintiffs in testing for and abating the hazardous conditions at the Subject Property."

In their 11th count, plaintiffs seek a declaratory judgment delineating the respective obligations of the parties for the testing and abatement costs described above. ***1154**

Defendant does not dispute that plaintiffs have pleaded facts sufficient to state causes of action in these counts. (See, e.g., *Selma Pressure Treating Co. v. Osmose Wood Preserving, Inc., supra,* 221 Cal.App.3d 1601.) Rather, defendant argues the counts are barred by the statute of limitations.

Defendant asserts, "Where the underlying causes of action are barred by limitations, so too is any claim for indemnity arising out of them." This assertion incorrectly states the law.

(15) It is well settled that, in the absence of a contrary statutory command, a cause of action for equitable indemnity does not come into existence until the indemnitee has suffered loss through payment. (*Valley Circle Estates v. VTN Consolidated, Inc.* (1983) 33 Cal.3d 604, 612 [189 Cal.Rptr. 871, 659 P.2d 1160]; *People* ex rel. *Dept. of Transportation v. Superior Court* (1980) 26 Cal.3d 744, 751 [163 Cal.Rptr. 585, 608 P.2d 673]; *E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 506 [146 Cal.Rptr. 614, 579 P.2d 505].) "[A] tort defendant does not lose his own independent right to seek such recovery simply because the injured party is barred from pursuing its separate claim against the additional defendant by the applicable statute of limitations. [Citations.]" ( *People* ex rel. *Dept. of Transportation, supra,* 26 Cal.3d at p. 752; see *Valley Circle Estates, supra,* 33 Cal.3d at p. 611; *Postley v. Harvey* (1984) 153 Cal.App.3d 280, 284- 285 [200 Cal.Rptr. 354].)

*Wagner v. State of California* (1978) 86 Cal.App.3d 922 [150 Cal.Rptr. 489], cited by defendant, is inapposite. There, this court held that a cross-complaint for equitable indemnity, filed in an action based upon a patent deficiency in real property, was barred by the statute of limitations. ( *Id.* at pp. 927-928.) We relied upon the language of Code of Civil Procedure section 337.1, which states in pertinent part, "Except as otherwise provided in this section, no action shall be brought to recover damages from any person performing or furnishing the design, ... or construction of an improvement to real property more than four years after the substantial completion of such improvement ...." (*Id.* at p. 927, fn. 2.) We concluded that since the statute provided "*No* action" could be brought after four years, and since the statute did not except actions for equitable indemnity from its purview, an action for equitable indemnity had to be brought within the four years from the substantial completion of the improvement. (*Id.* at p. 928.)

Code of Civil Procedure section 337.1 is inapplicable here. Defendant cites no correlative statutory language that would displace the ordinary rule that, "A tort defendant retains the right to seek equitable indemnity from another tortfeasor even if the plaintiff's action against the cross-defendant is ***1155** barred by the statute of limitations." (*Valley Circle Estates, supra,* 33 Cal.3d at p. 611.)

Even assuming the statute of limitations on a claim for equitable indemnity is one year (*Smith v. Parks Manor* (1987) 197 Cal.App.3d 872, 882 [243 Cal.Rptr. 256]), plaintiffs' count for equitable indemnity is not barred because the complaint does not disclose when plaintiffs incurred costs for testing or cleanup of the hazardous waste. (16) "In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows merely that the action may be barred. [Citation.]" (*McMahon v. Republic Van & Storage Co., Inc.* (1963) 59 Cal.2d 871, 874 [31 Cal.Rptr. 603, 382 P.2d 875].)

Plaintiffs' 11th count for declaratory relief is not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

barred for the same reason. Reasonably construed, this count seeks a declaration of plaintiffs' right to the equitable indemnity pleaded in their 10th count. Plaintiffs may seek such a declaration. (*Valley Circle Estates, supra,* 33 Cal.3d 604.) (17) As defendant acknowledges, the statute of limitations governing a request for declaratory relief is the one applicable to an ordinary legal or equitable action based on the same claim. (*Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 733 [146 P.2d 673, 151 A.L.R. 1062]; 3 Witkin, Cal. Procedure, *op. cit. supra,* Actions, § 475, p. 506.) Here, the underlying claim is for equitable indemnity. The count for declaratory relief is not barred for the same reason the count for indemnity is not barred.

VI *Plaintiffs' Count For Violation of Business and Professions Code Section 17200 Fails to State Facts Sufficient to Constitute a Cause of Action.*

(18) In their ninth count, plaintiffs allege, "The nuisance created and maintained by defendants ... in violation of Civil Code section 3479 and their conduct as alleged in this complaint constitute unfair business practices" in violation of Business and Professions Code section 17200.

When we read the complaint as a whole, as we are required to do (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318), it appears that defendant's wrongful conduct occurred during its leasehold, between 1960 and 1970.

Business and Professions Code section 17200 (hereafter section 17200) provides in relevant part that "unfair competition shall mean and include unlawful, unfair or fraudulent business *practice* ...." (Italics added.) Our *1156 Supreme Court has held that "practice" requires, at a minimum, ongoing conduct. (*State of California* ex rel. *Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1169-1170 [ 252 Cal.Rptr. 221, 762 P.2d 385].) Relief under section 17200 is unavailable to remedy past misconduct. (*Ibid.*)

In this case, when the complaint is given "a reasonable interpretation" (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318), it shows defendant's alleged misconduct occurred some 20 years ago. Therefore, section 17200 affords no remedy for the misconduct. (*Ibid.*)

Plaintiffs assert their claim under section 17200 should survive because their claims for continuing nuisance survive. The argument is unconvincing. As we have explained, the theory of continuing nuisance is not premised upon new wrongful conduct but upon the characterization of continuing *damages* as a continuing nuisance. (*Kafka v. Bozio, supra,* 191 Cal. at p. 751.)

Where, as here, defendant's wrongful conduct occurred many years ago, plaintiffs may not rely on the law of continuing nuisance to create a present pattern or practice of conduct required for relief under section 17200.

Plaintiffs' ninth count does not state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 430.10, subd. (e).)

Conclusion

Defendant's demurrer to plaintiffs' third, fourth, sixth and ninth "causes of action" was properly sustained without leave to amend. Defendant's demurrer may not be sustained with respect to plaintiffs' first, second, fifth, tenth, and eleventh " causes of action." On remand, the trial court shall vacate its order sustaining the demurrer with respect to the latter "causes of action" and shall allow plaintiffs to file an amended complaint as described in the opinion.

Disposition

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

Sparks, Acting P. J., and Marler, J., concurred.
A petition for a rehearing was denied June 19, 1991, and respondents' petition for review by the Supreme Court was denied August 29, 1991. *1157

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

230 Cal.App.3d 1125                                                                                     Page 22

230 Cal.App.3d 1125, 281 Cal.Rptr. 827, 21 Envtl. L. Rep. 21,429
**(Cite as: 230 Cal.App.3d 1125)**

Cal.App.3.Dist.
Mangini v. Aerojet-General Corp.
230 Cal.App.3d 1125, 281 Cal.Rptr. 827, 21 Envtl.
L. Rep. 21,429

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 21

Marshall v. Department of Water and Power of City of Los Angeles
Cal.App.2.Dist.
ERNEST MARSHALL et al., Plaintiffs and Appellants,
v.
DEPARTMENT OF WATER AND POWER OF THE CITY OF LOS ANGELES, Defendant and Appellant
**No. B027345.**

Court of Appeal, Second District, Division 4, California.
Mar 28, 1990.

SUMMARY

Several property owners and insurers filed suits against a city department of water and power alleging that a fire that damaged the property owners' property was caused by the department's downed power lines. With the exception of the inverse condemnation cause of action, the matter was tried to a jury, which found for the department and against plaintiffs. The trial court found for plaintiffs on the inverse condemnation cause of action. A second jury was empaneled to determine the amount of damages to be awarded to plaintiffs, and the trial court awarded varying amounts of attorney fees. (Superior Court of Los Angeles County, No. NWC 89152, Diane Wayne, Judge.)

The Court of Appeal affirmed, except that it remanded the matter as to two plaintiffs so that the trial court could reconsider its award of attorney fees. The court held that the trial court did not err in denying the department's request for a jury trial on the issue of causation on plaintiffs' inverse condemnation cause of action, even though the issue was a purely factual one. The court also held that substantial evidence supported the trial court's finding that the downed power lines caused the fire. The trial court did not err in discharging the original jury and empaneling a new jury to decide on compensation. Further, the jury was free to disbelieve evidence presented by one plaintiff that he suffered losses totaling $549,700 and award him instead compensation of only $1 (which by means of additur was increased to $100,001), and disbelieve the evidence of two other plaintiffs that their losses were $168,299 and award them only $1, even though the department of water and power presented no countervaluation evidence. The trial court, in awarding attorney fees on a percentage basis to plaintiffs, did not abuse its discretion in refusing to include prejudgment interest in the calculation of the fee award. Finally, the court held, the trial court abused its discretion by applying a uniform standard to all plaintiffs' requests for attorney fees as to their cause of action for inverse condemnation and disregarding the actual dollar impact on the individual plaintiffs. (Opinion by Goertzen, J., with Woods (A. M.), P. J., and George, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Eminent Domain § 132--Remedies of Owner--Inverse Condemnation--Nature and Basis of Action.
An action for inverse condemnation is an eminent domain proceeding initiated by the property owner rather than the condemner. The principles that affect the parties' rights to an inverse condemnation suit are the same as those in an eminent domain action. The authority for prosecution of an inverse condemnation proceeding derives from the just compensation guaranty of Cal. Const., art. I, § 19. Under that section, a public entity may be liable in an inverse condemnation action for any physical injury to real property proximately caused by a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

public improvement as deliberately designed and constructed, whether or not that injury was foreseeable, and in the absence of fault by the public entity. Inverse condemnation applies to personal as well as real property.
[See **Am.Jur.2d,** Eminent Domain, § 478.]
**(2)** Eminent Domain § 132--Remedies of Owner--Inverse Condemnation--Nature and Basis of Action--"Taking."
The primary question in an inverse condemnation action is whether there has been a "taking" in terms of property damage, destruction, depreciation in market value, or dispossession of the owner. Any governmental entity may be liable for inverse condemnation, even agencies that lack eminent domain authority. In order to establish an actionable taking, the plaintiff must demonstrate a causal relationship between governmental activity and the property loss complained of. Typically, this element is referred to as "proximate cause." Unlike the corresponding element in negligent cases, however, foreseeability is not a consideration for inverse condemnation. Instead, a governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause of the plaintiff's damages, even if only one of several concurrent causes.

**(3)** Eminent Domain § 71--Condemnation Proceedings--Jury Trial.
When an eminent domain proceeding comes on for hearing all issues except the sole issue relating to compensation are to be tried by the court and, if the court does not make special findings on those issues, its findings thereon are implicit in the verdict awarding compensation. It is only the compensation-the award-that is constitutionally required to be found and fixed by a jury. All other questions of fact, or of mixed fact and law, are to be tried without reference to a jury. The right to a jury trial on the issue of compensation applies as well in an inverse condemnation proceeding.
[See **Cal.Jur.3d (Rev),** Eminent Domain, § 334.]
**(4)** Eminent Domain § 136--Remedies of Owner--Inverse Condemnation--Jury Trial on Causation.
In consolidated actions by property owners and insurers against a city department of water and power arising from a fire allegedly caused by the department's fallen power lines, the trial court did not err in denying the department's request for a jury trial on the issue of causation on plaintiffs' inverse condemnation cause of action, even though the issue was a purely factual one. The parties in an inverse condemnation proceeding have a right to a jury trial solely on the issue of compensation; all other determinations related to the inverse taking, whether purely factual or a mixture of factual and legal, are nonjury questions. Generally, absent a specific statutory or constitutional requirement for a jury trial, there is no such right in a special proceeding. The doctrine of inverse condemnation is derived from the Constitution and is a special proceeding, implemented by specific statutory regulations.

**(5)** Appellate Review § 148--Questions of Law and Fact--Sufficiency of Evidence--General Principles.
In resolving the issue of the sufficiency of the evidence, a reviewing court is bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party and in support of the judgment. All issues of credibility are likewise within the province of the trier of fact. The appellate court ordinarily looks only at the evidence supporting the successful party, and disregards the contrary showing. All conflicts therefore must be resolved in favor of the respondent.

**(6)** Eminent Domain § 146--Remedies of Owner--Inverse Condemnation--Evidence--Sufficiency--Cause of Fire.
In consolidated actions by property owners and insurers against a city department of water and power, substantial evidence supported the trial court's finding, on plaintiffs' cause of action for inverse condemnation, that downed, arcing wires started the fire that damaged plaintiffs' property. Several residents in the area heard loud noises caused by the downed wires, saw them sparking, and witnessed the fire. A fire captain and a private fire investigator concluded that the fire was the direct result of the downed wires. An arson investigator for the city fire department reached the same conclusion, although by the time of trial he had changed his opinion, believing instead the statements of a prisoner who had written a letter to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Secret Service admitting he had set various fires, including the one in question.

(7) Eminent Domain § 136--Remedies of Owner--Inverse Condemnation--Jury Trial--Empanelment of New Jury for Compensation Phase.
In consolidated actions by property owners and insurers against a city department of water and power arising from a fire allegedly caused by fallen power lines, in which actions the cause of action for inverse condemnation was tried to the court, which found in favor of plaintiffs, and the other causes were tried to a jury, which found in favor of the department of water and power, the trial court did not err, after receiving a negative response to its question as to whether the jury would be available to remain for the second phase of the trial (compensation/damages for inverse condemnation), in discharging the jury and empaneling a new jury. Bifurcation is a common and appropriate practice in inverse condemnation trials. Were it not for the fact that there was a negligence cause of action to be tried, there would not have been a jury present during the liability phase of the inverse condemnation proceeding. Normally, a "fresh" jury would have been selected to fix the proper amount of compensation in any event, which is exactly what occurred here.

**(8a, 8b)** Eminent Domain § 142--Remedies of Owner--Inverse Condemnation--Damages--Measure and Elements--Jury's Discretion Where Only Plaintiff Presents Valuation Evidence.
In consolidated actions by property owners and insurers against a city department of water and power arising from a fire allegedly caused by fallen power lines, the jury was free to disbelieve evidence presented by one plaintiff that he suffered losses totaling $549,700 and award him instead compensation of only $1 (which by means of additur was increased to $100,001), and disbelieve the evidence of two other plaintiffs that their losses were $168,299 and award them only $1, even though the department of water and power presented no countervaluation evidence. While a jury cannot disregard the valuation testimony presented at trial, this rule applies only to competent evidence. The trier of fact is not stripped of its role as the arbiter of a witness's credibility merely because the trial is one to set compensation in an inverse condemnation hearing. The jury must first determine whether or not the witness is credible and thereafter determine the weight to be given to the testimony. By awarding a token $1, the jury was sending an unmistakable message that it did not believe plaintiffs' testimony.

(9) Eminent Domain § 142--Remedies of Owner--Inverse Condemnation--Damages--Measure and Elements.
In inverse condemnation proceedings, the usual measure of just compensation is the fair market value of the real or personal property taken, which is generally defined as the highest dollar price that the property would bring if exposed for sale in the open market, with a reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable.

**(10a, 10b)** Eminent Domain § 149--Remedies of Owner--Inverse Condemnation--Appeal--Harmless Error--Instructions--Fair Market Value.
In consolidated actions by property owners and insurers against a city department of water and power arising from a fire allegedly caused by fallen power lines, the trial court did not commit reversible error in modifying a pattern jury instruction on arriving at the fair market value of the damaged property so that it referred only to real property. Plaintiffs contended that this alteration coupled with a failure to instruct on the difference between real and personal property confused the jury into awarding them $1 each. Since the jury returned more favorable verdicts for some of the plaintiffs, in some cases for the exact amount to which they testified, the awards indicated that, independent of the alleged error, the jury understood and applied the correct criteria to compensate for real and personal property losses. Further, even if the modification of the instruction was improper, the error was corrected by the remaining instructions, where the term "property" was used.

**(11)** Appellate Review § 183--Harmless and Reversible Error--Instructions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In determining whether the probable effect of a jury instruction was to mislead the jury and was so prejudicial as to require reversal, the appellate court reviews all circumstances of the case, including the evidence and the other instructions given. There are no precise formulas to follow.

**(12a, 12b)** Eminent Domain § 148--Remedies of Owner--Inverse Condemnation--Attorney Fees--Inclusion of Prejudgment Interest in Calculation.
In consolidated actions by property owners and insurers against a city department of water and power arising from a fire allegedly caused by fallen power lines, the trial court, in awarding attorney fees on a percentage basis to plaintiffs after the jury awarded them $1 each (which in one case was increased to $100,001 by means of additur) on their inverse condemnation cause of action, did not abuse its discretion in refusing to include prejudgment interest in the calculation of the attorney fee award.

**(13)** Eminent Domain § 148--Remedies of Owner--Inverse Condemnation-- Prejudgment Interest.
The underlying rationale for an award of prejudgment interest in an inverse condemnation setting is to provide constitutionally mandated just compensation to persons whose property has been taken or damaged by the government. The right to prejudgment interest accrues on the date of the taking or damaging. If a government pays compensation to a property owner before or at the time property is taken or damaged, no interest is due. But if disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with taking.

**(14)** Eminent Domain § 148--Remedies of Owner--Inverse Condemnation--Judgment--Attorney Fees.
The allowance of attorney fees and witness fees in an inverse condemnation proceeding is not required by the just compensation clause (Cal. Const., art. I, § 19) and is merely permitted by statute. The constitutional mandate to make whole a property owner does not translate into a basis for enriching an attorney fee award.

**(15)** Eminent Domain § 148--Remedies of Owner--Inverse Condemnation--Judgment--Attorney Fees--Application of Uniform Standard to Fee Requests of All Plaintiffs.
In consolidated actions by property owners and insurers against a city department of water and power arising from a fire allegedly caused by fallen power lines, the trial court abused its discretion by applying a uniform standard to all plaintiffs' requests for attorney fees as to their cause of action for inverse condemnation and disregarding the actual dollar impact on the individual plaintiffs. Two of the plaintiffs had a 33 1/3 percent contingency fee agreement with their attorneys. As it did with several other plaintiffs, the trial court awarded attorney fees of 30 percent of the jury verdict to the two plaintiffs. Since these plaintiffs were awarded $1 by the jury, the attorney fee totaled 30 cents. A court is free to award reasonable attorney fees notwithstanding a contract for a contingency fee, and the outcome of the trial is only one of the factors to be considered. An attorney should not be punished for the unbelievability of his or her clients. The fact alone that the trial lasted three weeks indicated that the court could not have exercised its discretion as to the two plaintiffs' request with an awareness of the fractional dollar amount being awarded. However, attorney fees may not be awarded for services on appeal.

COUNSEL
Pat K. Bowen, Cummins & White, Marshall W. Vorkink and Kent M. Bridwell for Plaintiffs and Appellants.
James K. Hahn, City Attorney, Edward C. Farrell, Assistant City Attorney, and Roberta Scharlin Zinman, Deputy City Attorney, for Defendant and Appellant.
**GOERTZEN, J.**
After the 1981 Chatsworth fire, several property owners and insurance companies filed suits against the Department of Water and Power of the City of Los Angeles (DWP) and the City of Los Angeles. [FN1] Pursuant to written stipulation, the actions were consolidated. Included in the various causes of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

action was one for inverse condemnation. With the exception of the inverse condemnation cause of action, the matter was tried to a jury, which found for DWP and against the plaintiffs. Simultaneously, the inverse condemnation cause of action was tried to the court, which found for the plaintiffs. A second jury was impaneled to determine the amount of damages to be awarded to the plaintiffs. The court awarded varying amounts of attorney fees.

FN1 Subsequently, the City of Los Angeles was dismissed as a defendant.

The DWP appeals, contending that substantial evidence is lacking; that the trial court erred when it refused to allow a jury trial on the issue of causation and when it impaneled a second jury to determine the amount of damages. We reject each of these contentions.

The Ransbottom Limited Partnership (Ransbottom) and Ernest and Nelda Marshall (the Marshalls) appeal. Together they assert that the compensation awarded by the jury was inadequate as a matter of law, and prejudgment interest should have been included in the calculation of attorney fees. The Marshalls additionally argue that the court awarded inadequate attorney fees and request that we award attorney fees on appeal. [FN2] With the exception of the Marshalls' contention related to the adequacy of the attorney fees award, we also reject these assertions of error. ***1131**

FN2 Initially 12 plaintiffs appealed. After reaching settlement of their claims, 10 of these appeals have been dismissed.

Underlying Facts

*Plaintiffs' Case*. The Chatsworth fire broke out at approximately 11 a.m. on October 31, 1981. It started in a field near the intersection of Plummer Avenue and Rudnick Avenue.

A series of power poles were located along the northerly edge of Plummer Avenue, including two poles near Rudnick Avenue which were designated 12-West and 13-East, respectively. Those poles were spaced approximately 160 feet apart and each supported 3 primary conductors (wires) which were designed to carry 4,800 volts of electricity. Those wires were part of a power distribution circuit, the purpose of which was to provide electricity to consumers in the northwest section of Los Angeles City. This public improvement was undertaken by DWP, a governmental agency.

Angela Rasmussen and her three children witnessed the fire because they were tending their horses, which were corralled on the property adjacent to where the fire started. The day was windy, very dry and hot. Mrs. Rasmussen heard a zapping sound in the area of Plummer and Rudnick and within 10 to 15 seconds heard her daughter yell, "Fire!" Ms. Rasmussen immediately ran to get the water hose and, when she reached the hose, noticed that the power lines were down and jumping in the street. She saw white, blue, and yellow sparks coming from the wires. The fire was located inside the fence of the adjacent property, running parallel to Plummer Avenue. After the fire was underway, Ms. Rasmussen noticed marks on the pavement made by the downed electrical wires. The fire went across the open field and up the hill. Immediately prior to the fire starting, Ms. Rasmussen did not see anyone either in the open field or in the surrounding area.

Erik Rasmussen was 10 years old at the time of the fire. He was grooming his horse when he heard a loud booming sound. He looked toward the sound, and saw a wire down in the street. Two wires were jumping around in the street and sparking. After he heard his sister yell "Fire," Erik looked back to where the wires were. They were no longer both in the street; one was inside the field, next to the fire. When he first saw the fire, it was just starting and was a circle of about three feet in diameter. The wire was inside the circle of fire. Erik did not see the spark that set the fire. He attempted to smother the fire by shoveling dirt on it.

Monique Rasmussen was 14 years old on the day of the fire. As she was grooming her horse, she heard a big boom or snapping sound coming from behind her. She turned and saw the wires over Plummer Street had broken and were down in the street.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Within 15 seconds she saw the fire on the adjacent property. Monique estimated the fire to be about five feet in *1132 diameter when she first saw it. She noticed that the winds made the wires move, causing them to create a noise, and that the wires would occasionally spark when hitting the ground. Monique never saw a power line in the street showering sparks across into a grassy field. She attempted to fight the fire by shoveling dirt on it.

Several residents of the area heard the sounds made by the downed wires, saw the wires sparking, and witnessed the fire.

Captain Bruce Frashure of the Los Angeles City Fire Department was in command of the first fire engine to arrive at the scene. At that time, he had been employed by the fire department for 12 years, working mostly in fire suppression. Upon arrival at the fire, he noticed "a hot wire down in the street." He also observed burn marks on the pavement. "It appeared that the wires had arced in the street and left ... the mark on the asphalt." He recalled seeing one mark that "resembled a snake going across Plummer from what appeared to be a hot wire" toward the place where the fire had started. Based upon his observations, Captain Frashure believed that the fire had originated near the corral fence at Plummer and Rudnick, in the brush about five to ten feet from the edge of the roadway surface on Plummer.

At two different times that day, Captain Frashure examined the area to determine where the fire had started. On both occasions, he searched for possible sources of fireworks, flammable liquids, incendiary devices or "anything that could possibly ignite a fire. " He found none. Finding no source of ignition and hearing no one describe any suspicious activity, Captain Frashure made the initial determination that the fire probably had been caused by the arcing wires. This remained his opinion at the trial.

With regard to flammable liquids, Captain Frashure "kicked up the dirt looking for every possibility of moist spots underneath the area" and also used his nose. He explained, "[i]f they had used incendiary flammable liquids in the area, I am pretty sure I would be able to smell it." Based on his experience, Captain Frashure opined that the fire's origin, within a five-foot radius, was near the corral at Plummer and Rudnick, placing it off the pavement and in the grassy area. He also determined that the broken power line was long enough to reach into the area.

Cyrillis W. Holms, Jr., is a private fire investigator with substantial experience in his field. He was retained by Cummins & White, the law firm representing the insurance plaintiffs, to conduct an investigation of the Chatsworth Fire. He personally examined the scene on two occasions, taking photographs, checking for burn patterns, and identifying the structure *1133 which had been consumed in the fire. He began walking along Plummer and worked his way back and forth across the field.

At about 30 or 40 locations, he got down and looked for "burn indicators." These are minor obstructions, such as dirt clods, cans, fence posts, or other objects, which tend to protect adjacent material from the advancing flames. These create a " shadow" effect or difference of heat intensity, thereby leaving telltale evidence of the fire's direction.

Mr. Holms identified and interviewed several witnesses, including residents of the fire area and the Rasmussen family. In addition, he reviewed the transcript of Captain Frashure's deposition, as well as the report of the Fire Department arson investigator.

Based upon his investigation and prior experience, Mr. Holms concluded that the fire "was a direct result of the downed power lines generating the heat to cause ignition of the grass." In his opinion, it did not make any difference whether the heat had been caused by sparking or arcing. He noted that either end of the broken power line could have produced an electrical arc. He opined that the fire had originated in the northeast corner of the field, spreading west and south from there.

William Cass was employed as an arson investigator for the Los Angeles City Fire Department and was assigned to investigate the Chatsworth fire of October 31, 1981. At the time of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trial, he had investigated in excess of 2,300 fires for cause and origin. On November 3, 1981, he and his partner examined the scene. They walked through the area, looking for possible sources of ignition. They examined the probable area of origin, walked back to the base of the hill, and found no possible sources of ignition.

Investigator Cass observed some apparent burn or scorch marks within two distinct areas of the pavement on Plummer Avenue. With the use of a measuring tape, he further determined that the broken wire from pole 12-West was long enough to reach into the adjacent field where the fire had apparently started. He also interviewed two witnesses. Based upon these inquiries, Inspector Cass formed the opinion that "a downed power line had started the fire."

When he was called to testify at trial, Inspector Cass had changed his opinion. He testified that the fire had been deliberately set by one Douglas Ray Mordue (Mordue). [FN3] In July 1986, his office received information that *1134 Mordue, who was then serving a prison sentence for forgery, had written a letter to the Secret Service, admitting that he had set various fires, including the Chatsworth fire.

> FN3 Until Inspector Cass's testimony, the plaintiffs did not know of the existence of Mordue. The court asked the DWP counsel when DWP had first learned about Mordue and was informed that DWP knew of him since September 25, 1986, almost two years before trial. DWP did not believe it had a duty to disclose the existence of Mr. Mordue to the plaintiffs. The court was not in accord.

Investigator Cass interviewed Mordue in prison on two occasions. Mordue confessed to having set the Chatsworth brushfire. However, Cass was skeptical about the truth of Mordue's claims because some of Mordue's statements proved to be false, and his story changed between the first and second interviews. At times, Investigator Cass doubted Mordue's truth and veracity. Nonetheless, he believed Mordue with respect to the Chatsworth fire because of his "detailed information" and his " familiarity with the area and the terrain." However, Mordue's family home was in nearby Canoga Park, south of the Chatsworth Reservoir. Apparently, Mordue had attended both church and school in the area and had lived there for approximately 18 years. Mordue previously worked at a location due east of where the fire occurred.

During the course of his confessions, Mordue repeatedly expressed a desire to remain in an institutional setting. Investigator Cass believed Mordue was telling him about the fires to "make sure he stayed within the prison system." Mordue confessed to Investigator Cass that he had falsely confessed to brushfires in the past. He also described himself as a "paranoid schizophrenic," and he reportedly heard "voices."

Douglas Mordue was called as a witness. According to his testimony, he set four fires in the brush area near Plummer on October 31, 1981. During his earlier confession, Mordue had mentioned setting five different fires. He claimed to have set four separate fires along the base of the hill then walked down and started the fifth at a point close to the corral, using gasoline each time. At trial, Mordue testified that he used a special "chemical" that he had obtained from a friend. Unlike every other percipient witness, Mordue described the wind on that day as not very strong. Originally, Mordue had told Investigator Cass that he had been accompanied by a Luke Decinso when he set the fires. He also told a friend about having helped to save his grandmother's house from the fire. Investigator Cass eventually determined that no person named Luke Decinso actually existed, and that Mordue's grandmother did not live in the vicinity of the fire.

Frank D'Andrea, a resident of Rudnick Avenue on the day of the fire, lived across the street from where the fire started. He had a panoramic view of the fire scene. Other than the one fire near his home, Mr. D'Andrea did not see any smoke or fires at any other location. *1135

Steven Lang lived next door to Mordue on the day

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the fire. He had known Mordue for about 18 years and was familiar with Mordue's reputation for not telling the truth. According to Mr. Lang, "[Mordue] likes to tell tall tales."

Mordue's mother described Mordue as a "pathological liar" and testified that he had been diagnosed as such by a doctor.

*DWP Defense.* Benjamin Renfro, a retired fireman with over 30 years experience, was hired by DWP to investigate the fire scene. After visiting the location and interviewing witnesses, he was unable to form an opinion as to the exact point where the fire started. He opined that the cause was incendiary and not related to the downed wires.

Lee Lawhead, a DWP employee, testified about the behavior of the downed wires, concluding that it was unrealistic and not in conformance with physical evidence to conclude that the wire from pole 12-West could have come down in the field in the grassy area. Based on tests that Mr. Lawhead had performed, he opined that it was not possible that sparks created at the subject site could have caused a fire.

Patrick McGuiness, a self-employed fire consultant who had been a fire fighter for 23 years, was hired by DWP. In July 1985, he began his investigation. He read reports, interviewed witnesses, listened to fire department tapes to check time sequences, and formed the opinion that there was more than one area of origin of the fire.

Dr. Cheng, a 12-year employee of the University of Southern California electrical engineering department, was retained by DWP in July 1985. He testified about the effect of gravity upon the direction in which pole wires would fall. He opined that it was not possible for the wire to have reached beyond the fence to the field, nor did he believe that the wire from a 4,800-volt line could create a fire or that the temperature from a spark would be hot enough to create a fire.

As a consequence of the fire, real and personal property was destroyed. A more complete description of these losses will be included below in the discussion of the plaintiffs' appeals.

Procedural History

As noted above, two separate actions were filed against DWP. The first complaint, filed on September 13, 1982, was a joint pleading on behalf of, among others, the Marshalls and Ransbottom. In addition to specified *1136 actual damages, each of the plaintiffs sought to recover prejudgment interest, costs of suit and, with respect to the inverse condemnation, litigation expenses including attorney fees. The second action commenced on April 13, 1983.

After consolidation, the complaint alleged causes of action for "dangerous condition" under the Tort Claims Act; product liability; inverse condemnation; dangerous condition, failure to discharge mandatory duties; nuisance; and "public employee or independent contractor."

On October 14, 1986, several plaintiffs filed a motion to sever the inverse condemnation matter from all other issues. The motion was denied. On October 23, 1986, DWP requested a jury trial on the issue of proximate causation during the inverse condemnation trial. The court denied this request.

On October 14, 1986, the trial began. A jury was impaneled to hear the issues relating to the tort causes of action while the court heard the inverse condemnation cause of action.

On October 31, 1986, after presentation of evidence and argument, outside the presence of the jury, the court ruled against DWP on the issue of the inverse condemnation. [FN4] *1137

FN4 In making its ruling, the court commented as follows: "[Counsel], you say that this is a case of coincidences. I think it would have to be the most incredible coincidence for this fire to have started at Plummer and Rudnick at that corral near downed power lines that was [*sic*] sparking and arcing, leaving arc marks

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that were seen in the field for it to have been caused by any other source than those downed power lines. [¶] It is not just wires down and the conclusion, then, that wires started the fire, as you suggest, but, in fact, it is wires down, it is a fire, and an investigation that concludes that there is no other cause of that fire. [¶] This court concludes that the plaintiffs have proved their case by the preponderance of the evidence. I am satisfied that the fire, in fact, began at the point of origin - or area origin [which] was the southeast [*sic*] corner of the field adjacent to the corral and that the fire was caused by electrical sparks emanating from the downed power lines owned and maintained by the Department of Water and Power. The fire then spread due to the prevailing wind conditions. [¶] The plaintiffs have satisfied me from their evidence that the fire started from those downed power lines. Three persons who were closest to the fire were the three Rasmussens. Although Mrs. Rasmussen indicated ... she saw - first saw the fire 41 feet inside the field, her daughter Monique, who was the first person to see the fire, testified that the fire started 10 feet from the field. Whether it is 10 or 41, I don't think is that terribly significant. I believe that Erik Rasmussen was telling the truth when he said he saw the wire go into the field. [¶] Dr. Cheng did not convince me that it was impossible for that to happen. I thought his [Erik's] testimony was credible. There was absolutely no reason for him to make that up. [¶] As I indicated to you earlier, what D'Andrea saw, what Mrs. Nottoli saw, and what Mr. Soltis saw are not inconsistent with the Rasmussens, but rather they saw the fire and the activity of the wires sometime after the fire had begun. Immediately after Captain Frashure arrived, who was the first expert to arrive on the scene, he also indicated that the area of origin of the fire was in the southeast [*sic* ] corner of the field, that he saw the downed power lines on the south side of the street. [¶] .... [¶] Northeast corner of the field. ... [¶] I just made a mistake. ... [ ¶] His testimony was that he made an investigation and his investigation was not a casual investigation. He investigated that entire area, could find no other source of or cause of the fire. [¶] .... [¶] Cass also immediately investigated the fire, it was within days, and he also concluded that the fire was caused by the downed power lines. His opinion did not change for some five years, until he interviewed Mr. Mordue. And, as I indicated before, he relied on Mr. Mordue's confession for the following reasons: One, Mordue was familiar with the area. Two, he presented a knowledge of the weather conditions, although his knowledge, at least in court, was inconsistent with what I think is true, and that is that there was heavy winds that day. He [Cass] also was impressed that he had specific knowledge of the distance between houses, that he knew the dairy was open and that he had knowledge of the location and types of fences around the area of Plummer and Rudnick. [¶] All of that can be explained by the fact that Mr. Mordue lived in the area and, in fact, went to school near this area and apparently passed it often. [¶] As I indicated, his testimony is inherently incredible. ... [¶] And there is certainly testimony from his mother that he is not a truthful person. [¶] His demeanor was not truthful. He was inconsistent with what he had told Mr. Cass, and I think he's lying. [¶] .... [¶] The experts' opinion as to the cause of the fire, I am impressed with the people that were there immediately following the fire, and it seems to me that it could not have come from any other source but those downed power lines."

The trial continued on the issue of dangerous condition. The jury returned a verdict in favor of DWP. After the jurors had been polled, they were informed that a second phase of the trial was scheduled to commence on the issue of damages on the inverse condemnation action. The court inquired

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

if the jurors would be available to sit during the second phase; they responded negatively. The jury was dismissed without objection.

The second phase of trial commenced and a new jury was impaneled. In pertinent part, the jury awarded $1 in damages to the Marshalls. The jury also awarded $1 to Ransbottom, which by means of additur was increased to $100,001 after he moved for a new trial.

In response to the various memoranda submitted for awards of costs and attorney fees, the court refused to include prejudgment interest as part of the judgment when it calculated the amount of attorney fees. In pertinent part, the court awarded Ransbottom attorney fees in an amount representing 25 percent of the judgment and the Marshalls attorney fees in an amount representing 30 percent of the judgment. FN5 ***1138**

> FN5 In pertinent part, the order awarding prejudgment interest and attorney fees provided: "With respect to attorneys' fees, the plaintiffs have requested the court to award fees pursuant to C.C.P. § 1036, based on either their hourly rate, as applied to actual hours spent, or upon their contingency fee contract, as applied to the damages awarded by the jury, plus prejudgment interest. Each set of plaintiffs filed with the court, and the court has considered, for each plaintiff, one or more declarations setting forth the following information: [¶] 1. The number of hours actually expended by each lawyer and others at his law firm, [¶] 2. The reasonable hourly rate normally charged by said attorneys, [¶] 3. The novelty and difficulty of the issues involved in this case, [¶] 4. The skill and experience of each attorney, [¶] 5. The extent to which working on this litigation precluded other employment by the attorney, [¶] 6. The terms of the contingent fee arrangement between each attorney and his client(s), and; [¶] 7. The result obtained by the attorney. [¶] In addition, the court considered the fact that three days of the trial did not involve the issue of inverse condemnation. [¶] .... [¶] Plaintiffs are not entitled to have the percentage of attorneys' fee awarded herein applied to the amount of prejudgment interest awarded herein. Such an award would result in an enormous and inequitable windfall to the attorneys."

The DWP Appeal

Issues on Appeal

DWP contends that: (1) the trial court erred when it denied DWP's request for a jury trial on the issue of causation on the inverse condemnation cause of action; (2) substantial evidence is lacking to support the court's determination that the fire was started by the downed power lines; and (3) it was error to impanel a second jury to decide the issue of damages. We reject each of these assertions of error and affirm the judgment against DWP.

Discussion

We begin with a brief overview of applicable law. (1 ) An action for inverse condemnation "is an eminent domain proceeding initiated by the property owner rather than the condemner. The principles which affect the parties' rights in an inverse condemnation suit are the same as those in an eminent domain action. [Citations.]" (*Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 663, fn. 1 [39 Cal.Rptr. 903, 394 P.2d 719].) "The authority for prosecution of an inverse condemnation proceeding derives from article I, section 19, of the California Constitution." (*Holtz v. San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 652 [131 Cal.Rptr. 646, 552 P.2d 430].) FN6 The doctrine has been summarized as follows: "Article I, section 19 (formerly art. I, § 14) of the California Constitution requires that just compensation be paid when private property is taken or damaged for public use. Therefore, a public entity may be liable in an inverse condemnation action for any physical injury to real property proximately caused by a public

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

improvement as deliberately designed and constructed, whether or not that injury was foreseeable, and in the absence of fault by the public entity. [Citations.]" (*Souza v. Silver Development Co.* (1985) 164 Cal.App.3d 165, 170 [ 210 Cal.Rptr. 146].)

FN6 In pertinent part, article I, section 19, provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

Although historically stated in terms of real property, inverse condemnation also has been extended to compensate for the loss of personal property. (*Aetna Life & Casualty Co. v. City of Los Angeles* (1985) 170 Cal.App.3d 865, 877-878 [216 Cal.Rptr. 831].) (2) The primary question is whether *1139 there has been a "taking" in terms of property damage, destruction, depreciation in market value, or dispossession of the owner. ( *Olson v. County of Shasta* (1970) 5 Cal.App.3d 336, 341 [85 Cal.Rptr. 77].) This includes losses due to fire. (*Aetna Life & Casualty Co. v. City of Los Angeles, supra*, 170 Cal.App.3d at pp. 873-874 .) Any governmental entity may be liable for inverse condemnation, even agencies which lack eminent domain authority. (*Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 866-867 [218 Cal.Rptr. 293, 705 P.2d 866], cert. den. (1986) 475 U.S. 1017 [89 L.Ed.2d 314, 106 S.Ct. 1200].)

In order to establish an actionable "taking," the plaintiff must demonstrate a causal relationship between governmental activity and the property loss complained of. (*Souza v. Silver Development Co., supra*, 164 Cal.App.3d at p. 171.) Typically, this element is referred to as "proximate cause." Unlike the corresponding element in negligence cases, however, foreseeability is not a consideration for inverse condemnation. Instead, a governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause of the plaintiff's damages even if only one of several concurrent causes. (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558-559 [253 Cal.Rptr. 693, 764 P.2d 1070].)

With this summary as background, we turn to the issues before us.

1. *Jury Trial and Issue of Causation.* As noted in footnote 6, *ante*, article I, section 19, of the California Constitution provides that in an eminent domain proceeding the just compensation to be awarded is "ascertained by a jury unless waived." Either party has right to demand a jury trial on the ultimate issue of "just compensation."

Eminent domain proceedings often present issues of fact in addition to the question of whether there has been a "taking." (See *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 964 [218 Cal.Rptr. 839].) (3) The role of a jury and the court in an eminent domain proceeding where issues of fact arise was explained in *People v. Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799], as follows: "When the proceeding comes on for hearing all issues except the sole issue relating to compensation, are to be tried by the court, and if the court does not make special findings on those issues its findings thereon are implicit in the verdict awarding compensation. [Citations.] .... 'It is only the "compensation," the "award," which our constitution declares shall be found and fixed by a jury. *All other questions of fact, or of mixed fact and law, are to be tried, ... without reference to a jury.* [Citation.]'" (Italics added.) *1140

The right to a jury trial on the issue of compensation applies as well in an inverse condemnation proceeding. (*Highland Realty Co.* v. *City of San Rafael* (1956) 46 Cal.2d 669, 683 [298 P.2d 15].) Various cases have held that where determination of liability involves a mixed question of law and fact, the "Eminent Domain Rule" applies, and the only issue to be determined by the jury is compensation. (*Orpheum Bldg. Co.* v. *San Francisco Bay Area Rapid Transit Dist.* (1978) 80 Cal.App.3d 863, 868 [146 Cal.Rptr. 5].)

(4) The question presented by this appeal is: In an inverse condemnation proceeding where liability is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

completely a factual question, does the plaintiff have a right to a jury trial on the issue of liability? We answer, "No."

DWP objects, arguing that while causation is never an issue in eminent domain proceedings, it is the critical question in this inverse condemnation proceeding; that the eminent domain legal question, "Is there a taking?," differs from the factual inverse condemnation question, "What caused the fire?" This difference, DWP insists, mandates a jury trial. We acknowledge that the questions are distinct but cannot accept the result which DWP proposes. A myriad of cases exists where the trial court has decided other factual issues arising in eminent domain and inverse condemnation proceedings. (See, e.g., *People v. Ricciardi, supra*, 23 Cal.2d 390; *Belair v. Riverside County Flood Control Dist., supra*, 47 Cal.3d 550; *Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73 [185 Cal.Rptr. 159]; *Orpheum Bldg. Co. v. San Francisco Bay Area Rapid Transit Dist., supra*, 80 Cal.App.3d 863.)

The rule was succinctly stated in *Redevelopment Agency* v. *Tobriner* (1984) 153 Cal.App.3d 367, 376 [200 Cal.Rptr. 364], certiorari denied (1984) 469 U.S. 882 [83 L.Ed.2d 187, 105 S.Ct. 250]: "The determination of whether an inverse taking has occurred is a nonjury question, *even when there are factual questions involved.* [Citation.]" (Italics added.) Nothing DWP argues convinces us that this rule should not apply even when the factual issue is causation. Time and again, our trial courts act capably and fairly as triers of fact.

We are aware of several inverse condemnation cases where the jury was allowed to determine factual issues other than compensation. (See, e.g., *Tri-Chem, Inc. v. Los Angeles County Flood Control Dist.* (1976) 60 Cal.App.3d 306 [132 Cal.Rptr. 142]; *Stone v. City of Los Angeles* (1975) 51 Cal.App.3d 987 [124 Cal.Rptr. 822].) Pointing to *Stone*, DWP contends that the appellate court specifically approved of this procedure. Our reading of the *Stone* case does not lead us to the same conclusion. The *Stone* court did not ***1141** directly discuss the propriety of the trial court submitting factual issues, other than compensation, to the jury. Instead, the procedure seems to have been accepted as a fait accompli, and the court proceeded to address the admissibility of certain evidence and whether certain considerations were taken into account. The court's silence does not support the giant step proposed by DWP, that is, a holding that a plaintiff has a *right* to a jury determination of factual issues other than compensation.

We hold that in an inverse condemnation proceeding, the parties have a right to a jury trial solely on the issue of compensation. All other determinations related to the inverse taking, whether purely factual or a mixture of factual and legal, are nonjury questions. If the trial court is so inclined and the parties agree, or if the parties so stipulate and the court agrees, other factual issues may be submitted to the jury. (See discussion in *Orpheum Bldg. Co. v. San Francisco Bay Area Rapid Transit Dist., supra*, 80 Cal.App.3d at p. 868 .)

Our holding is further supported by the general rule that absent a specific statutory or constitutional requirement for a jury trial, there is no such right in a special proceeding. (*Taliaferro* v. *Hoogs* (1965) 236 Cal.App.2d 521, 529 [46 Cal.Rptr. 147].) The doctrine of inverse condemnation is derived from the constitution and is a special proceeding, implemented by specific statutory regulations. ( *County of San Diego v. Miller* (1980) 102 Cal.App.3d 424, 432-433 [162 Cal.Rptr. 480].)

2. *Substantial Evidence.* In propounding its contention that substantial evidence is lacking to support the trial court's conclusion that the downed power lines caused the fire, DWP focuses solely on evidence which it presented in defense. The rules on appeal render this focus totally inappropriate.

(5) "In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment. [Citation.] All issues of credibility are likewise within the province of the trier of fact. [Citation.] 'In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*disregards the contrary showing.*' [Citation.] All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]" (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480], italics in original.) (6) Without repeating it all, we conclude that the evidence summarized above provides the requisite substantial evidence to support the court's determination that the downed, arcing wires started the fire. *1142

3. *Impaneling the Second Jury*. (7) DWP asserts that the same jury panel which heard the first phase of the trial should have been retained to hear evidence on the issue of compensation/damages.

As noted above, the original jury was impaneled to determine the issue of liability for "dangerous condition." It returned a verdict in favor of the DWP on that issue. Afterwards, the trial court asked if those jurors would be available to remain for the second phase of the trial. The record indicates a negative response; consequently, the jury was discharged.

We fail to see what prejudice, if any, DWP suffered. Bifurcation is a common and appropriate practice in inverse condemnation trials. ( *Redevelopment Agency v. Contra Costa Theatre, Inc., supra*, 135 Cal.App.3d at p. 80.) Were it not for the fact that there was a negligence cause of action to be tried, there would not have been a jury present during the liability phase of this inverse condemnation proceeding. Normally, a "fresh" jury would have been selected to fix the proper amount of compensation in any event, which is exactly what occurred here. There was no error.

Ransbottom and Marshall Appeal

Issues on Appeal

On appeal, Ransbottom and the Marshalls assert that the compensation awarded was inadequate as a matter of law and that prejudgment interest should have been included in the calculation of the award of attorney fees. The Marshalls further assert that the trial court awarded inadequate attorney fees and request that we award attorney fees on appeal.

Facts Related to Damages

*The Ransbottom Property*. Jack G. Ransbottom is a builder and developer and has been in the construction business for 30 years. Over approximately a nine-month period, he had purchased six lots, totalling fifty-eight acres, in the fire area. He planned to subdivide the parcel into 70 separate lots, 24 for horsekeeping and 46 as "estates." There were several homes on the property at the time of the fire. The fire destroyed 50 percent of the property, including trees and homes.

With regard to the 9435 Shoup Avenue property losses, Mr. Ransbottom testified as follows: residence replacement - $277,682; cost of landscaping - $168,924, with the oak trees valued at $39,747; metal horse stable value - $3,500; wood fencing value - $4,080 and 1,500 feet of burned barbed wire value - $2.50 a lineal foot; office fixtures stored in the house value - *1143 $11,500; personal property and furnishings estimate value - $5,000. The total amount claimed for this property was $520,183. Mr. Ransbottom had received a $100,000 policy limit payment from his insurance company.

With regard to the 22350 Plummer Street property, Mr. Ransbottom testified as follows: no replacement cost as the building did not burn down; smoke damage - $3,500, of which $1811.80 was paid by his insurance company; landscaping cost - $64,788; damage to the oak trees - $22,670; 1540 feet of burned barbed wire value - $2.50 a lineal foot. The total net damage was $92,996.20.

With regard to the 22506 Plummer Street property, the only claim was for $12,551 for damage to oak trees.

With regard to the 22522 Plummer Street property, the only damage was to oak trees in the amount of $23,970.

The value of the raw land before the fire was valued

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by Mr. Ransbottom at $6 million.

James Shanahan, a consulting arborist, worked for the DWP from 1946 until his retirement in 1980. He had previously been called upon to testify as to the value of trees. In December of 1981, Mr. Ransbottom contacted Mr. Shanahan and asked him to evaluate the trees on his property. Mr. Shanahan formulated a list showing salvageable and damaged trees. The estimate to the damage to all the trees on the Shoup property was $102,338. The value of the trees lost at 22350 Plummer was $38,231. As to the 22522 Plummer location, the value of the trees lost was $36,210, and as to the 22506 Plummer property, the fire loss was estimated at $12,551.

On cross-examination, Mr. Shanahan admitted that he had presumed the trees to be healthy because he had not received information to the contrary. Based on new information, he adjusted some of the values downward. FN7

FN7 The value figures related above reflect this adjustment.

Efraim Donity, a landscape consultant and horticultural and irrigation consultant, was hired by Mr. Ransbottom to evaluate damages to landscaping and houses after the fire. He did not include the evaluation of damaged oak trees in his study. As to the 9435 Shoup Avenue property, he estimated $300 to prune back damaged bushes, $60,000 to replace three acres of shrubbery, and miscellaneous charges, all of which totalled $151,174. On 22350 Plummer property, he estimated a total of $61,358. ***1144**

At the time of the fire, Roger Rudenbush lived in the guest house at 9435 Shoup and served as a caretaker for the property. He had noticed that office furniture, such as desks, chairs and typewriters, and lumber were stored in the main residence.

*The Marshalls' Property*. On the day of the fire, the Marshalls lived at 22719 Michale Street, Canoga Park. Their home was burned down to the foundation, and all of their personal property was destroyed. A workshop and its contents were also destroyed as were trees and other landscaping. The Marshalls had lived in their home less than one year prior to the fire. The Marshalls' insurance company paid the cost of rebuilding their residence and their excess living expenses. This figure totalled $213,529. They testified to uninsured losses totalling $165,728.59.

On cross-examination, Mr. Marshall stated that the house which was destroyed was about 1,800 square feet and included 3 bedrooms, 2 1/2 baths, a living room, a dining room, kitchen, service porch and garage. He claimed to have lost hundreds of books, which he valued at $10,000.

Mrs. Marshall owned several collections, including silver spoons, stamps (valued at $500), coins (valued at $500), thimbles (valued at $350), and antique napkin holder rings (valued at $500). After the fire, she attempted to locate her jewelry, but it was either lost or found in pieces. Pieces of the 100-piece spoon collection were also found in the ashes. She estimated their losses, over and above the insurance, at $165,728.59.

On cross-examination, Mrs. Marshall testified that she had purchased the living room furniture in 1980, prior to moving into the house. The furniture had an estimated value of $11,500. She could not recall where she had purchased the furniture or if it came from more than one store. She probably paid for it both with cash and on credit. Mrs. Marshall estimated the value of the dining room furniture at $10,700. She purchased it in 1979 but could not recall where or how much she had paid for it. The family room furniture, purchased in 1977 at an unknown location, was estimated at $8,000. Mrs. Marshall could not recall if she paid cash or charged it. She estimated the television room furnishings to be valued at $8,500, the guest bedroom furnishing at $6,900, and the master bedroom furnishings at $8,800. Mrs. Marshall had prepared an extensive list of items lost in the kitchen, including $250 for "kitchen gadgets" and $200 for vitamins. She valued a loss of over 300 records at $3,410. She also claimed to have lost 50 pairs of shoes.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Chris Verhaegh, a professional numismatist (rare coin dealer), appraised some French 20-franc gold coins which were like those claimed as lost by ***1145** the Marshalls. A less valuable coin had a " melt" value of $150. In 1981, the catalog value of the coins was from $150 to $175 each.

DWP presented no affirmative defense as to the value of the property loss suffered either by Ransbottom or the Marshalls.

The Marshalls' motion for a directed verdict was denied as was their motion for a new trial.

Discussion

*Adequacy of the Compensation Award.* According to the uncontradicted evidence adduced at trial, Ransbottom suffered losses totalling $549,700. The jury awarded Ransbottom $1, which by means of additur was increased to $100,001. According to the uncontradicted evidence adduced at trial, the Marshalls suffered losses totalling $168,299. The Marshalls were awarded $1, and their motion for a new trial was denied. Both Ransbottom and the Marshalls argue that their respective damage awards are inadequate as a matter of law. Alternatively, they assert that prejudicial instructional error occurred when the court, sua sponte, modified an instruction.

(8a) The question presented by this appeal is: In an inverse condemnation proceeding, when the government agency has presented no counter valuation evidence, is a jury free to disbelieve a plaintiff's valuation testimony and award compensation in an amount less than the losses testified to by the plaintiff?

(9) Both Ransbottom and the Marshalls cite cases which hold that in an inverse condemnation action, the promise of "just compensation" is constitutional in origin; the usual measure of just compensation is the fair market value of the real or personal property taken, which is generally defined as the highest dollar price which the property "would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable." (*Sacramento etc. R.R. Co. v. Heilbron* (1909) 156 Cal. 408, 409 [104 P. 979]; see also *Holtz v. Superior Court* (1970) 3 Cal.3d 296, 303-304 [90 Cal.Rptr. 345, 475 P.2d 441]; *Klopping v. City of Whittier* (1972) 8 Cal.3d 39, 43 [ 104 Cal.Rptr. 1, 500 P.2d 1345].) No one disputes the validity of these holdings.

(8b) Disagreement ensues with the next part of the argument. Ransbottom and the Marshalls further contend that in an inverse condemnation suit, the plaintiff sets the ceiling of compensation and the government agency, through the presentation of counter evidence, sets the floor. Here, they ***1146** assert, the government agency failed to set the floor because it presented no affirmative evidence about the value of the property lost; consequently, the jury could do nothing but award them the amount of losses to which they testified. To support this proposition, Ransbottom and the Marshalls, among other cases, cite *Aetna Life & Casualty Co. v. City of Los Angeles, supra*, 170 Cal.App.3d 865.

The *Aetna* case involved a suit brought by property owners and their respective insurance companies against the DWP for property losses suffered as a consequence of the 1978 Mandeville Canyon fire. ( 170 Cal.App.3d at p. 872.) After the DWP failed to present affirmative evidence on valuation, the trial court granted the plaintiffs' motion for directed verdict. Among other things, on appeal DWP argued that the granting of the motion was erroneous. Writing for division 2 of this court, Justice Compton reiterated the rule governing the granting of a motion for a directed verdict [FN8] and affirmed the trial court's action, stating: "A jury hearing a condemnation action may not disregard the evidence as to value and render a verdict which either exceeds or falls below the limits established by the testimony of the witnesses. [Citations.] The trier of fact in an [inverse condemnation] action is not an appraiser, and does not make a determination of market value based on its opinion thereof. Instead it determines the market value of the property, based on the opinions of the valuation witnesses. [Citation.] [¶] ... [¶] Any deviation from the evidence by the jury would have been

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

improper." ( *Id.*, at pp. 877-878.) The *Aetna* court did not discuss credibility as it apparently was not an issue.

FN8 As stated by the *Aetna* court, the rule is: "A directed verdict is proper only when, after disregarding conflicting evidence and giving the opposing party's evidence every legitimate inference which may be drawn therefrom, there remains no evidence of sufficient substantiality to support a verdict in favor of the opposing party. [Citation.] Unless it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence and that any other holding would be so lacking in evidentiary support that a reviewing court would be compelled to reverse on appeal, or a trial court to set it aside, the trial court is not justified in taking the issue from the jury. [Citation.]" ( *Id.*, at p. 876.)

In support of their assertion that a jury cannot disregard the valuation testimony presented at trial, Ransbottom and the Marshalls also cite *County of Los Angeles v. Kling* (1972) 22 Cal.App.3d 916, 923 [99 Cal.Rptr. 642]; *Ventura County Flood Control Dist. v. Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1002 [93 Cal.Rptr. 653]; *Redevelopment Agency* v. *Modell* (1960) 177 Cal.App.2d 321, 326-327 [2 Cal.Rptr. 245]; and *People* ex rel. *D. of P. Wks. v. McCullough* (1950) 100 Cal.App.2d 101, 105 [223 P.2d 37].

The language in the *Aetna* case stressed by Ransbottom and the Marshalls was stated in the context of the granting of a motion for a directed verdict. Here, the court denied the Marshalls' motion for a directed verdict *1147 and commented: "I think there is certainly enough examination of your clients to indicate that it is a triable issue of fact as to whether or not all their property was, in fact, in the house and the value of that property, and the motion is denied." In other words, the court could not make the required findings to support a directed verdict. (See fn. 8, *ante*.)

We do not argue with the validity of the rule defining the limits within which the jury must set compensation as stated in *Aetna* and the other cases cited. We point out, however, that as stressed by Ransbottom and the Marshalls, one part of the rule is missing. That is: the only evidence which the jury is not free to disregard is *competent evidence. ( County of Los Angeles v. Kling, supra*, 22 Cal.App.3d at p. 923.) Moreover, "[w]here it appears that the opinion of a valuation witness is based upon considerations which are proper as well as those which are not, the testimony may be admitted and the *trier of fact shall determine its weight and credibility.* [Citation.]" (*Ventura County Flood Control Dist. v. Security First Nat. Bank, supra*, 15 Cal.App.3d at p. 1004, italics added.) Plainly stated, the trier of fact is not stripped of its role as the arbiter of a witness's credibility merely because the trial is one to set compensation in an inverse condemnation hearing. The jury must first determine whether or not the witness is credible and thereafter determine the weight to be given to the testimony. (*San Gabriel Valley Water Co. v. City of Montebello* (1978) 84 Cal.App.3d 757, 765.)

The jury was instructed that it could disregard the testimony of a witness that it did not believe. The DWP's failure to present affirmative evidence, in effect, set a floor of $0. By awarding the token $1, the jury was sending an unmistakable message - it did not believe the testimony either of Ransbottom or the Marshalls. When the court offered additur of $100,000 to Ransbottom and not the full amount testified to during trial, it was sending the same message. [FN9]

FN9 Regarding the additur, the court offered the following reasons: "I am considering an additure [*sic*] for plaintiff Ransbottom in relationship to the house. [¶] I am considering an additure [*sic*] of a hundred thousand dollars. ... [¶] I think he did lose something in the house. I think he has increased it somewhat. [¶] I am not prepared to make any findings that - for anything he presented regarding the landscaping, the stables, the fencing, the wire and the wood fencing. He didn't

> present enough evidence by a preponderance of the evidence to show me what the value of that was. [¶] But I think an additure [*sic*] for the residence of a hundred thousand dollars is appropriate, and I think there was enough evidence on the house alone. It's clear that the house was there and had gone. I am not sure about the fencing."

(10a) Alternatively, Ransbottom and the Marshalls argue that BAJI No. 11.80, modified by the court sua sponte, prejudicially confused the jury. FN10 The court substituted the terms "real property" for the original ***1148** language, "subject property," because it believed that the instruction applied solely to real property. Ransbottom and the Marshalls argue that this alteration coupled with a failure to instruct on the difference between "real" property and "personal" property confused the jury into awarding $1 to each of them. We do not find that the trial record supports this contention.

> FN10 BAJI No. 11.80, as modified, provides: "You must determine the fair market value of real property only from the opinions of the witnesses who have testified. [¶] You may not find the market value of property to be any less or more than that testified to by any witnesses. [¶] While owners and expert witnesses may express opinions on the issue of value, those opinions are worth no more than the reasons and factual data upon which they are based. [¶] Evidence has been received from witnesses of the reasons for their opinions of value, and all other evidence concerning the real property is to be considered only for the limited purpose of enabling [you] to understand and [weigh] the opinions of the witnesses regarding market value, if any. [¶] You must resolve any conflict in the testimony of the witnesses by weighing each opinion against the others, the reasons given for each opinion, the facts relied upon and the credibility and the qualifications of each witness."

To prevail on the basis of an alleged instructional error, a party must establish that but for the instructional error, a different result would have occurred. (Code Civ. Proc., § 475.) (11) "In determining whether the probable effect of a jury instruction was to mislead the jury and was so prejudicial as to require reversal, we review all circumstances of the case, including the evidence and the other instructions given. There are no precise formulas to follow. [Citations.]" (*Maupin v. Widling* (1987) 192 Cal.App.3d 568, 572 [237 Cal.Rptr. 521].)

(10b) One of the circumstances of this case which we find most telling is that the jury returned favorable verdicts for the other individual plaintiffs, some for the exact amount to which they testified. FN11 The awards indicate that, independent of the alleged error, the jury understood and applied the correct criteria to compensate for real and personal property losses. In addition, even if the trial court im properly modified this instruction, the error was corrected by the remaining instructions where the term "property" was used. In defining just compensation, the court charged the jury that it included "reasonable compensation for property lost or destroyed in, or because of, the fire. That amount is the fair market value of such property at the time of its loss or destruction."

> FN11 Other individual plaintiffs were awarded the following damages: Farrens - $78,000; Corliss - $39,652.15; Pincus - $81,186.67; Winners - $11,522; and Romero - $68,755.17.

*Prejudgment Interest*. (12a) Both Ransbottom and the Marshalls contend that in awarding reasonable attorneys' fees on a percentage basis, the trial court should have taken prejudgment interest into account as part of the underlying recovery.

In pertinent part, Code of Civil Procedure section 1036 provides: "In any inverse condemnation proceeding brought for the taking of any interest in ***1149** real property, the court rendering judgment for the plaintiff by awarding compensation for such taking, ... shall determine and award or allow to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such plaintiff, as a part of such judgment ... such sum as will, in the opinion of the court ... reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding." When we review this exercise of the discretionary judgment of the trial court, the well-established principles dealing with discretion and its abuse apply. (*San Gabriel Valley Water Co. v. City of Montebello, supra*, 84 Cal.App.3d at p. 769.)

When ruling that it would not include prejudgment interest in the award of attorney fees, the court commented, "[The attorney fee award] will not include pre-judgment interest. It is an interesting issue that I wish you would take up on appeal, but it seems to me that the purpose of the prejudgment interest is really to protect the private citizen against the taking of his or her property by the government, and really would result in an enourmous [*sic*] windfall to the attorneys, which I think would be inequitable." We are in accord with the court's view.

(13) The underlying rationale for the award of prejudgment interest in an inverse condemnation setting was explained in *Aetna Life & Casualty Co. v. City of Los Angeles, supra*, 170 Cal.App.3d at pages 878-879: "The purpose of an award of prejudgment interest is to provide constitutionally mandated just compensation to persons whose property has been taken or damaged by the government. [Citation.] The right to prejudgment interest accrues on the date of the taking or damaging. [Citation.] [¶] .... [¶] If a government pays compensation to a property owner before or at the time property is taken or damaged, no interest is due. [Citation.] But if disbursement of the award is delayed, ... the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the taking. [Citations.]"

These considerations are markedly different from those underlying an award of attorney fees. (14) As stated in *Holtz v. San Francisco Bay Area Rapid Transit Dist., supra*, 17 Cal.3d at page 658, the allowance of witness fees and attorney fees is not required by the just compensation clause of the California Constitution and is merely permitted by statute. The constitutional mandate to make whole a property owner does not translate into a basis for enriching an attorney fee award.

We are aware of *Parker v. City of Los Angeles* (1974) 44 Cal.App.3d 556 [118 Cal.Rptr. 687], where this court affirmed an attorney fee award which ***1150** was based upon a contingency fee agreement and included prejudgment interest in the calculation. The *Parker* court did not specifically discuss the propriety of including the prejudgment interest in the award and based its affirmance on an abuse of discretion standard. We do likewise. (12b) Here, in the exercise of its discretion, the trial court refused to include the prejudgment interest in the calculation of its attorney fee award. We cannot conclude that this decision constituted a manifest abuse of discretion. FN12

FN12 In its reply brief, Ransbottom states that the court failed to exercise its discretion, believing it had no choice. The court's comments, quoted *ante*, indicate the contrary.

(15) The Marshalls alone assert two further contentions. They argue that the trial court abused its discretion by applying a uniform standard to all plaintiffs' requests for attorney fees and disregarding the actual dollar impact on the individual plaintiffs. They further request that we award them attorney fees on appeal.

The Marshalls had a 33 1/3 percent contingency fee agreement with their attorneys. As it did with several other plaintiffs, the court awarded attorney's fees of 30 percent of the jury verdict to the Marshalls. Since the Marshalls were awarded $1 by the jury, the attorney fee totals $.30. The paltriness of this award leads us to accept the Marshalls' contention.

The court's order awarding attorney fees, quoted *ante* in footnote 5, indicates that the court appropriately considered the number of hours expended by each lawyer, the reasonable hourly rate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

normally charged, the novelty and difficulty of the issues, the skill and experience of each attorney, the extent to which this litigation had precluded other employment by the attorney, the terms of the contingent fee arrangement, and the result obtained by the attorney. (See *Aetna Life & Casualty Co.* v. *City of Los Angeles, supra*, 170 Cal.App.3d at pp. 880-881.)

"The contingent nature of the fee contract is only one element of evidence of the value of the attorney's services; it is not controlling. [Citation.] A court is free to award reasonable attorney fees notwithstanding the contract for a contingent fee. [Citations.]" (170 Cal.App.3d at p. 881.) Moreover, the outcome of the trial is only one of the factors to be considered. An attorney should not be punished for the unbelievability of his or her clients. This was a three-week trial. This fact alone leads us to find that the court could not have exercised its discretion as to the Marshalls' request with an awareness of the fractional dollar amount being awarded. Thus, we remand to the trial court for a reconsideration of the award of attorney fees to the Marshalls.

Lastly, we consider and deny the Marshalls' request that we award them attorney fees on appeal. No authority has been cited for this proposition. In ***1151** fact, *Holtz* v. *San Francisco Bay Area Rapid Transit Dist., supra*, 17 Cal.3d at page 658, held that under the predecessor statute to Code of Civil Procedure section 1036, attorney fees should not be awarded in connection with prosecuting an appeal of an inverse condemnation action.

Disposition

As to the DWP appeal, the judgment is affirmed.

As to the Ransbottom appeal, the judgment is affirmed.

As to the Marshalls' appeal, the matter is remanded to allow the court to reconsider its award of attorney fees. In all other respects the judgment is affirmed.

Each party to bear its own costs on appeal.

Woods (A. M.), P. J., and George, J., concurred.
The petition of all appellants for review by the Supreme Court was denied July 11, 1990. Lucas, C. J., did not participate therein. ***1152**

Cal.App.2.Dist.
Marshall v. Department of Water & Power
219 Cal.App.3d 1124, 268 Cal.Rptr. 559

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.